IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

BROWN JORDAN INTERNATIONAL, )
INC., BJI HOLDINGS, LLC )
BROWN JORDAN SERVICES and )
BROWN JORDAN COMPANY, )
                                        )
          Plaintiffs, )
                                        )
v. )
                                        )
CHRISTOPHER CARMICLE, )
                                        )
          Defendant. )
_____)

## COMPLAINT

Plaintiffs Brown Jordan International, Inc. ("BJI"), BJI Holdings, LLC, Brown Jordan Company ("BJC"), and Brown Jordan Services ("BJS") (collectively, the "Company") allege as follows in connection with their claims against Defendant Christopher Carmicle ("Defendant"):

## INTRODUCTION

1.      Defendant Christopher Carmicle, the former Division President of BJC and BJS, abused his position of trust at the Company by improperly incurring a range of significant expenses on multiple occasions from which he personally benefitted and treating them as "advertising" expenses rather than "travel and entertainment" expenses so that they would not be reviewed by the Chief Executive Officer. Defendant also provided products produced by the Company (outdoor furniture) to family and friends, at unapproved deeply-discounted prices or without charging at all.

2.      Moreover, Defendant unlawfully accessed the e-mail accounts of the Company's Chief Executive Officer, the General Counsel and Head of Human Resources, the

Chief Financial Officer, and numerous other employees. He secretly monitored their e-mail accounts for a lengthy period of time without authorization by using a temporary "dummy" password for an unintended purpose. He thereby accessed attorney-client privileged communications and attorney work product, confidential health information regarding Company employees, business plans and strategies related to divisions of the Company with which he had no involvement, and personal communications with third parties. Defendant knew that, because of his poor job performance, his employment was in jeopardy. He was driven by a desperate search for any information or "dirt" that could give him leverage to save his job. Defendant's actions violate the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, and the Stored Communications Act, 18 U.S.C. § 2701 *et seq.*, as well as his contractual and fiduciary duties to the Company.

3. As a result of his gross misconduct, the Company terminated Defendant's employment on or about February 17, 2014.

## PARTIES AND JURISDICTION

4. The Company manufactures and sells furniture in a wide range of styles and materials worldwide.

5. BJI oversees and owns several companies, including BJC and BJS. BJI is owned by BJI Holdings, LLC. BJI Holdings, LLC is a Delaware limited liability company with its principal place of business in Florida. BJI is a Florida corporation with its principal place of business in Florida. BJC is a Delaware corporation with its principal place of business in Kentucky. BJS is a California corporation with its principal place of business in Kentucky.

6. Defendant Christopher Carmicle worked for the Company from May 2002 until February 17, 2014, when his employment was terminated for cause.

7. Most recently, Defendant held the title of Division President of BJC and BJS.

8. As Division President of those two business units, Defendant had responsibility for the profits and losses of those units, and was responsible for managing operations, product development, sales and marketing, and finance.

9. Defendant worked in Pompano Beach, Florida, until 2006, when he moved to Louisville, Kentucky. He has since returned to Florida on a regular basis for Company business.

10. Defendant reported to Chief Executive Officer and Chairman of the Board Gene Moriarty of BJI from 2005 until his February 2014 termination. Moriarty lives and works in Florida.

11. Fred King is an attorney and serves as the General Counsel of BJI and Head of Human Resources. He is also Secretary of the Board of BJI. King lives and works in Florida.

12. Vincent Tortorici is the Chief Financial Officer of BJI. Tortorici lives and works in Alabama.

13. This Court has jurisdiction over this action under 28 U.S.C. § 1331 because the claims herein are being brought under the laws of the United States, including the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, and the Stored Communications Act, 18 U.S.C. § 2701, *et seq*.

14. This Court has supplemental jurisdiction over Plaintiffs' remaining claims pursuant to 28 U.S.C. § 1367(a) because the claims are so related to the claims for which this Court has federal question jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

15.     Venue in this Court is appropriate, particularly given that the parties have so agreed and waived any objection to this Court being a proper venue. Section 4.7 of Defendant's 2005 Employment Agreement (the "Employment Agreement") states:

> [E]ach party irrevocably submits to the personal and exclusive jurisdiction of any federal or state court of competent jurisdiction located in the County of Broward, State of Florida, in any action or proceeding arising out of or relating to this Agreement, and hereby irrevocably agrees, on behalf of such party's heirs, personal representatives, successors and assigns that all claims in response of such action or proceeding may be heard and determined in any such court.

(Exhibit A, Employment Agreement § 4.7). In addition, Defendant was a resident of South Florida from 2002 to 2006. Defendant also worked in Broward County from 2002 to 2006. Defendant returns to Florida on a regular basis for both business and personal reasons. Further, BJI and BJI Holdings, LLC were headquartered in Broward County until 2006, and are still headquartered in Florida.

## FACTS

**The Company's Policies and Agreements With Defendant**

16.     A leader in a competitive industry, the Company considers many aspects of its business confidential, and takes significant measures to protect the confidentiality of its information.

17.     Defendant signed several agreements with the Company that prohibit him from disclosing confidential information to third parties and require him to return Company information upon termination of his employment. Those agreements include the Employment Agreement Defendant signed in 2005 and two Profits Interest Agreements Defendant signed in 2006 and 2010, respectively (Exhibits B and C).

18. The Employment Agreement that Defendant signed in 2005 provides that he may be terminated "for cause" if he commits one of the following:

> (1) any act or acts constituting a crime involving fraud, embezzlement, misappropriation, theft, breach of fiduciary duty or dishonesty against the property or personnel of the Company or any of its Affiliates;" (2) any felony that carries a prison sentence of at least 5 years"; or (3) "gross negligence or willful misconduct in the performance of [the Defendant's] duties as an employee of the Company that is not cured within seven (7) days following written notice by the Company to the [Defendant] of such gross negligence or willful misconduct, or three (3) occurrences of the [Defendant's] gross negligence or willful misconduct in any twelve-month period.

(Exhibit A, Employment Agreement, Annex I).

19. Defendant's Profits Interest Agreements with the Company in 2006 and 2010 contain the following definition of a "for Cause" termination:

> Cause shall (a) have the same meaning as used in any employment agreement between the Company or any subsidiary and the [Defendant], and (b) if there is no such employment agreement between then in effect, mean a termination of the [Defendant's] employment by the Company or its subsidiaries due to the [Defendant's] (i) continued failure to perform his essential job functions, (ii) commission of a felony or any misdemeanor involving moral turpitude, (iii) material violation of any written policy of the Company or of any confidentiality, non-solicitation, non-competition or other similar agreement with the Company, (iv) misconduct in the performance of his duties with the Company or its subsidiaries, or (v) failure to fully cooperate in any audit or investigation involving the Company or its subsidiaries. Any good faith determination by the Board the [Defendant's] termination is for 'Cause' pursuant to clause (b) above shall be conclusive and binding upon all parties.

(Exhibit B, 2006 Profits Interest Agreement, § 2.3; Exhibit C, 2010 Profits Interest Agreement, § 2.2).

20. The Company maintains a policy generally prohibiting access to employees' e-mail accounts.

**Defendants' Misuse of Company**
**Funds and Violations of Company Policies**

21. Moriarty, King and BJI's Board of Directors had concerns about Defendant's performance, competency and judgment during the last several years of Defendant's employment, and those concerns heightened throughout 2013. Moriarty, King, and Tortorici also discovered, at the very end of 2013 and in early 2014, that Defendant had engaged in substantial misuse of Company funds, particularly during the latter half of 2013. As a result of these concerns, senior management at BJI began to consider seriously terminating Defendant's employment.

22. The Company discovered Defendant's improper use of Company funds in late 2013/early 2014 because of the Company's failure to reach the financial targets set by Defendant (and that were reiterated by Defendant as late as December 2013).

23. Defendant made multiple representations that BJS was going to have an EBITDA profit of $14.4 million for fiscal year 2013. As late as December 2013, Defendant assured his superiors that BJS would make that EBITDA target. Based on Defendant's repeated representations about meeting that EBITDA target, the Company paid out bonuses to various employees and engaged in other financial planning.

24. BJS's final EBITDA profit for fiscal year 2013, however, was $12.5 million, well below the target and what Defendant represented. Because of concerns that BJS had missed its target in such dramatic fashion, the Company began to explore potential causes. In this regard, the Company examined BJS's advertising expenses for 2013.

25. In reviewing BJS' advertising expenses, the Company learned of Defendant's improper characterization of certain substantial payments that Defendant had caused the

Company to make for his personal attendance at prominent sporting events, for personal travel and the like.

26. Under Company policy, "[e]xpense reports must be signed by the employee and reviewed/approved by the employee's manager." Furthermore, "[r]eimbursement for expenses that are not in compliance with this [travel and entertainment] policy requires written approval from the Chief Financial Officer." Defendant's travel and entertainment expenses had to be approved by BJI CEO Moriarty.

27. Defendant incurred a number of purported expenses that, if they were to be charged to the Company at all they should have been submitted for payment through the travel and entertainment expense approval process. Instead, Defendant hid the expenses from proper review by having the Company pay for them out of its advertising budget. (BJS's advertising expenses were not presented to BJI's officers in sufficient detail to reveal specific line-item expenditures). By proceeding in this fashion, Defendant avoided having his boss, BJI CEO Moriarty, review a number of substantial expenses that Defendant incurred on behalf of the Company.

28. For example, at Defendant's direction, the Company paid over $40,000 to the University of Louisville in Defendant's name to purchase basketball seats and to make a donation to the University of Louisville.

29. Also at Defendant's direction, the Company paid $22,000 to the University of Louisville in Defendant's name to purchase football tickets.

30. In addition, at Defendant's direction, the Company paid over $27,000 to purchase a membership at the Churchill Downs Turf Club and to purchase tickets to the 2013 Kentucky Derby. Defendant established the Turf Club account in his name.

31. Also at Defendant's direction, the Company paid more than $16,000 to the Young Presidents' Organization in Defendant's name for dues and conferences and exotic trips with his wife.

32. Defendant also booked a trip for his spouse and himself to travel to Cuba using Company funds. Upon information and belief, Defendant engaged in other travel for which he misused Company funds.

33. Defendant placed all of the above expenditures in the advertising budget.

34. Defendant knew that, had he submitted the above-described expenses as entertainment expenses for CEO Moriarty's approval (in accord with Company policy), they would have been rejected and he would have been forced to pay for them out of his own pocket.

35. None of the above-described expenses were for the purpose of purchasing advertising for the Company or its products.

36. The Company derived no known benefit from the above-described expenditures by Defendant.

37. Defendant, on the other hand, secured substantial lavish entertainment and travel for himself and his spouse as well as membership to exclusive clubs and organizations—in his name, and not that of the Company—all at the Company's expense.

38. The Company estimates that Defendant's above-described improper expenses for his personal benefit exceeded $100,000.

39. Defendant's improper expenses were particularly troubling given the state of the Company's financial affairs at the time they were incurred.

40. Since the termination of Defendant's employment, the Company has also learned that Defendant regularly provided Company product to family and friends at substantial

unapproved discounted prices or without charging anything at all. Defendants' actions contravened Company policy and amounted to theft of Company property.

**Defendant Surreptitiously Accessed and Reviewed**
**Top Officers' and Other Employees' E-mail Accounts**

41. In mid-2013, the Company was transitioning its e-mail systems to a new e-mail provider. As part of that transition, employees in the Company's Louisville office received an e-mail on July 16, 2013, instructing them that each employee could log on to "your" account—meaning, of course, the individual employee's own account—with a generic password.

42. Starting on or about July 16, 2013, Defendant used this generic password to access regularly the e-mail accounts of multiple Company officers and employees without authorization, including BJI CEO Moriarty, BJI General Counsel and Head of Human Resources King, BJI CFO Tortorici, and a number of Defendant's subordinates. Significantly, Moriarty, King and Tortorici were Defendant's superiors—under no theory did he have any right whatsoever to monitor their confidential e-mail communications.

43. Defendant repeatedly rummaged through folders in these e-mail accounts, including the in-box, sent items and deleted items folders. Furthermore, Defendant regularly ran searches in those individuals' e-mail accounts looking for correspondence regarding particular subjects.

44. At no time did Defendant seek or otherwise receive permission from BJI or any of its officers to access and review their e-mail.

45. Defendant first engaged in this conduct because he was angry that his superior, Moriarty, had spoken directly to some of Defendant's direct reports.

46. When Defendant began his unlawful access and review of his superiors' confidential e-mails, he learned of senior management's serious concerns about his performance.

As a result, he continued to spy on these individuals in order to search for anything that he thought could somehow provide him leverage to stave off the looming termination of his employment.

47. The e-mail accounts Defendant accessed contained confidential and proprietary information of the Company for which Defendant did not have a right to access. Moriarty, King, and Tortorici were all superiors to Defendant and had access to confidential Company information of which Defendant did not have a need to know. For example, Moriarty, King and Tortorici emailed with the members of BJI's Board of Directors relating to Company matters – confidential communications that Defendant had no right to access.

48. In addition, because King, an attorney, served as the Company's General Counsel, his e-mail account contained highly confidential attorney-client communications and attorney work product. Likewise, because King served as the Head of Human Resources, his e-mail account contained confidential health information regarding Company employees. Defendant had no right to access any of that confidential information.

49. Defendant's unauthorized access infringed upon the privacy rights of the individuals whose accounts he accessed. Defendant also infringed up on the rights of third parties with whom those individuals were communicating.

50. Defendant made hard copies of hundreds of e-mails and showed them to his wife and to at least two attorneys who represent Defendant individually and who do not represent the Company.

**Defendant Attempted to Save His Job By
Making Unfounded Claims to the Board**

51. Defendant's unauthorized review of Company e-mails led him to believe that his job was in jeopardy. He learned that senior management had serious concerns about his

performance, competency and judgment, and that they had so advised the Board of Directors ("Board").

52. Through his unauthorized access and review of confidential e-mails, Defendant learned that the Board would be meeting in February 2014 to discuss the Company's financial results and the performance of BJC and BJS, the companies for which Defendant was Division President.

53. To deflect attention from concerns regarding his performance, competency and judgment, on January 20, 2014, Defendant sent a letter to the Board claiming he had concerns about alleged misconduct at the Company.

54. Defendant's allegations in his January 20, 2014 letter to the Board were principally based on pieces of information he encountered upon accessing Moriarty's, King's and Tortorici's respective e-mail accounts without authorization, and thus were based on incomplete assumptions and speculation that lacked appropriate context, and were incorrect.

55. The Board promptly commissioned an investigation and ultimately concluded that Defendant's concerns were unfounded, and then relayed the results of that conclusion to the Company.

56. In response to questioning during the investigation, Defendant revealed that he had reviewed confidential Company e-mails (to which he had only gained access through the surreptitious means described above), brought a substantial volume of those documents to his home, and then provided them to third parties (including his wife and two attorneys).

57. Based on Defendant's misconduct, the Company terminated his employment for cause on February 17, 2014.

## COUNT I
### (Violation of the Computer Fraud and Abuse Act)

58. The Company realleges and restates Paragraphs 1-57 as if fully restated herein.

59. Defendant has violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing at least one Company computer used in or affecting interstate commerce or communications, without authorization or by exceeding authorized access to such computer(s), and by obtaining information from the Company's protected computer(s).

60. The computer files and e-mails Defendant accessed without authorization were maintained on the Company's computers and computer system, which are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2), in that they were used by the Company to engage in interstate and foreign commerce and communications, including e-mail communications with individuals located in foreign states, and to otherwise conduct the Company's business across state lines, via the Internet.

61. Defendant was not authorized to access the computer and e-mail files described above, and his accessing and transmission of those files was without authorization and contrary to the interests and policies of the Company.

62. Defendant kept his unauthorized activities a secret from the Company for months.

63. By engaging in the conduct described above:

    a. Defendant intentionally accessed at least one computer without authorization or exceeded his authorized access, and thereby obtained information from a protected computer, in violation of the CFAA, 18 U.S.C. § 1030(a)(2)(C);

    b. Defendant knowingly and with the intent to defraud, and in violation of his duty of loyalty and fiduciary duty to the Company, accessed at least one the Company

protected computer without authorization and/or exceeding his authorized access. By means of such conduct, he furthered his intended fraud, including without limitation accessing, obtaining, transmitting, and removing, without authorization, and disclosing to third parties electronic files and information belonging to the Company, including, but not limited to, files containing its valuable business information, including confidential, proprietary, and trade secret information, by dishonest methods in violation of the CFAA, 18 U.S.C. § 1030(a)(4);

c. Defendant knowingly caused and commanded the transmission of computer files and information and as a result of such conduct, intentionally and without authorization caused damage in violation of the CFAA, 18 U.S.C. § 1030(a)(5)(A); and

d. Defendant intentionally accessed a protected computer without authorization, and as a result of such conduct, recklessly and/or intentionally caused damage and loss, in violation of the CFAA, 18 U.S.C. § 1030(a)(5)(B) and (C).

64. As a result of Defendant's misconduct and violations of the CFAA, the Company suffered "damage" and/or "loss," as those terms are interpreted under the CFAA, in an amount exceeding $5,000, and is entitled to an award of damages under 18 U.S.C. § 1030(g) for Defendant's multiple breaches of the CFAA. The damage and loss suffered by the Company includes the cost of reasonably investigating and otherwise responding to Defendant's violations (including the hiring of a forensic computer analyst to conduct investigation and analysis) as well as impairment of the integrity of the Company's computers and system, and of the data stored in that system.

65. Wherefore, the Company respectfully requests judgment against Defendant for actual damages and preliminary and permanent injunctive relief, and such other relief as this Court may deem just and proper.

## COUNT II
### (Violation of the Stored Communications Act)

66. The Company realleges and restates Paragraphs 1-65 as if fully restated herein.

67. Defendant has violated the Stored Communications Act ("SCA"), 18 U.S.C. § 2701, by intentionally accessing without authorization or by intentionally accessing in excess of authorization a facility through which an electronic service is provided and thereby obtaining, altering or preventing authorized access to an electronic communication while it is in storage in such system.

68. Defendant intentionally accessed without authorization or by exceeding his authorization the Company's e-mail systems and accounts. To access the Company's e-mail systems, Defendant had to access a web portal that had a server that housed the e-mails he retrieved. Those systems and accounts, as well as the computer(s) used by Defendant to access those accounts, are each a "facility" under the SCA. Those accounts were accessed with a password that was provided with explicit instructions that it be used only for "your" account. The password did not authorize the access to e-mail accounts other than Defendant's account. Defendant's actions also violated Company policies regarding access of e-mail files of other employees.

69. The e-mails and electronic files obtained and reviewed by Defendant were in storage in the above-mentioned facilities at the time he accessed them without authorization or in excess of authorization.

70. Defendant's actions in violation of the SCA were willful and intentional. Defendant, despite knowing that his access to the facility was not authorized and in violation of Company policy, continued to access and retrieve electronic communications on a regular basis for months.

71. The Company has been damaged by Defendant's illegal access of its facilities.

72. The Company requests all damages allowed by the SCA.  18 U.S.C. § 2707. Those damages include, but are not limited to, actual damages, statutory damages, punitive damages, injunctive relief, and any other relief that the Court deems appropriate.

## COUNT III
### (Breach of Fiduciary Duty and the Duty of Loyalty)

73. The Company realleges and restates Paragraphs 1-72 as if fully restated herein.

74. Defendant was in a position of trust at the Company.  He was Division President of BJC and BJS.  In that position, he had significant management responsibilities and access to the Company's confidential and proprietary information, data, and property.  As a result, Defendant owed a fiduciary duty and a duty of loyalty to the Company.

75. Defendant's fiduciary duty and duty of loyalty required him to:  act only in the best interest of the Company; refrain from taking or using the Company's property and confidential information without authorization; use Company funds properly; and return all of the Company's property and confidential and proprietary information after his employment with the Company ended.

76. Defendant breached his fiduciary duty and duty of loyalty to the Company by: failing to act only in the best interest of the Company in the course of his employment and engaging in conduct that constituted a conflict of interest; taking and using the Company's property and confidential information without authorization; misusing Company funds; and failing to return all of the Company's property and confidential and proprietary information after his employment ended.

77. As a direct and proximate result of Defendant's breach of his fiduciary duty and duty of loyalty, the Company has suffered and will continue to suffer economic losses and irreparable injuries.

78. Wherefore, the Company respectfully requests this Court enter an order granting preliminary and permanent relief and such other relief as this Court may deem just and proper.

## COUNT IV
### (Conversion)

79. The Company realleges and restates Paragraphs 1-78 as if fully restated herein.

80. Plaintiffs possess or have the right to possession of Company property and company funds.

81. Defendant has engaged in unauthorized acts—including taking Company information and providing Company property to others without payment to the Company—to deprive the Company of its property.

82. Plaintiffs have demanded the return of its property and Defendant has refused to return Plaintiffs' property.

83. Defendants' acts in depriving the Company of its property were willful.

84. Plaintiffs have been damaged by Defendants' acts to deprive the Company of its property.

## COUNT V
### (Unjust Enrichment)

85. The Company realleges and restates Paragraphs 1-84 as if fully restated herein.

86. The Company conferred benefits upon Plaintiff, including the ability to use Company funds for business-related purposes in accordance with Company policies.

87. Defendant was aware of and accepted that he could use Company funds only for legitimate business-related purposes in accordance with Company policies.

88. Defendant abused his ability to use Company funds by expending Company funds for his own personal gain, including expenditures on football and basketball tickets at the University of Louisville, membership at the Turf Club at Churchill Downs, membership and conferences for the Young Presidents' Organization, and personal trips for himself and his spouse.

89. Defendant's misuse of Company funds for his personal use was inequitable.

90. Plaintiff has been damaged by Defendant's conduct.

91. It would be inequitable for the Defendant to retain these benefits without repaying the Company for the value he received from those benefits.

## COUNT VI
### (Breach of Contract and Declaratory Judgment (28 U.S.C. § 2201))

92. The Company realleges and restates Paragraphs 1-91 as if fully restated herein.

93. Defendant executed several agreements with the Company including an Employment Agreement on November 1, 2005. Among other things, that agreement requires Defendant to maintain the confidentiality of confidential information. He also agreed to return all of the Company's property to the Company upon termination of his employment. That agreement also contains a definition of a "for cause" termination.

94. Defendant also entered into Profits Interest Agreements with the Company in 2006 and 2010. Those agreements also require Defendant to maintain the confidentiality of the Company's information and not make any unauthorized disclosures of confidential information. Those agreements also require Defendant to return the Company's property upon termination of his employment. Those agreements also contain a definition of a "for cause" termination.

95. Defendant received good and valuable consideration for entering into each of the agreements described in Paragraphs 93-94.

96. Plaintiffs complied with all of their obligations under the agreements described in Paragraphs 93-94.

97. The agreements provide, among other things, that Defendant shall not disclose confidential information of the Company and that he shall return all the Company's property and confidential information upon the termination of his employment.

98. Defendant breached the non-disclosure provisions of those agreements by providing the Company's confidential information to third parties.

99. Defendant also breached the agreements by failing to return the Company's property and confidential information upon the termination of his employment.

100. Defendant's actions—including, but not limited to, accessing Company executives' and employees' e-mail accounts without authorization, taking company property, and misusing company funds—constitute "for Cause" termination under Defendant's agreements with the Company.

101. The Company has been injured by Defendant's breaches of his agreements.

102. Defendant's actions constitute a "for cause" termination under the agreements.

103. A declaratory judgment that Defendant's actions constituted a "for cause" termination under the agreements is appropriate because this case presents an actual and justiciable case or controversy, affecting the rights of the parties of both sides.

104. A declaratory judgment that Defendant's actions constituted a "for cause" termination under the agreements will serve a practical end in quieting and stabilizing an

uncertain or disputed jural relation as to present and prospective obligations. None of the enumerated exceptions to 28 U.S.C. § 2201 apply to this action.

105.    Therefore, Plaintiffs are entitled to a declaration pursuant to 28 U.S.C. § 2201, as well as further relief pursuant to 28 U.S.C. § 2202, that Defendant's actions constituted a "for cause" termination under the agreements in this cause of action.

## PRAYER FOR RELIEF

WHEREFORE, the Company requests that judgment be granted in its favor and against Defendants for the claims above and:

(a)    That the Company be awarded compensatory and actual damages in such amounts as shown at trial (including without limitation the costs, fees, and other expenses incurred by the Company in investigating and responding to Defendant's misconduct), costs and expenses, attorneys' fees, punitive and exemplary damages for Defendant's willful, wanton, and malicious misconduct in such amount as shown at trial, pre- and post-judgment interest at the highest rate permitted by law, and such further relief as this Court may deem appropriate.

(b)    A declaration that Defendant's actions constitute a "for cause" termination under Defendant's agreements with the Company—including the 2005 Employment Agreement and 2006 and 2010 Profits Interests Agreements—and that the Company acted lawfully in fulfilling the agreements' terms with respect to for cause terminations.

(c)    The issuance of a preliminary injunction, and a final, permanent injunction against Defendant as follows:

(1) That Defendant, and all those acting in concert or participation with him, be preliminarily and permanently enjoined from disclosing or utilizing for any purpose the Company's property or confidential and proprietary information.

(2) That Defendant, and all those acting in concert and participation with them, be directed immediately to return to the Company any and all of the Company's property and confidential, proprietary, and trade secret information in their possession, custody or control.

Date: March 11, 2014                    Respectfully submitted,

/s/ Allan H. Weitzman
One of Their Attorneys

Allan H. Weitzman
PROSKAUER ROSE LLP
2255 Glades Road
Suite 421 Atrium
Boca Raton, FL 33431
Telephone: (561) 995-4760
Facsimile: (561) 241-7145
aweitzman@proskauer.com

Lloyd B. Chinn
PROSKAUER ROSE LLP
(*pro hac vice* application pending)
Eleven Times Square
New York, NY 10036-8299
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
lchinn@proskauer.com