**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 0:14-CV-60629-ROSENBERG/BRANNON**

BROWN JORDAN
INTERNATIONAL, INC., *et al.*,

      Plaintiffs,

      v.

CHRISTOPHER CARMICLE,

      Defendant.

_____/

**CASE NO. 0:14-CV-61415-ROSENBERG/BRANNON**

CHRISTOPHER CARMICLE,

      Plaintiff,

      v.

BJI HOLDINGS, LLC, *et al.*,

      Defendants.

_____/

## <u>MEMORANDUM OPINION</u>

      This case requires the Court to determine whether certain actions taken by Christopher Carmicle ("Carmicle"), a high-ranking employee running two subsidiaries of an international furniture company, warranted termination for cause of his employment. In particular, the Court must determine whether Carmicle's repeated access of other employees' email accounts—including those of the parent company's Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), and General Counsel—using a single generic password provided to all employees in connection with the transition to a new email service amounted to gross negligence or willful misconduct. At stake is a substantial amount of money in profits interests and

1

severance pay to which Carmicle is entitled unless the Court determines that his employment was properly terminated for cause.

While the outcome of this case rests largely on that determination, the Court must also resolve various other factual and legal disputes stemming from Carmicle's conduct, both during the course of his employment and in connection with the litigation of this case. These include whether Carmicle violated federal law, including the Computer Fraud and Abuse Act and the Stored Communications Act, by accessing other employees' email accounts; whether Carmicle is liable to his former employer for the salary paid to Carmicle's wife and for various entertainment expenses incurred by Carmicle, including the cost of floor seats and private boxes at major collegiate athletic events and events at Churchill Downs,[1] all of which were paid at Carmicle's direction from company funds and deliberately obscured in the budget during a sharp downturn in profits; whether Carmicle is liable to his former employer for the value of furniture he provided at no cost to his country club; whether Carmicle's employment was terminated in retaliation for exposing what Carmicle characterized as illegal and fraudulent activity committed in connection with a potential management buyout of the company; and whether Carmicle's intentional destruction of relevant evidence warrants imposition of sanctions against him.

Prior to consolidation, the parties raised their respective claims in two separate cases. In one, Brown Jordan International, Inc. ("BJI"), BJI Holdings, LLC, Brown Jordan Company ("BJC"), and Brown Jordan Services ("BJS") (collectively, the "Company") alleged violations of the Computer Fraud and Abuse Act and the Stored Communications Act, breach of fiduciary duty and the duty of loyalty, conversion, unjust enrichment, and breach of contract, and requested a declaratory judgment that Carmicle's actions warranted termination for cause of his employment. In the other, Carmicle alleged fraudulent misrepresentation and breach of contract

---

[1] Churchill Downs is a horseracing venue most famous for hosting the Kentucky Derby and the Kentucky Oaks.

by BJI Holdings, LLC, BJI, BJS, and the CEO, CFO, General Counsel, and members of the Board of Directors of BJI (collectively, the "Brown Jordan Parties").[2] The Court consolidated the two cases for trial and all claims were tried before the Court in a bench trial from October 27, 2015 to October 30, 2015, from November 2, 2015 to November 6, 2015, and from November 9, 2015 to November 10, 2015.

The Court ultimately concludes that Carmicle's employment was properly terminated for cause, primarily due to his accessing other employees' email accounts, which the Court further concludes violated the Computer Fraud and Abuse Act and the Stored Communications Act. Carmicle is therefore not entitled to any profits interests or severance pay. While Carmicle also failed to comply with Company policies governing disclosure of conflicts of interest and approval of entertainment expenses, that failure does not render Carmicle liable to the Company for the salary paid to Carmicle's wife and the various entertainment expenses incurred by Carmicle. Likewise, Carmicle is not liable to the Company for the value of furniture he provided to his country club. The only damages to be recovered by either side are those awarded to the Company as a result of Carmicle's violations of the Computer Fraud and Abuse Act and the Stored Communications Act. In addition, the Court will impose sanctions in the form of adverse inferences drawn against Carmicle for his spoliation of evidence.

Based on the evidence presented at trial, the memoranda submitted, and oral argument of the parties, the Court makes the following findings of fact and conclusions of law:

## I.      __INTRODUCTION__

The Court first briefly summarizes the background facts and relevant procedural history of this case before detailing its specific findings of fact and conclusions of law.

---

[2] Carmicle's allegations were initially far more numerous. Prior to trial, however, the Court granted partial summary judgment in favor of the Brown Jordan Parties as to seven of the eleven counts asserted by Carmicle.

A.  __Background Facts__

Carmicle was born and raised in Louisville, Kentucky. After graduating from the University of Kentucky with a degree in civil engineering in 1997, Carmicle received an MBA from Bellarmine University in 2000. Two years later, while working for a venture capital fund in Louisville, Carmicle was contacted by Bruce Albertson, then-CEO of BJI. Shortly thereafter, Carmicle accepted a position with BJI as director of new business development and moved to Pompano Beach, Florida. Carmicle's wife, Rashna Carmicle ("Mrs. Carmicle" or "Rashna")[3] joined BJI that same year as director of marketing.

Carmicle swiftly rose through the ranks at BJI, the parent company of a number of entities engaged in the manufacture and sale of furniture for both residential and commercial use. Only five or six months after joining BJI, Carmicle was promoted to vice president of sales. By 2005, Carmicle was the president of a BJI subsidiary that would eventually become BJS, and had relocated to Louisville with his wife. That year, Mrs. Carmicle left her full-time position with BJI and entered into an independent contractor agreement, pursuant to which she would continue to provide marketing services for the Company for up to two years, but would work fewer hours for reduced compensation.

Shortly after Carmicle became president of BJS, Gene Moriarty ("Moriarty") became CEO of BJI. At Moriarty's request, Carmicle entered into an Executive Employment Agreement with BJI, solidifying the terms of his employment. Carmicle subsequently entered into several Profits Interest Agreements, pursuant to which Carmicle acquired profits interests in BJI Holdings, LLC, subject to the Agreements' vesting and forfeiture provisions. Whether Carmicle is now entitled to severance pay and profits interests turns on whether his employment was properly terminated for cause as defined in those Agreements.

---

[3] Carmicle and his wife were not yet married at the time they joined BJI in 2002.

By all accounts, Carmicle was initially well-liked by Moriarty and the members of BJI's Board of Directors, who described him as personable, capable, and smart. In 2004, the year before Carmicle became president, BJS was on the verge of bankruptcy with negative earnings before interest, taxes, depreciation, and amortization ("EBITDA"). By 2007, EBITDA at BJS had risen to almost thirty million dollars. After a couple of good years, however, EBITDA dropped to under ten million dollars in 2011, and rose only slightly in 2012 and 2013.

Meanwhile, Moriarty and others were beginning to have doubts about Carmicle. The trouble started at the end of 2011, when it came to light that Mrs. Carmicle remained on the payroll and had received several raises in salary at Carmicle's direction and with Carmicle's sole approval, despite little evidence that Mrs. Carmicle continued to provide services to the Company, while profits were low and a number of full-time employees had been laid off. Although Carmicle immediately complied when Moriarty instructed him to cease all payments to Mrs. Carmicle, Moriarty considered the failure to disclose this conflict of interest so egregious that it provided cause to terminate Carmicle's employment. Instead, however, Moriarty gave Carmicle a stern warning and a second chance. Moriarty also gave Carmicle greater responsibility, making him president of BJC, another BJI subsidiary, in addition to BJS.

Around the same time, faint hints of Carmicle's excessive entertainment expenses began to appear. In an email to Moriarty, Carmicle requested authorization for a substantial expenditure on tickets to athletic events. After learning about the request from Moriarty, BJI's General Counsel was struck by how large the amount seemed compared to the amount approved in 2007, when profits were substantially higher than at the end of 2011. Nevertheless, no one sought additional information about Carmicle's actual entertainment expenses in previous years or Carmicle's requested budget for such expenses in the coming year. It was not until the end of

2013, when BJI's CFO was reviewing BJS's past advertising expenses for an unrelated reason, that the full extent of Carmicle's unauthorized entertainment expenses was recognized.

Everything began to unravel for Carmicle in 2013. That year, Moriarty learned that Carmicle had hired Jeanie Kellogg to manage freight for BJC, despite a clear directive from Moriarty not to hire her or make any other change to the freight program. As far as Moriarty was concerned, Carmicle had blown the second chance he had been given. Shortly thereafter, BJS's controller resigned under peculiar circumstances, first submitting a lengthy resignation letter to Carmicle, then submitting an edited resignation letter to a member of BJI's Board of Directors. At that point, Moriarty was ready to terminate Carmicle's employment for cause.

However, Moriarty was persuaded not to pursue termination at that time. In the spring of 2013, BJI's Board of Directors decided to hire an investment bank and offer the Company for sale, either as a whole or separately, with the entities comprising the consumer side of the business going to one buyer and the entities comprising the commercial side of the business going to another. In the event the Company was sold separately, Moriarty would likely remain with the commercial business and Carmicle would remain with the consumer business, so Moriarty would no longer have to work with Carmicle and the buyer of the consumer business would have the benefit of continuity. Moriarty ultimately agreed that it was best not to terminate Carmicle's employment while the Company was offered for sale.

In the meantime, Moriarty, BJI's CFO, and BJI's General Counsel decided to pursue a management buyout ("MBO") of the consumer business. In connection with seeking lending to finance the MBO, they prepared a financial model that differed from that prepared by the Company's investment bank for potential outside buyers. Members of BJI's Board of Directors

were aware of and unconcerned by the potential MBO, but were not aware of the second financial model.

In the summer of 2013, the Company began a transition from one email service to another. To assist in that transition, BJI's Chief Information Officer provided a generic password—Password1—to Company employees and instructed each to test his or her new email account with that password. Suspicious that an employee Carmicle considered a subordinate was communicating directly with Moriarty, and that both were lying to Carmicle about it, Carmicle used the generic password to access their accounts and read their emails. From there, it snowballed, as Carmicle repeatedly accessed other employees' email accounts with the generic password and used his personal iPad to take screenshots of hundreds of emails over the next six months. Along the way, Carmicle learned about the MBO and the second financial model. Carmicle also learned that BJI's CFO was scrutinizing his expenses.

As 2013 drew to a close and 2014 began, it became clear that BJS and BJC had not performed well. BJI's Board of Directors were scheduled to meet in early February, and both Carmicle's expenses and the poor performance of BJS and BJC were on the agenda. Carmicle saw the writing on the wall. In an attempt to save his job, Carmicle wrote a letter to BJI's Board of Directors in January of 2014, accusing Moriarty and others of various illegal and fraudulent activities, including their preparation of a second financial model to the detriment of shareholder value in an attempt to secure the consumer business through an MBO.

Concerned about Carmicle's accusations, and because Carmicle had expressed a fear of retaliation, the Board of Directors hired an independent investigator. During the investigation into Carmicle's allegations, Carmicle revealed that he had learned much of the information contained in his letter by accessing others' email accounts. The investigator ultimately concluded

7

that Carmicle's allegations were entirely without merit, and reported that fact to the Board of Directors. The investigator also reported Carmicle's email access and the fact that Carmicle had used in excess of $100,000.00 in Company funds for unauthorized entertainment expenses. When the Board of Directors met in February of 2014, they decided that Carmicle's employment should be terminated for cause, primarily due to his accessing others' email accounts.

On February 17, 2014, Moriarty met with Carmicle in Louisville and informed him of the decision to terminate for cause his employment. Carmicle demanded that he be permitted to take his personal laptop with him when he left, but was told it would not be returned to him until Carmicle proved that he had used his own funds to purchase the laptop. As soon as he returned home, Carmicle used the "Find My iPhone" application to remotely lock a different laptop owned by the Company, rendering it inaccessible. Carmicle claims that he intended to lock his personal laptop, and inadvertently locked the Company-owned laptop, but as of the conclusion of trial—over a year and a half later—still had not provided the password and PIN necessary to unlock the Company-owned laptop. Carmicle also claims to have subsequently lost the personal iPad with which he had taken screenshots of emails, and was therefore unable to produce it during the course of discovery, along with various other data and devices Carmicle claims to have deleted or lost despite the near certainty of impending litigation.

## B.  Procedural History

On March 11, 2014, less than a month after termination of Carmicle's employment, the Company filed its initial Complaint against Carmicle in federal court in the Southern District of Florida. *See* Brown Jordan's DE 1.[4] That case has been before the undersigned since its inception.

---

[4] All docket entries in case number 0:14-cv-60629 will be cited in the following format: "Brown Jordan's DE __."

On March 21, 2014, Carmicle filed his initial Complaint against the Brown Jordan Parties in Kentucky state court. *See* Carmicle's DE 1-2.[5] On April 2, 2014, the Brown Jordan Parties removed that case to federal court in the Western District of Kentucky. *See* Carmicle's DE 1. On April 11, 2014, the Brown Jordan parties filed a Motion to Transfer that case to the Southern District of Florida. *See* Carmicle's DE 6. On June 19, 2014, the Motion to Transfer was granted. *See* Carmicle's DE 23. On September 12, 2014, the parties filed an Agreed Motion to Transfer, requesting that the case be transferred within the Southern District of Florida to the undersigned, and on September 22, 2014, the case was so transferred. *See* Carmicle's DE 39, DE 42.

On November 25, 2014, the Court consolidated the two cases for purposes of discovery and all pretrial activity. *See* Brown Jordan's DE 57. On August 27, 2015, the Court consolidated the two cases for trial. *See* Carmicle's DE 92.[6]

Both the Company and Carmicle have amended their initial Complaints. The operative pleadings and remaining claims are described in detail below.

### 1. The Company's First Amended Complaint

On February 12, 2015, the Company filed its First Amended Complaint against Carmicle, asserting the following causes of action:

- Violation of the Computer Fraud and Abuse Act (Count I)

- Violation of the Stored Communications Act (Count II)

- Breach of Fiduciary Duty and the Duty of Loyalty (Count III)

- Conversion (Count IV)

- Unjust Enrichment (Count V)

---

[5] All docket entries in case number 0:14-cv-61415 will be cited in the following format: "Carmicle's DE __."
[6] Although the Court denied the Brown Jordan Parties' motion to strike Carmicle's jury demand at the time of consolidation, it later granted the Brown Jordan Parties' motion for reconsideration, struck Carmicle's jury demand, and ordered that the consolidated cases would be tried before the Court. *See* Carmicle's DE 92, DE 114.

- Breach of Contract and Declaratory Judgment (Count VI)

*See* Brown Jordan's DE 61.

Carmicle filed his Answer to the Company's First Amended Complaint on February 23, 2015. *See* Brown Jordan's DE 62.

### 2.  Carmicle's Revised Amended Complaint

On July 20, 2015, Carmicle filed his Revised Amended Complaint against the Brown Jordan Parties, asserting the following causes of action:

- Wrongful Termination (Count I) (summarily adjudicated in favor of the Brown Jordan Parties)

- Wrongful Discharge in Violation of the Parties' Code of Conduct (Count II) (summarily adjudicated in favor of the Brown Jordan Parties)

- Wrongful Discharge in Breach of Defendants' Fraudulent Misrepresentations to Protect Carmicle Against Retaliation (Count III)

- Claim for Breach of Contract by Refusing to Compensate Carmicle for His Ownership Interest in BJI (Count IV)

- Claim for Violation of the Computer Fraud and Abuse Act (Count V) (summarily adjudicated in favor of the Brown Jordan Parties)

- Defamation and False Light (Count VI) (summarily adjudicated in favor of the Brown Jordan Parties)

- Petition for Declaration of Rights (Count VII)

- Breach of Fiduciary Duty Against Officers of BJI (Count VIII) (summarily adjudicated in favor of the Brown Jordan Parties)

- Breach of Fiduciary Duty Against Members of the Board of BJI (Count IX) (summarily adjudicated in favor of the Brown Jordan Parties)

- Vicarious Liability Against BJI (Count X) (summarily adjudicated in favor of the Brown Jordan Parties)

- Breach of Contract – Severance Pay (Count XI)

*See* Carmicle's DE 71.

The Brown Jordan Parties filed their Answer and Affirmative Defenses to Carmicle's Revised Amended Complaint on July 31, 2015. *See* Carmicle's DE 74.

### 3. Motions for Summary Judgment and Remaining Claims

On June 3, 2015, the Court entered an Order denying Carmicle's motion for partial summary judgment as to Counts I and II of the Company's First Amended Complaint. *See* Brown Jordan's DE 100.

On October 9, 2015, the Court entered an Order denying the Company's motion for partial summary judgment as to Count VI of its First Amended Complaint. *See* Brown Jordan's DE 160.

On October 19, 2015, the Court entered an Order granting the Brown Jordan Parties' motion for summary judgment as to Counts I, II, V, VI, VIII, IX, and X of Carmicle's Revised Amended Complaint, and denying the Brown Jordan Parties' motion for summary judgment as to Counts III, IV, and XI of Carmicle's Revised Amended Complaint. *See* Carmicle's DE 126.

The Court then conducted a bench trial commencing October 27, 2015, on the parties' remaining claims:

- Count I of the Company's First Amended Complaint against Carmicle for violation of the Computer Fraud and Abuse Act.

- Count II of the Company's First Amended Complaint against Carmicle for violation of the Stored Communications Act.

- Count III of the Company's First Amended Complaint against Carmicle for breach of fiduciary duty and the duty of loyalty.

- Count IV of the Company's First Amended Complaint against Carmicle for conversion.

- Count V of the Company's First Amended Complaint against Carmicle for unjust enrichment.

11

- Count VI of the Company's First Amended Complaint against Carmicle for breach of contract and declaratory judgment.

- Count III of Carmicle's Revised Amended Complaint for wrongful discharge in breach of the Brown Jordan Parties' fraudulent misrepresentations to protect Carmicle against retaliation.

- Count IV of Carmicle's Revised Amended Complaint for breach of contract by refusing to compensate Carmicle for his ownership interest in BJI.

- Count XI of Carmicle's Revised Amended Complaint for breach of contract and severance pay.

While Count VII (Petition for Declaration of Rights)[7] of Carmicle's Revised Amended Complaint remains pending, no evidence or argument relevant to Count VII was presented at trial. The Court notes that this was likely because Count VII was rendered moot before trial began. The Court will therefore dismiss Count VII of Carmicle's Revised Amended Complaint as moot.

### 4. Motion for Sanctions

On August 17, 2015, the Brown Jordan Parties filed a motion seeking imposition of sanctions against Carmicle for spoliation of evidence. *See* Brown Jordan's DE 121. That motion focused on Carmicle's handling of the following devices, both prior to and following the termination of his employment: (1) a Company-owned laptop computer; (2) a Company-owned iPad; (3) a Company-owned iPhone; (4) Carmicle's personal laptop computer; (5) Carmicle's personal iPad; (6) Carmicle's personal iPhone; and (7) Mrs. Carmicle's computer.

Immediately prior to the commencement of trial, the Court held a two-day evidentiary hearing on the motion, at the conclusion of which the Court made factual findings on the record

---

[7] In Count VII, Carmicle asserts that a non-competition clause contained in the Employment Agreement had expired or was abandoned by the parties prior to the termination of his employment and is unreasonable and unenforceable as a matter of law. *See* DE 71. That clause was effective during Carmicle's employment and for a period of twelve months after the date of termination of his employment. ***See* Brown Jordan's Trial Exhibit 1.** Because Carmicle's employment was terminated on February 17, 2014, and the non-competition clause remained effective only for a period of twelve months after that date, the clause expired prior to trial, rendering Count VII moot.

but deferred ruling to the end of trial. *See* **Trial Tr. Vol. 2, Pages 197:1–208:7.** The Court incorporates those findings by reference herein and, where appropriate, will repeat some of those findings below. The Court will also set forth additional findings of fact based on the evidence presented at trial. Finally, the Court will set forth the legal reasons for its conclusion that sanctions against Carmicle are appropriate.

## II.   FINDINGS OF FACT

### A. The Parties

BJI Holdings, LLC is a Delaware limited liability company with its principal place of business in Florida. **Joint Pretrial Stipulation [Brown Jordan's DE 153].**

Brown Jordan International, Inc. ("BJI") is a Florida corporation with its principal place of business in Florida. **Joint Pretrial Stipulation [Brown Jordan's DE 153].**

Brown Jordan Services, Inc. ("BJS") is a California corporation with its principal place of business in Kentucky. **Joint Pretrial Stipulation [Brown Jordan's DE 153].**

Brown Jordan Company ("BJC") is a Delaware corporation with its principal place of business in California. **Joint Pretrial Stipulation [Brown Jordan's DE 153].**

BJI Holdings, LLC owns the entirety of the stock issued by BJI. **Joint Pretrial Stipulation [Brown Jordan's DE 153].**

BJI, in turn, is a holding company comprising five operating business entities, including BJS and BJC. **Joint Pretrial Stipulation [Brown Jordan's DE 153].**[8]

Gene Moriarty ("Moriarty") was at all relevant times the President, Chief Executive Officer ("CEO"), and Chairman of the Board of Directors of BJI. **Moriarty Test. Trial Tr. Vol. 3, Pages 157:20–158:15, 160:4–18.** As of the time of trial, Moriarty resided and worked in Florida. **Moriarty Test. Trial Tr. Vol. 3, Page 154:15–22.**

---

[8] Where appropriate, the Court will refer to BJI Holdings, LLC, BJI, BJS, and BJC collectively as the "Company."

13

Frederick King ("King") was at all relevant times the General Counsel and head of Human Resources for BJI. **King Test. Trial Tr. Vol. 10, Page 10:1–5.** From 2010 to 2014, King ran BJI subsidiary Charter Furniture, and as of the time of trial ran BJI subsidiaries Winston Furniture and Tropitone. **King Test. Trial Tr. Vol. 10, Page 11:3–12; Moriarty Test. Trial Tr. Vol. 3, Page 160:4–18.** Around the end of 2013 and beginning of 2014, King also became the Chief Operating Officer ("COO") of BJI. **Moriarty Test. Trial Tr. Vol. 3, Page 161:9–15.** As of the time of trial, King worked in Florida. **Moriarty Test. Trial Tr. Vol. 3, Page 161:7–8.**

Vincent Tortorici ("Tortorici") was at all relevant times the Chief Financial Officer ("CFO") of BJI. **Tortorici Test. Trial Tr. Vol. 6, Pages 18:13–19:24; Moriarty Test. Trial Tr. Vol. 3, Page 161:16–23.** As of the time of trial, Tortorici worked in Alabama and Florida. **Moriarty Test. Trial Tr. Vol. 3, Page 161:16–21.**

Wayne Teetsel ("Teetsel") was at all relevant times a member of BJI's Board of Directors. **Teetsel Test. Trial Tr. Vol. 2, Page 158:7–12.** As of the time of trial, Teetsel was a partner at Stonehill Capital Management ("Stonehill"), a hedge fund that owned approximately 52% of the Class A units of BJI Holdings, LLC. **Teetsel Test. Trial Tr. Vol. 2, Pages 156:24–157:2, 157:23–158:2.** Teetsel joined BJI's Board of Directors in or around 2006. **Teetsel Test. Trial Tr. Vol. 2, Page 158:3–12.**

Pamela Packard ("Packard") was at all relevant times a member of BJI's Board of Directors. **Packard Test. Trial Tr. Vol. 2, Page 131:10–13.** As of the time of trial, Packard had her own consulting firm, Strategic Enterprises, LLC. **Packard Test. Trial Tr. Vol. 2, Page 130:14–20.** Packard joined BJI's Board of Directors in 2006 as an independent board member and as of the time of trial chaired the Board's audit committee. **Packard Test. Trial Tr. Vol. 2, Page 131:10–25.**

14

Jason Breaux ("Breaux") was at all relevant times a member of BJI's Board of Directors. **Breaux Test. Trial Tr. Vol. 3, Page 56:8–16.** As of the time of trial, Breaux was employed by Crescent Capital ("Crescent"), an investment management company that owned approximately 28 or 29% of BJI Holdings, LLC. **Breaux Test. Trial Tr. Vol. 3, Pages 54:12–55:13.** Breaux joined BJI's Board of Directors in 2008. **Breaux Test. Trial Tr. Vol. 3, Page 56:8–10.**

Christopher Carmicle ("Carmicle") was employed by the Company from 2002 until his employment was terminated in February of 2014. **Carmicle Test. Trial Tr. Vol. 11, Pages 8:11–9:7; Moriarty Test. Trial Tr. Vol. 3, Pages 220:14–221:25.** At all relevant times, Moriarty was Carmicle's immediate supervisor. **Carmicle Test. Trial Tr. Vol. 11, Pages 13:25–14:12.**

### B.  Carmicle's Employment

The Court first summarizes Carmicle's role and responsibilities within the Company, then turns its attention to the terms of Carmicle's employment.

#### 1.  Carmicle's Role and Responsibilities

In 2002, Carmicle began working for the Company in Pompano Beach, Florida, first as director of new business development, then as vice president of sales. **Carmicle Test. Trial Tr. Vol. 11, Pages 8:11–9:16.** In 2005, Carmicle began running BJI subsidiary Casual Living Worldwide, which at the time was referred to as National Accounts. **Carmicle Test. Trial Tr. Vol. 11, Page 9:17–23; Moriarty Test. Trial Tr. Vol. 3, Pages 165:5–166:9; Brown Jordan's Trial Exhibit 1.** The name of that entity ultimately changed to BJS in or around 2011. **Moriarty Test. Trial Tr. Vol. 3, Page 166:3–9.**

Shortly after assuming responsibility for that entity, Carmicle entered into an Executive Employment Agreement (the "Employment Agreement") with BJI. **Moriarty Test. Trial Tr.**

**Vol. 3, Pages 165:5–166:2; Carmicle Test. Trial Tr. Vol. 11, Pages 9:24–10:22; Brown Jordan's Trial Exhibit 1.** That Employment Agreement, dated November 1, 2005, is the only written employment agreement between Carmicle and BJI or any related entity. **Carmicle Test. Trial Tr. Vol. 11, Page 10:5–24.** Pursuant to the Employment Agreement, Carmicle was to "initially serve as the President of National Accounts & Import Division, a division of [BJI]." **Brown Jordan's Trial Exhibit 1.** In so serving, Carmicle was required to report to the President and CEO of BJI, and to "render such services of an executive and administrative character for the benefit [of BJI] . . . as the President and CEO of [BJI] may from time to time direct." **Brown Jordan's Trial Exhibit 1.**

In addition to running BJS, Carmicle assumed responsibility for BJI subsidiary BJC in 2011 or 2012. **Tortorici Test. Trial Tr. Vol. 6, Pages 83:19–84:7; Moriarty Test. Trial Tr. Vol. 3, Page 170:3–13.** Carmicle was never formally appointed as president of BJS or BJC by BJI's Board of Directors, but was permitted to use the title as a "customer facing accommodation." **King Test. Trial Tr. Vol. 10, Page 11:13–22; Moriarty Test. Trial Tr. Vol. 3, Page 168:2–14.** At no point did Carmicle have managerial responsibilities for BJI or any related entities except BJS and BJC. **Moriarty Test. Trial Tr. Vol. 3, Pages 167:19–168:1.**

### 2.  Terms of Carmicle's Employment

#### a.  Reimbursement of Business Expenses

Under the terms of the Employment Agreement, Carmicle was "entitled to reimbursement of reasonable business expenses incurred by [Carmicle] (subject to submission of appropriate substantiation by [Carmicle] in accordance with the rules in place for other executives of [BJI])". **Brown Jordan's Trial Exhibit 1.**

With respect to travel and entertainment expenses in particular, BJI's written Travel Policy "contains the rules and requirements relating to reimbursement of travel and entertainment expenses incurred during the conduct of Company business." **Moriarty Test. Trial Tr. Vol. 4, Pages 89:22–90:1; Tortorici Test. Trial Tr. Vol. 6, Page 65:2–24; King Test. Trial Tr. Vol. 10, Pages 31:10–32:18; Brown Jordan's Trial Exhibit 53.** "This policy covers [BJI], its subsidiaries and affiliates in all locations and is applicable to all functions." **Brown Jordan's Trial Exhibit 53.** Thus, the provisions of the Travel Policy unquestionably applied to Carmicle during his employment with the Company. **King Test. Trial Tr. Vol. 10, Page 32:8–10.**

Under the Travel Policy, reimbursable entertainment expenses "include clubs, theater, sporting and special events, when a business discussion takes place immediately before, during or immediately after the event." **Brown Jordan's Trial Exhibit 53.** Similarly, reimbursable business meals include "meals taken with customers, prospects, suppliers or associates during which a business discussion takes place." **Brown Jordan's Trial Exhibit 53.** Credit card fees and annual dues, however, are among the list of non-reimbursable expenses under the Travel Policy. **Brown Jordan's Trial Exhibit 53.**

To claim reimbursement under the Travel Policy, employees are required to submit expense reports, which "must be signed by the employee and reviewed/approved by the employee's manager." **Brown Jordan's Trial Exhibit 53.** "All meals and entertainment expenses of $25 or greater must be supported by a receipt attached to the expense report." **Brown Jordan's Trial Exhibit 53.** "Entertainment expenses must be approved in advance by the employee's immediate supervisor." **Brown Jordan's Trial Exhibit 53.**

Pursuant to the Travel Policy, "Company employees who incur travel and entertainment expenses are responsible for complying with the policy. Employees submitting expenses that are not in compliance with this policy risk delayed, partial or total forfeited reimbursement. Cases of significant abuse may result in disciplinary action, including termination. **Brown Jordan's Trial Exhibit 53.**

### b.  <u>Computer and Internet Policy</u>

BJI maintains an Employee Handbook, which contains—among other provisions—a Computer and Internet Policy. **Brown Jordan's Trial Exhibits 7, 8.** The Computer and Internet Policy provides in relevant part as follows:

> [E]mployees at the Company should have no expectation of privacy while using company-owned or company-leased equipment. Information passing through or stored on Company equipment can and will be monitored. Employees should also understand that the Company has the right to monitor and review Internet use and e-mail communications sent or received by employees. Access to another employee's email and internet usage is controlled solely by senior management. No IT staff person is authorized to give out passwords to users other than the account holder without the permission of senior management. Managers and employees who need access for legitimate Company purposes to another employee's email must request such access from a member of corporate senior management.
>
> *        *        *
>
> Violations will be reviewed on a case-by-case basis. If it is determined that an employee has violated one or more of the above regulations, that employee will receive a reprimand from his or her supervisor and future use will be closely monitored. If a gross violation has occurred, management will take immediate action. Such action may result in losing Internet and/or e-mail privileges or severe reprimand, up to and including termination.

**Brown Jordan's Trial Exhibits 7, 8.**

### c.  <u>Code of Conduct and Ethics Policy</u>

BJI's Employee Handbook also contains a Code of Conduct and Ethics Policy, which provides in relevant part as follows:

Employees are also expected to use good judgment, adhere to ethical standards and avoid situations that create an actual or potential conflict between the employee's personal interests and the interests of the Company. A conflict of interest exists where the employee's loyalties or actions are divided between the Company's interests and those of another . . . . Both the fact and the appearance of a conflict of interest must be avoided. Employees who are unsure as to whether a certain transaction, activity or relationship constitutes a conflict of interest should discuss such an issue with their supervisor for clarification.

*  *  *

On an annual basis at the Company's request, all employees are required to complete a written statement regarding the Company's **Code of Conduct and Ethics Policy**. These written statements are then retained in the employee's personnel file. Failure to adhere to this policy, including failure to discuss or disclose any potential or actual conflicts of interest, may result in discipline, up to and including termination.

**Brown Jordan's Trial Exhibits 7, 8.**

### d.  Termination of Employment

Under the terms of the Employment Agreement, Carmicle's employment could be terminated "on the date specified in a Notice of Termination given by the President and CEO of the Company to [Carmicle] stating that [Carmicle's] employment [was] being terminated for cause." **Brown Jordan's Trial Exhibit 1.** As defined in Annex I to the Employment Agreement, "cause" means, among other things,

any one or more of the following: . . . (c) the commission by the Executive of (i) any act or acts constituting a crime involving fraud, embezzlement, misappropriation, theft, breach of fiduciary duty or dishonesty against the property or personnel of the Company or any of its Affiliates, (ii) any felony that carries a prison sentence of at least 5 years or (iii) any crime of moral turpitude; [or] (d) the Executive's gross negligence or willful misconduct in the performance of his duties as an employee of the Company that is not cured within seven (7) days following written notice by the Company to the Executive of such gross negligence or willful misconduct, or three (3) occurrences of the Executive's gross negligence or willful misconduct in any twelve-month period . . . .

**Brown Jordan's Trial Exhibit 1.**

19

In the event BJI terminated Carmicle's employment without cause, as defined above, BJI is required pursuant to the Employment Agreement to pay Carmicle "his full compensation through the date of termination and, as severance pay an amount equal to the amount of Base Salary then in effect that [Carmicle] would have been entitled to receive during the period beginning on the Termination Date and ending on the date which is six (6) months after the Termination Date." **Brown Jordan's Trial Exhibit 1.**

    **e.   Profits Interest Agreements**

Under two Profits Interest Agreements executed in 2006 and 2010, Carmicle acquired profits interests in BJI Holdings, LLC, subject to the Agreements' vesting and forfeiture provisions. **King Test. Trial Tr. Vol. 10, Pages 78:3–79:14; Brown Jordan's Trial Exhibit 254.** In the event of termination for cause, Carmicle immediately forfeits all vested and unvested shares acquired pursuant to these Profits Interest Agreements. **King Test. Trial Tr. Vol. 10, Pages 78:3–79:14; Brown Jordan's Trial Exhibit 254.**

> For this purpose, "Cause" shall (a) have the same meaning as used in any employment agreement between the Company or any subsidiary and [Carmicle], and (b) if there is no such employment agreement between them in effect, mean a termination of [Carmicle's] employment by the Company or its subsidiaries due to [Carmicle's] (i) continued failure to perform his essential job functions, (ii) commission of a felony or any misdemeanor involving moral turpitude, (iii) material violation of any written policy of the Company or of any confidentiality, non-solicitation, non-competition or other similar agreement with the Company, (iv) misconduct in the performance of his duties with the Company or its subsidiaries, or (v) failure to fully cooperate in any audit or investigation involving the Company or its subsidiaries. Any good faith determination by the Board that [Carmicle's] termination is for "Cause" pursuant to clause (b) above shall be conclusive and binding upon all parties.

**Brown Jordan's Trial Exhibit 254.**

### C. **Rashna Carmicle's Employment**

Carmicle's wife, Rashna Carmicle ("Rashna" or "Mrs. Carmicle"), was employed full-time as the head of marketing for BJI from 2002 to 2005. **Rashna Test. Dep. Tr., Pages 46:23–47:1, 50:4–14;[9] Carmicle Test. Trial Tr. Vol. 11, Page 15:3–22; Patrick Isaacs ("Isaacs") Test. Dep. Tr., Pages 11:6–14.[10]** During that period, Mrs. Carmicle worked in excess of 40 hours per week, including time spent travelling. **Rashna Test. Dep. Tr., Page 47:2–11.** Her final rate of pay in this position was approximately $85,000.00 per year. **Rashna Test. Dep. Tr., Pages 51:17–52:12.**

In 2005, Mrs. Carmicle decided to scale back her hours following the birth of her first child, and entered into an independent contractor agreement (the "Contractor Agreement") with BJI. **Rashna Test. Dep. Tr., Pages 50:15–24, 61:19–62:1; Carmicle Test. Trial Tr. Vol. 11, Pages 16:11–25, 180:1–15; Brown Jordan's Trial Exhibit 51.** The Contractor Agreement became effective July 1, 2005, and continued for a period of six months, following which it could be renewed for a second six-month period upon mutual agreement of the parties. **Rashna Test. Dep. Tr., Pages 67:7–10, 67:21–68:6; Brown Jordan's Trial Exhibit 51.** At the end of the second six-month period, BJI retained the right to renew the Contractor Agreement for an additional twelve months, through June 30, 2007. **Rashna Test. Dep. Tr., Page 69:6–11; Brown Jordan's Trial Exhibit 51.**

This Contractor Agreement is the only written agreement concerning BJI's engagement of Mrs. Carmicle as an independent contractor. **Rashna Test. Dep. Tr., Page 67:21–68:6; Carmicle Test. Trial Tr. Vol. 11, Pages 179:21–181:5.** There is no writing extending the initial

---

[9] All citations to Mrs. Carmicle's testimony refer to the transcript of the video deposition presented at trial. *See* **Trial Tr. Vol. 9, Pages 3:1–12, 5:22–6:15, 80:20–84:20.**

[10] Citations to Patrick Isaacs's testimony that do not refer to the trial transcript refer to the transcript of the video deposition presented at trial. *See* **Trial Tr. Vol. 8, Page 129:2–9.**

term of the Contractor Agreement. **Rashna Test. Dep. Tr., Page 67:21–68:6; Carmicle Test. Trial Tr. Vol. 11, Pages 179:21–181:5.**

Pursuant to the Contractor Agreement, the total fees paid to Mrs. Carmicle were not to exceed $50,000.00 for any twelve-month period, or $4,166.67 per month. **Brown Jordan's Trial Exhibit 51.** In addition, Mrs. Carmicle would be reimbursed for out-of-pocket expenses incurred in connection with performance of her obligations under the Contractor Agreement, provided that she obtained prior written permission to incur the expense from BJI and submitted receipts or other supporting documents to BJI. **Brown Jordan's Trial Exhibit 51.** The Contractor Agreement further provides that no amendments or changes to or modification of the Contractor Agreement would be valid unless in writing and signed by both parties. **Brown Jordan's Trial Exhibit 51.**

Despite the absence of any writing extending the initial term of the Contractor Agreement, but with her husband's verbal approval, Mrs. Carmicle continued to receive payments from the Company at an increasing rate until 2011. **Moriarty Test. Trial Tr. Vol. 3, Pages 170:17–171:22; King Test. Trial Tr. Vol. 10, Pages 20:7–21:4.** In January of 2007, Mrs. Carmicle's annual pay increased from $50,000.00 to $70,000.00. **Rashna Test. Dep. Tr., Pages 164:13–165:10, 165:20–166:7.** In 2008, Mrs. Carmicle's annual pay increased again from $70,000.00 to $78,000.00. **Rashna Test. Dep. Tr. Pages 172:14–21, 173:22–174:23.** Mrs. Carmicle continued to be paid at the rate of $78,000.00 per year from 2008 through the end of 2011, when Moriarty and King learned that Mrs. Carmicle remained on the payroll, at which time Mrs. Carmicle's association with the Company was terminated and all payments to Mrs. Carmicle ceased. **King Test. Trial Tr. Vol. 10, Pages 21:16–22:21; Moriarty Test. Trial Tr. Vol. 3, Pages 190:9–191:3; Brown Jordan's Trial Exhibit 116.**

### D. University of Louisville Ticket Package: 2007–2011

In 2007, Carmicle approached Moriarty with a request to purchase tickets to athletic events at the University of Louisville. **Moriarty Test. Trial Tr. Vol. 3, Pages 171:20–172:22; Brown Jordan's Trial Exhibits 55, 56.** Carmicle presented Moriarty with four ticket package options, each of which involved the commitment of a certain amount each year from 2007 through 2011 in exchange for tickets to football games, tickets to basketball games, and other benefits. **Brown Jordan's Trial Exhibit 55.** Carmicle represented to Moriarty that the tickets purchased would be used for customer entertainment, and provided Moriarty with a list of specific customers BJS could entertain in Louisville. **Moriarty Test. Trial Tr. Vol. 3, Pages 172:24–173:7; Brown Jordan's Trial Exhibit 55.**

After reviewing the four ticket package options, Moriarty gave written approval for "Plan B," pursuant to which BJS would pay $27,400.00 in 2007, $27,400.00 in 2008, $37,000.00 in 2009, $68,000.00 in 2010, and $68,000.00 in 2011. **Moriarty Test. Trial Tr. Vol. 3, Pages 174:17–175:2; Brown Jordan's Trial Exhibits 55, 56.** Given that the EBITDA for BJS in 2007 was $29 million, Moriarty believed this commitment was a reasonable expense for customer entertainment. **Moriarty Test. Trial Tr. Vol. 3, Page 175:12–23; King Test. Trial Tr. Vol. 10, Pages 27:10–29:5.** This is the only written approval Carmicle obtained from Moriarty for the purchase of any ticket package such as this. **Moriarty Test. Trial Tr. Vol. 3, Page 176:9–13; Carmicle Test. Trial Tr. Vol. 11, Pages 152:22–153:2.**

Carmicle caused BJS to pay the following amounts to the University of Louisville between 2007 and 2011: $62,828.00 in 2007, $106,300.00 in 2008, $47,517.00 in 2009, $86,900.00 in 2010, and $77,900.00 in 2011. **Moriarty Test. Trial Tr. Vol. 3, Page 196:3–19; Brown Jordan's Trial Exhibit 223.** The amounts paid by BJS to the University of Louisville

exceeded the amounts for which Moriarty gave written approval by \$35,428.00 in 2007, \$78,900.00 in 2008, \$10,517.00 in 2009, \$18,900.00 in 2010, and \$9,900.00 in 2011. ***See* Brown Jordan's Trial Exhibits 55, 56.**

On multiple occasions between 2009 and 2011, Carmicle also caused BJS to pay tens of thousands of dollars to the University of Kentucky, Churchill Downs, and others for various entertainment expenses. ***See* Brown Jordan's Trial Exhibit 54.**

### E.  Annual Budget Approval Process

Between October and December of each year, the president, senior team members, and controller of each BJI subsidiary were instructed by BJI CFO Tortorici to prepare a proposed budget for the coming year. **Moriarty Test. Trial Tr. Vol. 4, Page 18:11–20; David Phillips ("Phillips") Test. Trial Tr. Vol. 5, Page 133:8–18.** At BJS, the annual budget approval process began each year when Tortorici distributed general guidelines—essentially a template with instructions to follow in preparing each specific line item within the budget—to the controller for BJS.[11] **Breunig Test. Dep. Tr., Pages 13:11–18, 31:20–32:13;[12] Sorich Test. Dep. Tr., Page 17:2–22.[13]** Relying on historical data and forecasts for the coming year, the controller prepared a budget that included, among other things, estimated sales, margins, fixed and variable advertising costs, and other expenses. **Breunig Test. Dep. Tr., Pages 12:23–15:25; Sorich Test. Dep. Tr., Pages 15:16–16:22.** The preparation of the annual budget was a "collective effort" between Carmicle, the BJS controller (Sorich, Breunig, or Deinlein), BJS vice president of

---

[11] Jack Sorich ("Sorich") was the controller for BJS (or its predecessor) from 1990—long before Carmicle began running that entity in 2005—until his retirement in July of 2011. **Sorich Test. Dep. Tr., Pages 9:5–10:3, 11:2–9, 80:12–81:9.** Brandon Breunig ("Breunig") was the controller for BJS from June of 2011 through March of 2013. **Breunig Test. Dep. Tr., Pages 10:12–19, 11:8–14.** Michael Deinlein ("Deinlein") has been the controller for BJS since April of 2013. **Deinlein Test. Trial Tr. Vol. 7, Page 145:6–14.**

[12] All citations to Breunig's testimony refer to the transcript of the video deposition presented at trial. ***See* Trial Tr. Vol. 5, Pages 149:9–151:13; Trial Tr. Vol. 6, Pages 3:1–5:11.**

[13] All citations to Sorich's testimony refer to the transcript of the video deposition presented at trial. ***See* Trial Tr. Vol. 6, Pages 6:17–16:23.**

operations James Hall ("Hall"), BJS vice president of sales David Phillips ("Phillips"), and others at BJS, all of whom provided input and attended internal meetings until a budget book was ultimately assembled. **Breunig Test. Dep. Tr., Pages 15:23–16:24; Sorich Test. Dep. Tr., Pages 16:23–18:11; Moriarty Test. Trial Tr. Vol. 4, Pages 18:11–19:12; Phillips Test. Trial Tr. Vol. 5, Page 133:8–18; Brown Jordan's Trial Exhibits 185, 183, 319, 320, 321 (BJS budget books for 2007 and 2011–2014); Carmicle's Trial Exhibit 340 (BJS budget books for 2008 and 2009).** While its preparation was a collective effort, the proposed BJS budget was subject to final approval by Carmicle. **Breunig Test. Dep. Tr., Page 170:8–12; Sorich Test. Dep. Tr., Pages 138:14–22, 139:4–7.**

Once the proposed BJS budget was prepared, Carmicle and the BJS controller met with Moriarty, Tortorici, and King to review the budget book. **Breunig Test. Dep. Tr., Pages 16:20–17:9, 17:21–18:5; Sorich Test. Dep. Tr., Pages 18:12–19:10; Moriarty Test. Trial Tr. Vol. 4, Page 19:1–16; Phillips Test. Trial Tr. Vol. 5, Pages 133:8–134:2.** Each individual in attendance was provided with a copy of the budget book and supporting documentation. **Breunig Test. Dep. Tr., Page 18:1–13; Sorich Test. Dep. Tr., Page 19:18–19:25; Phillips Test. Trial Tr. Vol. 5, Page 134:3–135:4; Moriarty Test. Trial Tr. Vol. 4, Page 19:17–23.** As they walked through the budget book, Moriarty, Tortorici, and King could and did ask questions, request additional information, and review supporting documentation for any item in the budget. **Breunig Test. Dep. Tr., Pages 18:14–19:8; Sorich Test. Dep. Tr., Page 20:1–20; Moriarty Test. Trial Tr. Vol. 4, Pages 21:7–22:18.** This was a "very, very detailed process." **Breunig Test. Dep. Tr., Page 18:20–21.**

### F.  **Annual Budget Approval Process: 2005–2010**

During the annual budget approval process for each of the years from 2005 through 2010, resulting in approved budgets for each of the years from 2006 through 2011, Sorich was the controller for BJS. **Sorich Test. Dep. Tr., Pages 9:5–10:3, 11:2–9, 80:12–81:9.**

### 1.  **Payments to Rashna Carmicle**

In each of the years from 2005 through 2010, the BJS budget book presented to Moriarty, Tortorici, and King included the amount paid to Mrs. Carmicle and her company, Optica Communications. **Sorich Test. Dep. Tr., Pages 30:5–12, 34:16–35:2, 104:12–18.** However, neither Mrs. Carmicle's name nor the name of her company appeared in the budget book; rather, the amount paid to Mrs. Carmicle was included within the line item for "outside services." **Sorich Test. Dep. Tr., Pages 100:22–102:16; Tortorici Test. Trial Tr. Vol. 6, Pages 29:25–36:10; Brown Jordan's Trial Exhibits 185, 183; Carmicle's Trial Exhibit 340.**

The fact that Mrs. Carmicle continued to receive payment as an independent contractor, and that her rate of pay had increased, was not mentioned by Carmicle or Sorich or otherwise discussed at any of the annual budget meetings with Moriarty, Tortorici, and King during these years. **Sorich Test. Dep. Tr., Pages 103:7–104:2, 104:24–105:6; King Test. Trial Tr. Vol. 10, Pages 11:23–12:11; Tortorici Test. Trial Tr. Vol. 6, Page 24:17–22.** However, if Moriarty, Tortorici, or King had asked what was included in outside services, Sorich would have told them that it included payments to Mrs. Carmicle and her company. **Sorich Test. Dep. Tr., Page 128:3–11.**

Between 2005 and 2011, Sorich saw no written approval for the payments made to Mrs. Carmicle and her company or the increases in the amount of those payments. **Sorich Test. Dep.**

**Tr., Pages 85:11–86:3.** Carmicle simply told Sorich that "corporate"[14] had approved Mrs. Carmicle's hire as an independent contractor, the continuation of that relationship through 2011, and the increases in her rate of pay, and Sorich accepted this information as true. **Sorich Test. Dep. Tr., Pages 85:11–86:3, 98:23–99:8, 99:12–100:14.** Nevertheless, Sorich was bothered by the conflict of interest inherent in Carmicle's approval of payments to his wife, particularly in light of the fact that Mrs. Carmicle submitted invoices for payment with no description of the work she had performed. **Sorich Test. Dep. Tr., Pages 87:1–88:15, 89:7–90:5, 102:22–103:6.** For that reason, Sorich periodically spoke with both Hall and Phillips about the payment of invoices submitted by Mrs. Carmicle and the inclusion of payments to Mrs. Carmicle in the BJS budget each year. **Sorich Test. Dep. Tr., Pages 30:13–31:24, 90:6–14, 92:18–93:24.** Sorich did not, however, bring these matters to the attention of Moriarty, Tortorici, or King. **Sorich Test. Dep. Tr., Pages 93:25–94:18.**

### 2.  Tickets to Athletic Events

In each of the years from 2006 through 2010, the annual BJS budget submitted to and approved by Moriarty, Tortorici, and King included the cost of tickets to athletic events at the University of Louisville, the University of Kentucky, and Churchill Downs in the fixed advertising portion of the budget. **Sorich Test. Dep. Tr., Pages 21:10–22:12, 24:4–14; Carmicle Test. Trial Tr. Vol. 11, Page 46:16–22, 47:8–11.** The cost of these tickets was not presented as a separate line item in the budget. **Sorich Test. Dep. Tr., Pages 114:20–116:3.** Moriarty never asked where the amounts he had approved for University of Louisville tickets in 2007 were in the budget. **Moriarty Test. Trial Tr. Vol. 4, Pages 22:19–23:5.**

---

[14] Sorich understood "corporate" to mean the officers of BJI, including Moriarty, Tortorici, and King, but not Carmicle. **Sorich Test. Dep. Tr., Pages 84:13–15, 84:18–85:8.**

The practice of including this type of cost in the fixed advertising portion of the budget dates back to the 1990s—before Casual Living Worldwide became BJS and long before Carmicle was employed by the Company—when Sorich included the cost of tickets to Los Angeles Dodgers baseball games in the advertising portion of the budget. **Sorich Test. Dep. Tr., Pages 70:17–72:16, 129:3–11; Carmicle Test. Trial Tr. Vol. 11, Pages 46:23–47:7.** No one ever told Sorich that it was inappropriate to do so.[15] **Sorich Test. Dep. Tr., Pages 23:17–24:3.** Sorich continued the practice between 2006 and 2010 because the tickets were typically paid for when sales were low, and including them in the fixed advertising portion of the budget allowed Sorich to spread the cost across the entire year. **Sorich Test. Dep. Tr., Pages 22:6–23:5, 74:9–20.**

According to Moriarty, it was "virtually impossible" to detect the cost of these tickets within the advertising portion of the budget. **Moriarty Test. Trial Tr. Vol. 3, Pages 196:23–197:3.** The inclusion of this cost in fixed advertising was not apparent in any of the budget books or mentioned during any of the annual budget meetings with Moriarty, Tortorici, and King during these years. **Tortorici Test. Trial Tr. Vol. 6, Pages 38:23–40:9, 44:3–13; Brown Jordan's Trial Exhibits 185, 183; Carmicle's Trial Exhibit 340.** However, during these annual budget meetings, Moriarty, Tortorici, and King could have asked about any of the amounts included in fixed advertising, and if they had asked about tickets, they would have been

---

[15] Tortorici conceded that it was the controllers—Sorich, Breunig, and Deinlein—who misclassified tickets to athletic events in the BJS budget. **Tortorici Test. Trial Tr. Vol. 7, Page 5:7–9.** There is no evidence that Carmicle instructed any of the controllers to include Mrs. Carmicle's salary or the cost of tickets to athletic events in the fixed advertising portion of the BJS budget. **Tortorici Test. Trial Tr. Vol. 7, Page 4:7–24.** The controllers reported to Tortorici with respect to financial controls, financial results, directives, policies, and procedures, including the manner in which expenses were approved and recorded. **Tortorici Test. Trial Tr. Vol. 7, Pages 5:7–6:14.** Tortorici regularly spoke to the controllers about these matters. **Tortorici Test. Trial Tr. Vol. 7, Pages 6:25–7:14.** The controllers knew that it was incumbent upon them to bring it to Tortorici's attention if they thought any expenses were misclassified or unauthorized. **Tortorici Test. Trial Tr. Vol. 7, Page 6:18–24.**

shown the cost of the tickets and any supporting documentation. **Sorich Test. Dep. Tr., Pages 20:1–20; 64:3–15.**

Sorich periodically spoke to Hall and Phillips about the ticket expenditures, just as he had spoken to them about the payments to Mrs. Carmicle. **Sorich Test. Dep. Tr., Pages 30:13– 31:24.** Sorich never spoke to Moriarty, Tortorici, or King about the tickets. **Sorich Test. Dep. Tr., Pages 94:19–95:6.** The ticket expenditures bothered Sorich less than the payments to Mrs. Carmicle, however, because the tickets were shared with others in the office by lottery. **Sorich Test. Dep. Tr., Pages 91:5–23, 92:5–17.**

Hall testified that BJS had tickets to basketball games at the University of Louisville and University of Kentucky, football games at the University of Louisville and University of Kentucky, and events at Churchill Downs. **Hall Test. Trial. Tr. Vol. 5, Page 54:11–16.** Employees were able to use some of these tickets, and sometimes there was a raffle for the tickets within BJS, but no customers or suppliers were taken to any of these events by Carmicle or anyone else. **Hall Test. Trial Tr. Vol. 5, Pages 54:11–60:16; Phillips Test. Trial Tr. Vol. 5, Pages 100:5–103:2; Holly Hruska-Isaacs ("Hruska-Isaacs") Test. Dep. Tr., Page 77:14– 22;**[16] **Breunig Test. Dep. Tr., Pages 160:23–161:10.** Carmicle announced tickets at staff meetings, and said they could be used for staff and customers, but also viewed these tickets and events as a way to boost employee morale and to foster camaraderie and team spirit between employees. **Hall Test. Trial Tr. Vol. 5, Pages 68:10–70:21, 72:14–73:3, 74:5–10; Phillips Test. Trial Tr. Vol. 5, Pages 138:21–139:6; Carmicle Test. Trial Tr. Vol. 11, Pages 26:13– 27:6, 44:3–18.** Carmicle testified that other employees used most of these tickets, and that he personally used very few of these tickets. **Carmicle Test. Trial Tr. Vol. 11, Pages 41:10–42:1.**

---

[16] All citations to Hruska-Isaacs's testimony refer to the transcript of the video deposition played at trial. *See* **Trial Tr. Vol. 5, Page 146:6–14.**

Carmicle's membership in the Young Presidents' Organization ("YPO") was also paid for by the Company; this expense was reflected each year in the advertising portion of the budget. **Sorich Test. Dep. Tr., Pages 28:11–29:8.** This expense was never discussed at the annual budget meetings, nor was it ever included as a separate entry in the budget. **Sorich Test. Dep. Tr., Pages 121:15–122:6.** Carmicle's testimony establishes that Moriarty, Tortorici, and others were aware of and supported Carmicle's membership in YPO, and that there may have been business benefits to Carmicle's membership, but does not establish that Moriarty ever specifically approved reimbursement of associated fees. **Carmicle Test. Trial Tr. Vol. 11, Pages 47:13–52:25; Carmicle's Trial Exhibit 171.**

G. **Annual Budget Approval Process: 2011**

At the end of 2011, Breunig began preparing the BJS budget for 2012, the first annual budget to be prepared after Breunig replaced Sorich as the controller for BJS. **Breunig Test. Dep. Tr., Page 19:9–14.** During that process, Breunig noticed certain expenditures—including tickets to athletic events at the University of Louisville, the University of Kentucky, and Churchill Downs, as well as payments to Mrs. Carmicle's company, Optica Communications—included as fixed advertising costs in the BJS budget. **Breunig Test. Dep. Tr., Page 19:9–20:5.** With respect to these expenditures, Breunig was concerned about a lack of transparency and sought to confirm that these expenditures had been approved. **Breunig Test. Dep. Tr., Pages 79:18–80:3.** As to the tickets, Breunig was particularly concerned because the expense was so large. **Breunig Test. Dep. Tr., Page 81:9–12, 81:15–23.** As to Mrs. Carmicle's company, Breunig was concerned because Carmicle, the man who ran BJS, was paying his own wife based on vague invoices she submitted with little substantiation. **Breunig Test. Dep. Tr., Pages 80:4–81:2, 81:7–9.** In light of the relationship between Carmicle and Mrs. Carmicle, Breunig believed

that Carmicle's superior should have been the one to approve her salary. **Breunig Test. Dep. Tr., Page 122:6–11, 122:14–24.** Like Sorich, Breunig discussed his concerns about the lack of approval for these expenditures with Phillips. **Breunig Test. Dep. Tr., Pages 89:20–90:7, 90:13–22.**

In an attempt to understand the approval process for these expenditures, Breunig spoke first with someone in the accounts payable department at BJS, then with Carmicle. **Breunig Test. Dep. Tr., Page 19:9–21:7.** Carmicle provided Breunig with what documentation he had, all of which was "pretty dated." **Breunig Test. Dep. Tr., Page 20:6–21:7.** For example, Carmicle forwarded Moriarty's 2007 email approving the purchase of a University of Louisville ticket package, "just in case these tickets ever get questioned." **Breunig Test. Dep. Tr., Pages 70:9–22, 72:7–24, 73:4–9; Brown Jordan's Trial Exhibit 61.** There was no written approval from Moriarty for the cost of tickets to events at Churchill Downs. **Breunig Test. Dep. Tr., Page 105:8–24.** Likewise, there was no written approval from Moriarty for the increases in Mrs. Carmicle's rate of pay, aside from the fact that her salary may have been included in the proposed BJS budget as "outside services." **Breunig Test. Dep. Tr. Pages 118:18–120:13.**

In the absence of any recent documented approval of these expenditures, Breunig suggested to Carmicle that these expenditures should be disclosed to and expressly approved by Carmicle's superior on an annual basis. **Breunig Test. Dep. Tr., Pages 102:3–103:15.** Carmicle agreed and told Breunig that he would speak to Moriarty and begin obtaining his approval for such expenditures annually. **Breunig Test. Dep. Tr., Page 20:6–21:7, 21:20–23:4.**

On December 7, 2011, Carmicle sent Moriarty an email praising Breunig for "scrubb[ing] our books with an auditor's eye" and for bringing it to Carmicle's attention "that we are missing a process for annual approvals for expense areas that were approved but lack recent

documentation." **Moriarty Test. Trial Tr. Vol. 3, Pages 176:14–177:9; Carmicle Test. Trial Tr. Vol. 11, Page 173:11–21; Brown Jordan's Trial Exhibit 81.** Carmicle went on to write,

> Since I approve certain expenses, there needs to be an annual documentation for that, and on downstream within our unit. There are also expenses that you have approved or that you have given me authority to approve the company to spend that also lacks recent annual documentation. For the planned 2012 budget, there are three instances he has brought to my attention that I want to remind you of as well. All have been previously approved, but now is a good time to revisit before we enter into the New Year.

**Brown Jordan's Trial Exhibit 81.** The first of these "three instances" was Carmicle's auto allowance, about which Moriarty was not concerned and for which Moriarty told Carmicle no annual approval was necessary. **Moriarty Test. Trial Tr. Vol. 3, Pages 179:11–14; Brown Jordan's Trial Exhibits 81, 114.** The second was the cost of tickets to local athletic events, and the third was the fact that Mrs. Carmicle and her company, Optica Communications, continued to be paid by BJS. **Brown Jordan's Trial Exhibit 81.** In addition to bringing these expenditures to Moriarty's attention, Carmicle indicated that Breunig would establish a procedure for annual approval and documentation of these expenditures going forward. **Brown Jordan's Trial Exhibit 81.** Carmicle also forwarded this email exchange to Breunig, writing that Breunig's suggestion "was well received and immediately is the best time to start the process for the future." **Breunig Test. Dep. Tr., Pages 99:25–100:15; Brown Jordan's Trial Exhibit 81.**

### 1. Tickets to Athletic Events

With respect to the tickets, Carmicle informed Moriarty that "[w]e have commitments to local sporting tickets and the basketball suite required the signing of a multi-year lease. You approved this via email a few years ago but [Breunig] also feels we need to have an annual check in so we are all on the same page." **Brown Jordan's Trial Exhibit 81.** Moriarty understood Carmicle to be referring to the approval Moriarty had given in 2007 for a University of

Louisville ticket package, which involved the commitment of a certain amount each year from 2007 through 2011 in exchange for tickets to football games, tickets to basketball games, and other benefits. **Moriarty Test. Trial Tr. Vol. 3, Page 179:15–25; Brown Jordan's Trial Exhibits 55, 56.** In response, Moriarty simply advised Carmicle that "we need amounts that hit budget." **Brown Jordan's Trial Exhibits 114.** This was not intended by Moriarty to be construed as approval for ticket expenditures in 2012; rather, it was a request for additional information. **Moriarty Test. Trial Tr. Vol. 3, Page 193:16–194:7.**

> Carmicle responded to Moriarty by email the following day, writing:
>
> Tickets and leases all combined are budgeted at about $110k next year. Unless we have more use through BJ, I have been trying to sell off much of this for a while now. A majority of it is locked in a lease still and if we drop the others we can't get them back if we do find a way out of the lease. So, we kept the budget as is and I figured we would get upside if I can sell them.

**Brown Jordan's Trial Exhibit 114.** In a second email to Moriarty, Carmicle provided additional details with respect to the proposed ticket expenditures for 2012. **Brown Jordan's Trial Exhibit 117.** Carmicle indicated that the 2012 budget included $45,150.00 for University of Louisville men's basketball tickets, $8,200.00 for University of Louisville men's football tickets, and $11,357.00 for events at Churchill Downs, altogether totaling $64,707.00. **Moriarty Test. Trial Tr. Vol. 3, Page 195:4–8; Brown Jordan's Trial Exhibit 117.**

Moriarty did not give written approval for either the $110,000.00 ticket expenditure proposed in Carmicle's first email or the $64,707.00 ticket expenditure proposed in Carmicle's second email. Instead, Moriarty's final written word on the subject was an email to Carmicle dated December 8, 2011, in which Moriarty wrote, "I have a few questions to discuss relative to these expenses, reporting structure, where they land in the P+L etc when we reach the finalization step of this budget. Plan will be to review week of 12/19." **Moriarty Test. Trial Tr.**

Vol. 3, Pages 194:24–195:2; Carmicle's Trial Test. Vol. 11, Pages 154:18–155:7, 212:23–213:11; Breunig Test. Dep. Tr., Page 140:3–8; Brown Jordan's Trial Exhibit 117.

Neither Carmicle nor Breunig raised the subject of ticket expenditures during any of the 2012 budget approval meetings with Moriarty, Tortorici, and King at the end of 2011. **Tortorici Test. Trial Tr. Vol. 6, Page 47:12–24; Moriarty Test. Trial Tr. Vol. 3, Page 199:19–25.** Likewise, the subject was not raised during these meetings by Moriarty, Tortorici, or King. **Moriarty Test. Trial Tr. Vol. 4, Pages 39:25–40:20; King Test. Trial Tr. Vol. 10, Page 29:6–23; Sorich Test. Dep. Tr., Page 64:16–18.** In light of the emails exchanged between Carmicle and Moriarty, King assumed that the ticket expenditures had been cut from the budget because Carmicle did not raise the subject and King did not see tickets in the budget materials presented. **King Test. Trial Tr. Vol. 10, Page 29:14–23.** However, at the time of those meetings, Moriarty knew that ticket expenditures had been included in the fixed advertising portion of the BJS budget since 2007: In an email dated December 9, 2011, Carmicle informed Moriarty that "[t]he sports tickets have always fallen in the Advertising budget and I think [Sorich] just spread them out appropriately since it was hard to allocate them to one specific customer." **Brown Jordan's Trial Exhibit 117.** Carmicle further stated that "[Breunig] suggested and I agreed that we needed to bring this up for transparency and annual approval. [Breunig] also feels there is a better place to report them in the P&L in the future." **Brown Jordan's Trial Exhibit 117.** Prior to receiving this email, Moriarty was not aware that Carmicle had been including the cost of tickets to athletic events in the advertising portion of the budget. **Moriarty Test. Trial Tr. Vol. 3, Page 196:3–22.**

Pursuant to BJI's Travel Policy, Carmicle was required to obtain advance approval from his immediate supervisor for entertainment expenses, including the purchase of tickets to athletic

events at the University of Louisville, University of Kentucky, and Churchill Downs. **Brown Jordan's Trial Exhibit 53.** The fact that Carmicle sought Moriarty's approval prior to purchasing a University of Louisville ticket package in 2007 suggests that Carmicle understood the requirement that he obtain approval for entertainment expenses from Moriarty in advance. **Carmicle Test. Trial Tr. Vol. 11, Page 156:3–14; Brown Jordan Trial Exhibits 55, 56, 223.** This is also suggested by the fact that Carmicle agreed with Breunig about the need to establish a procedure for annual approval and documentation of such expenses and approached Moriarty about it in December of 2011.

Moriarty, Tortorici, and King should have asked during the budget approval process whether the fixed advertising portion of the BJS budget for 2012 included any ticket expenditures, particularly in light of BJS's poor performance in 2011, their desire to cut costs, and their knowledge that Carmicle had been planning to spend more money on tickets in 2012 and had been including such expenditures in the fixed advertising portion of the budget in previous years.

### 2.  Mrs. Carmicle and Optica Communications

In his initial email to Moriarty dated December 7, 2011, Carmicle wrote:

> Rashna continues to perform services for the company under a year-to-year contractor agreement the company executed with her in 2005. The extent of these services was divulged in the due diligence process in August of this year, but again we have no annual check point on this arrangement either. As a reminder in 2005 she decided to stay home and Doug Foley executed an agreement with her that we have kept in place since then for services she performs including mainly the photo shoots locally. Since I am an executive now and she is my wife, this should be documented annually.

**Brown Jordan's Trial Exhibit 81.** Moriarty understood Carmicle to be referring to the 2005 Contractor Agreement between Mrs. Carmicle and BJI, but had been unaware that the BJS budget included payments to Mrs. Carmicle after 2006. **Moriarty Test. Trial Tr. Vol. 3, Pages**

170:14–22, 180:20–181:15; **Brown Jordan's Trial Exhibit 51.** In response, Moriarty advised

Carmicle that "we need amounts that hit budget, and . . . duties performed. I was not aware #3

[Mrs. Carmicle as independent contractor] was still active since it hasn't been mentioned in

budgets for quite some time." **Moriarty Test. Trial Tr. Vol. 3, Page 183:16–22; Brown**

**Jordan's Trial Exhibit 114.**

> Carmicle responded to Moriarty by email the following day, writing:

> As for Rashna, her contract was a year to year and we have always used her. Most
> of the photography we do she coordinates at houses of friends. Her compensation
> is $70k a year I think. I can get you more documentation on that as well. We
> should discuss both [tickets and Mrs. Carmicle] for adjustments and final
> approval/documentation.

**Brown Jordan's Trial Exhibit 114.** At this point in time, the BJS budget for 2012 had not yet

been approved. **Moriarty Test. Trial Tr. Vol. 3, Page 184:2–16.**

> Moriarty forwarded Carmicle's email to King, asking "Is this within our code of conduct?

I haven't heard a word of this or seen it referenced in a budget since 2006." **Brown Jordan's**

**Trial Exhibit 114.** King responded to Moriarty by email on December 8, 2011, as follows:

> Our code of conduct has no prohibition against employing spouses. It would have
> been a good idea from a financial controls standpoint if any invoices for payment
> to Rashna had gone through you, me or Vincent [Tortorici] for approval. Chris
> [Carmicle] should not have been approving her bills; inherent conflict of interest
> there. This was not ever mentioned in any budget meeting I recall; nor was it ever
> mentioned when we were looking for costs to cut.[17] I had no idea Rashna was still
> working for us, and definitely not that we were paying her $70,000 per year. That
> seems quite high to me given what she is doing.

**Brown Jordan's Trial Exhibit 114.** Later that day, King sent a second email to Moriarty:

> The more I think about it, the more concerned I become. There is no way this
> should not have been brought to our attention over the past four years. $70,000 is

---

[17] Due to poor performance in 2011, Moriarty had given specific instructions to cut spending at BJS by at least $1
million that year. **Moriarty Test. Trial Tr. Vol. 3, Pages 184:25–185:18.**

a lot different than a few thousand dollars. $70,000 is a full time position.[18] If it is going to continue, we need a written agreement between the Company and Rashna setting forth the services to be performed in detail and the expected amount of time the services will require. All invoices, along with detailed description of services performed and hours spent for each invoice, should go directly to Vincent [Tortorici] for approval. No one in Louisville should be involved on the billing/payment side.

**Brown Jordan's Trial Exhibit 115.**

In addition to corresponding with King, Moriarty discussed Mrs. Carmicle with Tortorici. At Moriarty's request, Tortorici sought additional information from Breunig. **Moriarty Test. Trial Tr. Vol. 3, Page 187:19–24; Tortorici Test. Trial Tr. Vol. 6, Page 25:13–25; Brown Jordan's Trial Exhibit 296.** Breunig provided Tortorici with the latest signed agreement he had, which was the 2005 Contractor Agreement between Mrs. Carmicle and BJI. **Tortorici Test. Trial Tr. Vol. 6, Page 26:1–17; Brown Jordan's Trial Exhibits 296, 51.** Breunig also informed Tortorici that Mrs. Carmicle had been paid $78,000.00 in 2009, $92,100.00 in 2010, and $81,400.00 in 2011 for services and expenses. **Brown Jordan's Trial Exhibits 296.** Tortorici then passed this information along to Moriarty. **Tortorici Test. Trial Tr. Vol. 6, Pages 26:20–27:4; Moriarty Test. Trial Tr. Vol. 3, Pages 188:12–189:4; Brown Jordan's Trial Exhibits 296.**

Moriarty and King exchanged emails discussing the amounts paid to Mrs. Carmicle, the ethical concerns raised by the situation, and the provisions of the Employee Handbook governing employment of relatives.[19] **Brown Jordan's Trial Exhibit 116.** In one of these emails, King wrote:

---

[18] In 2011, BJS staff—including full-time employees whose compensation was roughly $70,000 per year—had been reduced to cut costs, while Mrs. Carmicle continued to be paid. **Moriarty Test. Trial Tr. Vol. 3, Pages 186:10–187:16.**

[19] In that regard, the Employee Handbook provided as follows:

While the Company does not ban employment of relatives, relatives of employees may not be placed in positions where they can effect, evaluate, proof, audit the work or influence the salary or

> This really is starting to smell bad. Who authorized the increase? It had to be someone (Chris?) without approval from us. That is borderline unethical, especially if the time and effort involved didn't justified [sic] the raise; even assuming it did, Chris [Carmicle] can't make that call. I have a strong suspicion this was deliberately concealed from us. Vincent [Tortorici] quizzed Jack [Sorich] about these exact costs and he never said a word about it being Rashna.

**Brown Jordan's Trial Exhibit 116.** Moriarty shared these sentiments, was bothered by the situation, and decided to speak with Carmicle directly in order to learn who had authorized the increased payments to Mrs. Carmicle. **Moriarty Test. Trial Tr. Vol. 3, Pages 190:15–191:3.**

In addition to a series of emails between Moriarty and Carmicle in which it was agreed that Mrs. Carmicle's services would no longer be used, **Brown Jordan's Trial Exhibit 121**, Moriarty claims to have had a "pretty direct" conversation with Carmicle regarding the conflict of interest, lack of transparency, and Moriarty's disappointment. **Moriarty Test. Trial Tr. Vol. 3, Pages 191:9–15, 191:24–192:7.** Moriarty claims to have made it clear during this conversation that Carmicle's actions warranted termination for cause of his employment, but that Moriarty decided to give Carmicle a second chance because he believed Carmicle had learned from his mistake. **Moriarty Test. Trial Tr. Vol. 3, Page 192:8–16; King Test. Trial Tr. Vol. 10, Pages 16:10–17:8.** While there is no written evidence of this communication, King testified that Moriarty generally prefers to communicate verbally, whether in person or over the phone, and does not put much in writing. **King Test. Trial Tr. Vol. 10, Pages 72:9–73:10.**

At BJS, Carmicle met with Breunig, Hall, and Phillips, and told them that due to Breunig's uncovering of Mrs. Carmicle's employment, going forward Mrs. Carmicle would no longer be working for the Company. **Hall Test. Trial Tr. Vol. 5, Pages 62:24–63:8, 85:16–25.**

---

career progression of one another. This applies to all placements and transfers while family members are employed in the Company. The Company has full discretion to make a decision, for any reason, regarding the employment of relatives if the Company believes it will have or has an adverse impact on Company business.

**Brown Jordan's Trial Exhibits 7, 116.**

Carmicle also told Phillips that as a result of terminating Mrs. Carmicle's engagement with the Company, Carmicle had taken a pay cut. **Phillips Test. Trial Tr. Vol. 5, Pages 99:24–100:4.**

From December of 2011 forward, the Company made no further payments to Mrs. Carmicle. **Moriarty Test. Trial Tr. Vol. 3, Page 192:17–20; Breunig Test. Dep. Tr., Page 30:15–21.** While Moriarty had not followed up as to the tickets after that expenditure came to light in December of 2011, Moriarty did follow up as to Mrs. Carmicle, as did King and Tortorici. **Moriarty Test. Trial Tr. Vol. 4, Pages 40:21–42:2.** In an email to Breunig dated December 14, 2011, King gave the following explicit instructions: "From here forward, prior to the payment of any invoices for Optica Communications, please forward all invoices and/or requests for payment to Vincent and me for approval at the corporate level." **Tortorici Test. Trial Tr. Vol. 6, Pages 27:11–28:11; Brown Jordan's Trial Exhibit 126.**[20] King also reviewed the proposed budget for 2012 and, finding that $28,000.00 remained allocated to outside services, asked Tortorici to follow up with Breunig, who confirmed in an email dated December 22, 2011, that the $28,000.00 remained in the budget not necessarily for payment to Mrs. Carmicle and her company but for photo shoots and related expenses by whomever provided, and that no payments would be made to Mrs. Carmicle going forward without following King's instructions. **Breunig Test. Dep. Tr., Pages 41:5–42:12; Tortorici Test. Trial Tr. Vol. 6, Pages 28:12–29:6; Brown Jordan's Trial Exhibit 126.** In August of 2012, Tortorici again followed up with Breunig, who confirmed that there had been no payments to Mrs. Carmicle and

---

[20] In an email dated December 14, 2011, Breunig conveyed King's instructions to Carmicle, writing:

> Regarding Optica . . . [King] said that we should provide invoices with details of the services performed, exact number of hours worked, etc. He said that he expects [Moriarty] to discuss with you but believes from a conflict of interest perspective services should only be provided when there are no alternatives or the total expenses related to the services are financially better for the Company.

**Breunig Test. Dep. Tr., Pages 128:11–130:20; Brown Jordan's Trial Exhibit 190.**

her company after December 2011. **Breunig Test. Dep. Tr., Pages 41:5–42:12; Tortorici Test. Trial Tr. Vol. 6, Page 29:7–24; Brown Jordan's Trial Exhibit 126.**

Phillips is not aware of any services Mrs. Carmicle provided to the Company after 2006, and as head of sales for BJS he would have been aware of Mrs. Carmicle's work. **Phillips Test. Trial Tr. Vol. 5, Pages 96:22–25, 97:23–99:15.** Holly Hruska-Isaacs, BJS vice president of sales, former director of sales, and former National Account Sales Manager, saw Mrs. Carmicle's name on some press releases and knows that some photo shoots were done at her home, but is not aware of anything else; however, she did not manage or supervise Mrs. Carmicle. **Hruska-Isaacs Test. Dep. Tr., Pages 9:20–10:24, 16:25–17:6, 18:14–19:6, 22:24– 23:7.**

The decision was made to discontinue payments to Mrs. Carmicle because her husband, who ran a BJI entity, had been paying his wife for five or six years, and had unilaterally increased her compensation twice, without the knowledge of Moriarty, Tortorici, or King, and there was no evidence to suggest that the work performed by Mrs. Carmicle justified the amount she was paid. **King Test. Trial Tr. Vol. 10, Page 15:15–22.** In other words, the decision resulted from the conflict of interest, Carmicle's failure to disclose his wife's continued employment, and the fact that Mrs. Carmicle's work did not appear to justify her pay. **King Test. Trial Tr. Vol. 10, Pages 20:20–21:4.** Although Carmicle was required to review the Code of Conduct and Business Ethics Policy and sign a Certificate of Agreement and Compliance to the Code of Conduct and Business Ethics Policy each year, Carmicle never disclosed the conflict of interest created by his wife's continued employment. **King Test. Trial Tr. Vol. 10, Page 17:9– 19:18; Brown Jordan's Trial Exhibits 9–16, 18.** The Company did not ask Carmicle to return the money paid to Mrs. Carmicle in 2011 because Moriarty, King, and Tortorici were unaware of

how little work she had actually done until the end of 2013. **King Test. Trial Tr. Vol. 10, Pages 21:13–23:9.**

### 3. Procedure for Annual Approval and Documentation

Despite Carmicle's representation to Moriarty in December of 2011 that Breunig would "set up a system to document processes and controls in this area and make this a part of the annual process for future years," **Brown Jordan's Trial Exhibit 81**, Moriarty never received a written request for approval of ticket expenditures after December of 2011, and no procedure for annual approval and documentation of such expenditures was ever established by Breunig. **Moriarty Test. Trial Tr. Vol. 3, Pages 181:22–182:18; Tortorici Test. Trial Tr. Vol. 6, Pages 43:13–44:2.**

Breunig advised Carmicle that the ticket expenses should be "below the margin line," in SG&A, or selling, general, and administrative, because they were not offsets to revenue specific to customers. **Breunig Test. Dep. Tr., Pages 97:11–98:20.** Breunig never approached Tortorici with the suggestion that tickets should be in SG&A rather than fixed advertising. **Tortorici Test. Trial Tr. Vol. 6, Page 44:14–25.** These costs remained in fixed advertising and were not moved from one classification to another. **Tortorici Test. Trial Tr. Vol. 6, Page 46:14–23.**

In the 2011 budget book, there is a separate line entry for Power Creative, set apart from fixed advertising, because it was not specific to any customer, and creating a separate category like this could have been done with sports tickets. **Tortorici Test. Trial Tr. Vol. 6, Pages 40:7–41:19.** Expenses such as those for tickets to athletic events should have been included "below the line" in SG&A, rather than "above the line" as an adjustment from gross to net revenues. **Tortorici Test. Trial Tr. Vol. 6, Pages 42:17–43:12.** These costs could still have been spread out across the year if classified in SG&A. **Tortorici Test. Trial Tr. Vol. 6, Page 45:1–20.**

41

### H. **Annual Budget Approval Process: 2012–2013**

In 2013, Tortorici was concerned by the increase in the amount of fixed advertising in the proposed 2014 budget. **Tortorici Test. Trial Tr. Vol. 6, Page 52:7–21.** Moriarty and Tortorici discussed the advertising commitment for Home Depot, and Moriarty asked Tortorici to look into advertising for 2013 to see what had been spent, to compare it to the proposed amount for 2014; Tortorici looked into these matters between November of 2013 and January of 2014. **Tortorici Test. Trial Tr. Vol. 6, Page 54:1–55:1.** In connection with that endeavor, Tortorici got the BJS ledger from Deinlein and found that University of Louisville and University of Kentucky tickets had still been charged to advertising during the calendar year 2013, as had YPO expenses, despite Carmicle's promise of greater transparency. **Tortorici Test. Trial Tr. Vol. 6, Page 55:2–18.**

Moriarty came to learn that ticket expenditures had been included in the 2012, 2013, and 2014 budgets, but no annual written approval was sought for any of these. **Moriarty Test. Trial Tr. Vol. 3, Page 197:8–17.** These ticket expenditures were never presented in a way that made them transparent or subject to approval. **Moriarty Test. Trial Tr. Vol. 3, Page 197:18–22.**

At the 2012 and 2013 annual budget meetings for approval of the 2013 and 2014 budgets, Carmicle did not mention ticket expenditures or the previous representation that a procedure for annual approval and documentation of such expenditures would be established. **King Test. Trial Tr. Vol. 10, Pages 29:24–30:6; Tortorici Test. Trial Tr. Vol. 6, Page 48:11–20.** These expenditures were not included in the 2012 or 2013 budget books presented to Moriarty, Tortorici, and King. **Tortorici Test. Trial Tr. Vol. 6, Pages 49:3–50:2, 51:18–52:2, 53:10–20; Brown Jordan's Trial Exhibits 320, 321.** According to Tortorici, the proper process would not have been for him, Moriarty, or King to ask whether such costs were included; rather, the

representatives from BJS would lay out the budget and provide detail, especially in sensitive areas like the employment of a relative or a matter as sensitive as the tickets had become by that time. **Tortorici Test. Trial Tr. Vol. 6, Pages 47:25–48:10.**

In addition to the amounts paid to the University of Louisville from 2007 through 2011, Carmicle caused BJS to pay the University of Louisville $52,500.00 in 2012 and $55,499.00 in 2013. **Brown Jordan's Trial Exhibit 223.** However, BJS recouped some of these amounts when Carmicle sold a number of tickets that were locked in a lease. **Carmicle's Trial Exhibit 228.** Thomas Tabb paid BJS $4,921.50 on September 6, 2013; Nick Carricato paid BJS $9,160.00 in June 2013, $1,512.00 in July 2012, $3,750.00 in May 2012, and $2,270.00 in December 2013. **Carmicle's Trial Exhibits 395, 394, 372.** Altogether, between $21,000.00 and $22,000.00 was returned to the Company through these ticket sales. **Carmicle Test. Trial Tr. Vol. 11, Page 157:1–24.**

### I.  Provision of Furniture to Hurstbourne Country Club

Around the end of 2012 or beginning or 2013, Carmicle provided a set of outdoor furniture to Hurstbourne Country Club ("Hurstbourne") at no cost. **Steven Shafer ("Shafer") Test. Dep. Tr., Pages 49:22–50:2.**[21] The set consisted of about one hundred pieces of BJC furniture, including chaise lounges, side tables, and matching dining tables and chairs. **Shafer Test. Dep. Tr., Page 63:2–16.** Carmicle explained to Hurstbourne's manager that the furniture was very nice but had been rejected by a customer.[22] Rather than press the issue and risk losing

---

[21] All citations to Shafer's testimony refer to the transcript of the video deposition presented at trial. *See* **Trial Tr. Vol. 8, Pages 164:5–165:18.**

[22] Steven Elton ("Elton"), senior vice president of sales and branding for BJC, testified at trial that the customer—a hotel in Florida—had not taken proper care of the furniture. When the customer pushed back against his suggestion that the furniture simply needed to be cleaned, Elton had agreed to replace certain parts of the furniture at no cost. Dissatisfied, the customer demanded that BJC replace the entire set of furniture. Although it was an important and aggressive customer, Elton refused to do so. **Elton Test. Trial Tr. Vol. 7, Pages 84:22–85:1, 86:16–87:7, 95:12–98:9, 121:17–123:6.** Carmicle eventually stepped in and agreed to replace the furniture because the customer "had drawn a line in the sand." **Carmicle Test. Trial Tr. Vol. 11, Pages 67:10–21, 68:21–69:8.** Elton testified that,

the customer's business, Carmicle had decided to take the furniture back. With nowhere to store the furniture, Carmicle explained that he needed to get rid of it. **Shafer Test. Dep. Tr., Pages 56:21–24, 58:8–59:21.** Hurstbourne's manager offered to pay, but Carmicle never provided an invoice and, as of the time of trial, Hurstbourne had not paid anything for the furniture. **Shafer Test. Dep. Tr., Pages 66:22–67:8.**

Although Hurstbourne did not pay for the furniture, the Company may have benefited from the donation. For example, the Company was permitted to hold a photo shoot at the club at no cost. In addition, members of the club—many of whom were wealthy and in the market for outdoor furniture—knew that the furniture had been provided by BJC. **Shafer Test. Dep. Tr., Pages 91:15–23, 92:2–4, 92:8–92:1.**

Carmicle was a member at Hurstbourne, but did not receive any personal benefit from donating the furniture, other than being able to use it while at the club like any other member. **Shafer Test. Page 85:11–15.** Carmicle never asked Hurstbourne's manager for anything, such as a discount on his club membership, in exchange for the furniture. **Shafer Test. Page 90:11–91:10.**

## J. Potential Sale of the Company

In the spring of 2013, BJI's Board of Directors (the "Board") decided to pursue a potential sale of the Company. **Breaux Test. Trial Tr. Vol. 3, Pages 59:17–60:8; Teetsel Test. Trial Tr. Vol. 2, Page 167:14–25.** After considering several different investment banks, the Board ultimately hired Moelis to market the Company for sale. **Breaux Test. Trial Tr. Vol. 3, Pages 59:17–60:8; Teetsel Test. Trial Tr. Vol. 2, Page 167:14–25.** The Board agreed to offer the Company for sale either as a whole or separately, selling the "commercial business" (Wabash

---

rather than giving the furniture away to Hurstbourne, BJC could have either stored the furniture or stripped it down, made any necessary improvements, and attempted to resell it. Elton acknowledged, however, that there would have been costs associated with either of those alternatives. **Elton Test. Trial Tr. Vol. 7, Pages 123:1–124:7.**

Valley, Winston Furniture, and Charter Furniture) to one buyer, and the "consumer business" (BJS and BJC) to another buyer. **Teetsel Test. Trial Tr. Vol. 2, Pages 167:14–168:6, 171:20– 25, 184:8–17; Moriarty Test. Trial Tr. Vol. 3, Pages 163:11–164:12.** By August of 2013, the Company and Moelis had prepared a confidential information memorandum ("CIM") detailing such items as the Company's history, strategy, customers, financials, and outlook. **Breaux Test. Trial Tr. Vol. 3, Page 68:2–13.**

After the Board had decided to offer the Company for sale, but before Moelis had been hired, Teetsel became aware of a possible management buyout ("MBO") by Moriarty, Tortorici, and King when Moriarty approached Teetsel to ask whether Stonehill would object to their preparing a bid for the commercial business. **Teetsel Test. Trial Tr. Vol. 2, Page 168:7–18; Moriarty Test. Trial Tr. Vol. 3, Page 213:3–14.** Teetsel saw no problem with the idea of an MBO provided that potential conflicts of interest were properly addressed and that the value of the sale was maximized. **Teetsel Test. Trial Tr. Vol. 2, Page 168:19–24.** Moriarty also spoke to Breaux, who—like Teetsel—had no objection to the idea of an MBO provided that the overall value of the sale was maximized. **Breaux Test. Trial Tr. Vol. 3, Pages 60:23–61:11.** However, the Board was only interested in selling the commercial business on its own, whether through an MBO or otherwise, if the consumer business were sold to another buyer at the same time. **Teetsel Test. Trial Tr. Vol. 2, Pages 169:25–170:18; Breaux Test. Trial Tr. Vol. 3, Page 62:1–13.** After the Board hired Moelis, its lead banker Frank Sellman was also made aware of the possibility of the MBO of the commercial business. **Teetsel Test. Trial Tr. Vol. 2, Page 171:4–13; Breaux Test. Trial Tr. Vol. 3, Pages 62:22–63:5.**

In connection with financing the MBO, Moriarty, Tortorici, and King prepared their own financial model (the "WWC model") for the commercial business only. **Moriarty Test. Trial**

**Tr. Vol. 3, Pages 213:15–215:12; Tortorici Test. Trial Tr. Vol. 6, Page 55:25–57:4; King Test Trial Tr. Vol. 10, Pages 40:24–42:4.** While the CIM prepared by the Company and Moelis would be presented to potential buyers, the WWC model would be presented to potential lenders. **Moriarty Test. Trial Tr. Vol. 3, Pages 213:15–215:12; Tortorici Test. Trial Tr. Vol. 6, Page 55:25–57:4; King Test Trial Tr. Vol. 10, Pages 40:24–42:4.** Because the CIM and the WWC model were prepared at different times and for different purposes, Moriarty, Tortorici, and King saw no problem with the differences between the two, and felt no obligation to disclose the WWC model either to the Board or to Moelis. **Moriarty Test. Trial Tr. Vol. 3, Pages 213:15–215:12; Tortorici Test. Trial Tr. Vol. 6, Page 55:25–57:4; King Test Trial Tr. Vol. 10, Pages 40:24–42:4.**

Nevertheless, Moriarty, Tortorici, and King did share the WWC model with Breaux in connection with seeking financing for the MBO from Crescent. **Breaux Test. Trial Tr. Vol. 3, Pages 63:6–22, 65:4–14, 66:5–67:6; Moriarty Test. Trial Tr. Vol. 3, Page 215:8–219:9; Tortorici Test. Trial Tr. Vol. 6, Pages 57:5–59:12; King Test Trial Tr. Vol. 10, Pages 41:17–42:4; Brown Jordan's Trial Exhibits 137, 238.** While Breaux—who did not work in Crescent's lending division—would not personally have been involved in the financing, Breaux did participate in conference calls and was copied on emails in which the financing was discussed. **Breaux Test. Trial Tr. Vol. 3, Pages 63:6–22, 65:4–14, 66:5–67:6;Brown Jordan's Trial Exhibits 137, 238.** The WWC model was attached to an email received by Breaux and another Crescent employee. **Breaux Test. Trial Tr. Vol. 3, Pages 69:7–72:2; Brown Jordan's Trial Exhibit 238.** While Breaux did not open the attachment or review the WWC model, he could have done so. **Breaux Test. Trial Tr. Vol. 3, Pages 69:7–72:2.** In addition, there would have

been nothing to stop Breaux from sharing the WWC model with the rest of the Board and with Moelis. **King Test Trial Tr. Vol. 10, Pages 41:17–42:4.**

Moriarty, Tortorici, and King did not ask the Board for favorable treatment in the bidding process, and ultimately did not submit a bid for the commercial business. **Breaux Test. Trial Tr. Vol. 3, Page 61:12–25.** Such a bid would not have been accepted, because the Board never received an acceptable bid for the consumer business. **Breaux Test. Trial Tr. Vol. 3, Page 61:12–62:21.**

At the conclusion of the bidding process in February of 2014, Moelis presented three bids—two for the Company as a whole, and one for the consumer business only. **Breaux Test. Trial Tr. Vol. 3, Pages 73:20–77:12; Brown Jordan's Trial Exhibit 172.** The Board decided not to sell the Company, and instead purchased Tropitone, another furniture business, in or around September of 2014. **Teetsel Test. Trial Tr. Vol. 2, Pages 185:21–186:1; Breaux Test. Trial Tr. Vol. 3, Pages 77:13–79:2.**

### K.  Carmicle's Accessing Emails of Other Company Employees

On July 16, 2013, BJI's Chief Information Officer, Bill Snow ("Snow"), sent an email to Carmicle and numerous other Company employees regarding the upcoming transition from USA.net to Microsoft Office 365 as the Company's email service provider. **Kevin Coddington ("Coddington") Test. Dep. Tr., Pages 25:24–26:7, 28:2–29:2;[23] Brown Jordan's Trial Exhibit 27.** In that email, Snow wrote, "In preparation for the move to the new email service, I would like you all to test your account on the new service, Office 365."[24] **Brown Jordan's Trial Exhibit 27.** Snow provided all recipients of that email with a single generic password—

---

[23] All citations to Coddington's testimony refer to the transcript of the video deposition presented at trial. *See* **Trial Tr. Vol. 5, Pages 147:15–149:8.**
[24] Office 365 operates and provides the Company with a cloud-based server. **Coddington Test. Dep. Tr., Pages 25:24–26:7.**

"Password1"—and instructed each person to test his or her account with that password. **Brown Jordan's Trial Exhibit 27.**

Shortly thereafter, Carmicle began monitoring the emails of BJS employee Steve Elton ("Elton") using Elton's username and the generic password provided by Snow to log in to Elton's Company email account. **Carmicle Test. Trial Tr. Vol. 11, Pages 76:1–9, 127:2–6.** Concerned about what he perceived as Elton's dishonesty and insubordination, Carmicle testified that he believed he had authority to monitor Elton's emails. **Carmicle Test. Trial Tr. Vol. 11, Pages 70:6–72:6.** Carmicle further testified that, in monitoring Elton's emails, he became concerned that Moriarty was being dishonest with him; for that reason, Carmicle began monitoring Moriarty's emails as well, using the same method he had used to access Elton's emails. **Carmicle Test. Trial Tr. Vol. 11, Pages 76:10–77:9; Brown Jordan's Trial Exhibits 32, 33.** Thus, Carmicle began accessing Moriarty's emails not because he suspected any illegal activity, but simply because he believed that Moriarty might be lying to him about his interactions and communications with Carmicle's subordinate. **Timothy Silvestre ("Silvestre") Test. Dep. Tr., Pages 127:8–129:4;[25] Brown Jordan's Trial Exhibits 32, 33.**

In monitoring Moriarty's emails, Carmicle became aware of discussions between Moriarty, Tortorici, and King with respect to a possible MBO. **Carmicle Test. Trial Tr. Vol. 11, Page 77:10–78:3.** Carmicle went on to review the emails of multiple Company employees, many of which included discussions about the valuation of the Company. **Carmicle Test. Trial Tr. Vol. 11, Page 82:13–22.** Carmicle eventually discovered that Moriarty, Tortorici, and King had prepared their own model—the WWC model—using different numbers and projections than those provided to Moelis in connection with preparing the CIM. **Carmicle Test. Trial Tr. Vol.**

---

[25] Citations to Timothy Silvestre's testimony that do not refer to the trial transcript refer to the transcript of the video deposition presented at trial. *See* **Trial Tr. Vol. 5, Pages 6:9–9:2.**

**11, Pages 82:23–83:5.** Carmicle does not know whose emails he accessed, when he accessed them, or how many times he accessed them before discovering that two different models had been prepared. **Carmicle Test. Trial Tr. Vol. 11, Pages 130:1–131:5, 148:12–15.**

Likewise, Carmicle does not know whose emails he accessed, when he accessed them, or how many times he accessed them overall between July of 2013—when he first accessed Elton's emails—and the end of 2013 or beginning of 2014.[26] **Carmicle Test. Trial Tr. Vol. 11, Page 131:1–5.** At the very least, Carmicle admits using his iPad to access, view, and take screenshots of numerous emails sent or received by Moriarty, Tortorici, King,[27] Elton, and other Company employees, many of whom worked for BJI or other entities for which Carmicle had no managerial responsibility. **Carmicle Test. Trial Tr. Vol. 11, Pages 131:1–135:8.** Each time, Carmicle logged in using the employee's username and the generic password supplied by Snow in connection with the transition to Microsoft Office 365. **Silvestre Test. Dep. Tr., Pages 105:24–106:19.**

Although Carmicle was aware of the Computer and Internet Policy, he did not review the Policy at any point during this period of time. **Carmicle Test. Trial Tr. Vol. 11, Pages 135:9–138:3.** The last time Carmicle had reviewed the Computer and Internet Policy was likely sometime in 2011, when Carmicle was considering accessing the emails of a subordinate employee. **Carmicle Test. Trial Tr. Vol. 11, Pages 135:9–138:3.** In that instance, Carmicle spoke with Snow and obtained the ability to view that employee's emails through delegation, rather than using that employee's username and password. **Carmicle Test. Trial Tr. Vol. 11, Pages 135:9–138:3.**

---

[26] Because Carmicle "lost" the iPad he used to access, view, and take screenshots of others' emails, the only existing data from which this information can be reconstructed are the printouts of the screenshots Carmicle has produced. **Carmicle Test. Trial Tr. Vol. 11, Page 131:6–12.**
[27] As BJI's General Counsel and head of Human Resources, King regularly sent and received emails regarding legal matters, employee health and insurance issues, and employee salaries and finances.

On August 30, 2013, Carmicle contacted Silvestre, an attorney whose practice is focused in the area of mergers and acquisitions, to discuss his concerns about the sale process, the existence of two models, and the fact that certain financial information had not been provided to Moelis.[28] **Silvestre Test. Dep. Tr., Pages 13:14–23, 16:15–20; Silvestre Test. Trial Tr. Vol. 5, Page 11:4–17; Carmicle Test. Trial Tr. Vol. 11, Page 127:2–12.** Carmicle told Silvestre that he had obtained this information by reviewing others' emails and that he had authority to do so in light of his role within the Company as "senior management." **Silvestre Test. Dep. Tr., Pages 42:24–43:25; Silvestre Test. Trial Tr. Vol. 5, Pages 11:22–13:1.** Silvestre advised Carmicle that he was not an expert in electronic privacy, but as a matter of course, emails are property owned by the corporate or limited liability entity, the entity decides who should or should not have access to which emails, and—in light of Carmicle's representation that he was a member of senior management—Silvestre believed Carmicle's actions were authorized.[29] **Silvestre Test. Dep. Tr., Pages 49:21–50:11, 52:2–17.** At the time, Silvestre had not seen the Computer and Internet Policy. **Silvestre Test. Dep. Tr., Pages 52:18–20, 167:6–13.**

Silvestre reviewed screenshots of emails provided to him by Carmicle, advised Carmicle that he had a fiduciary duty to act in good faith as a reasonable person would act, and discussed with Carmicle whether and how this fiduciary duty had been triggered when Carmicle discovered the two models. **Silvestre Test. Trial Tr. Vol. 5, Pages 19:16–21:1.** However, Silvestre was unable to conclude that Moriarty, Tortorici, or King had engaged in any unlawful activity or that Carmicle's fiduciary duty had been triggered on the basis of the information

---

[28] Carmicle does not know whose emails he accessed or how many times he accessed them prior to speaking with Silvestre. **Carmicle Test. Trial Tr. Vol. 11, Pages 127:13–128:17.**

[29] Silvestre was aware that Carmicle used a generic password to access others' emails, but Silvestre did not believe that password gave Carmicle authority to access those emails. Rather, the generic password was the means by which Carmicle exercised the authority derived, in Silvestre's opinion, from his position as a member of senior management. **Silvestre Test. Dep. Tr., Pages 132:21–133:23, 134:1–7, 134:11–135:2, 137:2–11, 137:15–16; Silvestre Test. Trial. Tr. Vol. 5, Pages 13:2–22, 14:4–6.**

provided by Carmicle. **Silvestre Test. Dep. Tr., Pages 162:16–163:10; Silvestre Test. Trial Tr. Vol. 5, Pages 39:20–40:10.** Although Silvestre needed additional information to reach such a conclusion, Silvestre did not advise Carmicle to continue monitoring the emails of Moriarty or anyone else. **Silvestre Test. Dep. Tr., Pages 142:21–143:1.**

L. **Carmicle's Letter to the Board and the Board's Investigation**

At the end of 2013 and beginning of 2014, BJS and BJC were not performing as well as expected. **Teetsel Test. Trial Tr. Vol. 2, Page 172:1–6; Tortorici Test. Trial Tr. Vol. 6, Pages 59:14–60:15.** The Board, which met quarterly in addition to occasional ad hoc meetings, was scheduled to meet in January or February of 2014, and would be discussing the performance of BJS and BJC. **Teetsel Test. Trial Tr. Vol. 2, Page 172:7–22.** In January of 2014, Carmicle told Phillips that he felt there was a target on his back, that he needed to make a move, and that he was going to send a letter. **Phillips Test. Trial Tr. Vol. 5, Page 105:10–18.**

1. **Carmicle's Letter Dated January 20, 2014**

On January 20, 2014, Carmicle emailed a letter to Teetsel, Breaux, Packard, and Jamie Zimmerman (a representative of shareholder Litespeed Partners), alleging that Moriarty, King, and Tortorici had engaged in certain activity Carmicle described as "potentially illegal, fraudulent, and damaging to shareholder value." **Teetsel Test. Trial Tr. Vol. 2, Pages 172:23–173:18; Breaux Test. Trial Tr. Vol. 3, Page 79:3–8; Packard Test. Trial Tr. Vol. 3, Pages 136:23–137:1; Brown Jordan's Trial Exhibit 50.** Carmicle wrote that he had "a grave fear of retaliation and reprisal," but felt at that point that he "must come forward to protect the best interests of the Company and its shareholders." **Brown Jordan's Trial Exhibit 50.**

At the time he wrote this letter, Carmicle was aware that both BJS and BJC had performed poorly in 2013. **Carmicle Test. Trial Tr. Vol. 11, Pages 97:6–98:8, 116:17–119:4.**

Carmicle was also aware that his expenses were being reviewed, both because he had read about it in Tortorici's emails[30] and because he had heard about it from Deinlein. **Carmicle Test. Trial Tr. Vol. 11, Pages 98:10–99:5, 118:23–119:4.**

Among other things, Carmicle blamed Moriarty, King, and Tortorici for the "disastrous" performance of BJS and BJC in 2013, and expressed his suspicion that they would attempt to shift blame to Carmicle. **Brown Jordan's Trial Exhibit 50.** Carmicle also included information about the potential MBO and the WWC model prepared by Moriarty, King, and Tortorici, suggesting that the value of the Company and its prospects for sale had been damaged as a result, but did not mention how he had discovered that information. **Brown Jordan's Trial Exhibit 50.** In addition, Carmicle wrote that Moriarty, King, and Tortorici were "secretly examining" his expenses in an attempt to discredit him, but that he "would welcome the opportunity to discuss or explain every single cent that the company has reimbursed to [him], the business reasons for all expenses, and to produce the approvals through expense reports or budgets." **Brown Jordan's Trial Exhibit 50.** Finally, Carmicle hinted at "potentially illegal, notoriously disgraceful conduct, violating several employee regulations covering ethics and the conduct of employees in the performance of official duties. These acts were scheduled using company email and the acts apparently were physically committed while on official company business." **Brown Jordan's Trial Exhibit 50.**

After submitting this letter, Carmicle was "in a heightened state of concern," because he "had just gone live with that [he] had been investigating, and [he] did not know what the outcome was going to be." **Carmicle Test. Trial Tr. Vol. 1, Pages 194:16–196:9.** As Carmicle put it, "I pulled the pin and rolled the grenade and I didn't know when it was going to go off. I

---

[30] Because an earlier attempt to do so had failed, Tortorici did not successfully change his email password until February of 2014. **Tortorici Test. Trial Tr. Vol. 6, Pages 61:18–62:8.**

needed to have, I believe, at that point the data I collected and in a place that I could control it." Tr. 196:9–12. **Carmicle Test. Trial Tr. Vol. 1, Page 196:9–12.**

On January 20, 2014—the date of Carmicle's letter—Carmicle purchased a personal laptop computer. **Carmicle Test. Trial Tr. Vol. 1, Page 194:4–23.** Prior to purchasing that laptop, Carmicle did not have his own personal laptop, and primarily used a Company-owned laptop. **Carmicle Test. Trial Tr. Vol. 1, Page 194:7–15.** On January 21, 2014, Carmicle migrated data—including data-destruction application TrashIt!—from the Company-owned laptop to his personal laptop. **Carmicle Test. Trial Tr. Vol. 1, Page 198:6–16.** Since purchasing the personal laptop, Carmicle admits to having used TrashIt! "with some frequency." **Carmicle Test. Trial Tr. Vol. 1, Pages 198:17–199:5.**

Shortly after submitting the letter on January 20, 2014, Carmicle also stopped using his company-issued iPhone and began using a personal iPhone instead. **Carmicle Test. Trial Tr. Vol. 1, Pages 191:22–192:18.** On or around February 8, 2014, Carmicle wiped the company-issued iPhone and restored it to factory settings. **Carmicle Test. Trial Tr. Vol. 1, Pages 192:22–193:7; Brown Jordan's Trial Exhibit 205.** Carmicle claims that the personal iPhone he began using at that time may since have been discarded or damaged, but that he cannot recall with any certainty. **Carmicle Test. Trial Tr. Vol. 1, Page 215:5–16.**

## 2.   The Board's Initial Response

The day after receiving Carmicle's letter, on January 21, 2014, Teetsel emailed Carmicle and copied Breaux,[31] thanking Carmicle for the letter and asking about his availability to discuss the letter further. **Teetsel Test. Trial Tr. Vol. 2, Pages 177:17–178:17; Brown Jordan's Trial Exhibit 153.** Teetsel wrote, "We are concerned about the issues you raised and want to fully

---

[31] It had been discussed and determined that Teetsel and Breaux would address the situation. **Teetsel Test. Trial Tr. Vol. 2, Page 178:8–10; Breaux Test. Trial Tr. Vol. 3, Page 81:13–20.**

understand each of them. Please be assured that you will not suffer any retaliation as a result of bringing these issues to our attention." **Brown Jordan's Trial Exhibit 153.**

Because Carmicle had expressed fear of retaliation in his letter, Teetsel included this language in an attempt to alleviate that fear. **Teetsel Test. Trial Tr. Vol. 3, Page 42:7–20.** Packard, Teetsel, and Breaux also circulated among themselves the Code of Conduct and Business Ethics Policy, which contained a paragraph titled "Protection from Retribution," in light of Carmicle's expressed concerns. **Teetsel Test. Trial Tr. Vol. 3, Page 43:6–24; Packard Test. Trial Tr. Vol. 3, Page 139:15–140:13; Carmicle's Trial Exhibit 12.** However, there was no particular concern at the time that Carmicle would suffer retaliation. **Packard Test. Trial Tr. Vol. 3, Page 140:20–25.** Teetsel was in fact concerned about Carmicle's allegations that certain individuals had been stealing, destroying value, and engaging in illegal conduct, and did not intend to retaliate against Carmicle for bringing these issues to light. **Teetsel Test. Trial Tr. Vol. 2, Pages 178:11–179:2; Breaux Test. Trial Tr. Vol. 3, Page 92:1–5; Packard Test. Trial Tr. Vol. 3, Page 144:6–15.**

On January 22, 2014, Carmicle, Teetsel, and Breaux spoke over the telephone; both Teetsel and Breaux took notes of what was said during that conversation. **Teetsel Test. Trial Tr. Vol. 2, Pages 179:8–14, 181:2–5; Breaux Test. Trial Tr. Vol. 3, Pages 84:11–85:15, 86:12–87:20, 88:14–89:17, 90:2–8; Brown Jordan's Trial Exhibits 157, 167.** When asked how he had obtained the information contained in his letter, Carmicle stated that he had stumbled into it, and that it was all aboveboard, but that he had been advised not to say anything more at that time. **Teetsel Test. Trial Tr. Vol. 2, Page 182:4–14; Breaux Test. Trial Tr. Vol. 3, Page 90:12–25; Brown Jordan's Trial Exhibits 157, 167.** Carmicle did not mention that he had

accessed others' emails. **Breaux Test. Trial Tr. Vol. 3, Page 90:12–25; Brown Jordan's Trial Exhibit 167.**

During this conversation, Carmicle was told that he would not be retaliated against, but was not told that he was absolutely immune from termination for any reason. **Breaux Test. Trial Tr. Vol. 3, Pages 85:16–86:11.** Neither Teetsel nor Breux[32] promised Carmicle that his employment would not be terminated no matter what, even if misconduct on his part was discovered. **Carmicle Test. Trial Tr. Vol. 11, Page 211:6–25.**

### 3. The Board's Investigation

After receiving Carmicle's letter, the Board decided to seek legal advice, on which Teetsel took the lead. **Teetsel Test. Trial Tr. Vol. 2, Pages 173:24–174:7; Breaux Test. Trial Tr. Vol. 3, Pages 79:21–89:9; Packard Test. Trial Tr. Vol. 3, Pages 137:18–138:5.** To that end, Teetsel contacted Larry Budish, a corporate attorney at Proskauer Rose LLP ("Proskauer"), for a recommendation.[33] **Teetsel Test. Trial Tr. Vol. 2, Pages 174:8–175:13.** Budish recommended Steven Pearlman ("Pearlman"), a partner of his at Proskauer. **Teetsel Test. Trial Tr. Vol. 2, Page 175:14–17.** Teetsel then contacted Pearlman for legal advice on how to respond to Carmicle's letter. **Teetsel Test. Trial Tr. Vol. 2, Page 175:18–23.**

The Board ultimately hired Pearlman, an independent attorney, to investigate all allegations in Carmicle's letter and to provide continuing advice on protecting Carmicle from retaliation. **Teetsel Test. Trial Tr. Vol. 2, Pages 176:11–177:1; Breaux Test. Trial Tr. Vol. 3,**

---

[32] Packard never sent anything in writing to Carmicle making a statement to the effect that he would not be retaliated against, nor did Packard ever speak directly with Carmicle during the course of the investigation following receipt of Carmicle's letter. **Packard Test. Trial Tr. Vol. 3, Pages 138:25–139:14.**

[33] The Company had retained Budish in 2013 to represent it in connection with offering the Company for sale. **Teetsel Test. Trial Tr. Vol. 2, Page 174:14–22.** Due to the potential MBO, the Company sought representation from Proskauer—with whom the Company's majority owner, Stonehill, had a relationship—rather than Jenner & Block—the Company's regular outside counsel with whom the management team at the Company had a relationship—to avoid any conflicts of interest. **Teetsel Test. Trial Tr. Vol. 2, Pages 174:23–175:8; Breaux Test. Trial Tr. Vol. 3, Page 60:9–22.**

**Page 83:1–24; Packard Test. Trial Tr. Vol. 3, Pages 138:6–18.** The Board did not direct Pearlman to reach any particular outcome and did not give Pearlman any instructions aside from asking him to conduct the investigation and to provide advice. **Teetsel Test. Trial Tr. Vol. 2, Page 177:5–16; Packard Test. Trial Tr. Vol. 3, Page 141:7–17.**

On January 23, 2014, Teetsel informed Moriarty about Carmicle's letter, telling him only that Carmicle had made a complaint, that the Board was taking it seriously, that the Board had hired Pearlman to investigate, and that there could be no retaliation against Carmicle. **Moriarty Test. Trial Tr. Vol. 3, Page 219:10–22; Teetsel Test. Trial Tr. Vol. 2, Pages 189:1–191:10; Teetsel Test. Trial Tr. Vol. 3, Pages 44:6–45:2; Brown Jordan's Trial Exhibit 157; Carmicle's Trial Exhibit 13.** Teetsel did not provide Moriarty with any details about the nature of Carmicle's complaint, but instructed him to contact Pearlman to schedule an initial conversation with him. **Moriarty Test. Trial Tr. Vol. 3, Pages 219:20–220:1.** Neither Teetsel nor Breaux solicited Moriarty's views on Carmicle's employment between January 23, 2014, and the Board's ultimate decision to terminate Carmicle's employment. **Moriarty Test. Trial Tr. Vol. 3, Page 220:8–18.**

Also on January 23, 2014, Teetsel emailed King and Pearlman to facilitate initial communications between them, and to inform Pearlman that King had been advised of the Board's decision to hire Pearlman to investigate Carmicle's allegations. **Teetsel Test. Trial Tr. Vol. 2, Page 176:1–4; Brown Jordan's Trial Exhibit 159.** In one of their conversations, King mentioned to Pearlman that there had been some suspicion around September or October of 2013 that Carmicle had been accessing others' emails, but that Carmicle had not been terminated because there was no proof. **King Test. Trial Tr. Vol. 10, Pages 51:19–53:8.** King did not ask Pearlman to investigate that suspicion, but felt that Pearlman should be made aware of the

suspicion to facilitate a thorough investigation. **King Test. Trial Tr. Vol. 10, Pages 53:9–55:9.** The next day, Teetsel called King and told him to change the password to his email account. **King Test. Trial Tr. Vol. 10, Page 55:10–16.**

In their initial interview, to which Silvestre was a party, Pearlman assured Carmicle that there would be no retaliation resulting from Carmicle's letter to the Board. **Carmicle Test. Trial Tr. Vol. 11, Pages 84:10–85:8; Silvestre Test. Trial Tr. Vol. 5, Pages 23:24–24:13.** Comforted by that assurance, Carmicle divulged to Pearlman that he had learned much of the information contained in his letter by accessing other Company employees' emails. **Carmicle Test. Trial Tr. Vol. 11, Pages 140:20–141:7; Silvestre Test. Trial Tr. Vol. 5, Pages 26:15– 27:12.** Pearlman then became very focused on Carmicle's email access. **Carmicle Test. Trial Tr. Vol. 11, Page 142:22–24; Silvestre Test. Trial Tr. Vol. 5, Pages 27:13–28:3.** In a second telephone conversation between Carmicle and Pearlman, which Silvestre described as more "confrontational" in tone, Pearlman asked Carmicle a number of questions about Carmicle's email access, as well as Carmicle's expenses, including tickets to athletic events at the University of Louisville. **Silvestre Test. Trial Tr. Vol. 5, Pages 29:18–31:5.** At no point during the first or second interview, or in a series of follow-up emails, however, did Carmicle or Silvestre tell Pearlman that Carmicle had authority to access others' emails pursuant to the Computer and Internet Policy. **Carmicle Test. Trial Tr. Vol. 11, Page 142:8–144:10.** Instead, Carmicle wrote that he had been advised by two attorneys that he "was not doing anything wrong by accessing company email with a company wide provided password." **Brown Jordan's Trial Exhibit 33.**

### 4. Results of the Investigation

Although Teetsel was aware of the potential MBO prior to receiving Carmicle's letter, Teetsel was not aware that Moriarty, Tortorici, and King had prepared the WWC model to obtain

financing. **Teetsel Test. Trial Tr. Vol. 2, Pages 182:24–183:3.** However, Teetsel was not surprised to learn that they had, because it is not uncommon for any buyer to prepare such a model when seeking financing. **Teetsel Test. Trial Tr. Vol. 2, Page 183:4–9.** Teetsel was concerned that the management team may have "sandbagged" the sale of the Company through Moelis, using artificially low projections in preparing the CIM to make the commercial business less desirable to other buyers and less expensive to purchase through an MBO. **Teetsel Test. Trial Tr. Vol. 2, Page 183:10–17.** After reviewing the WWC model, however, Teetsel was no longer concerned, concluding that Moriarty, Tortorici, and King were simply willing to pay themselves less if they were working for themselves, rather than working for someone else, that they may have made a different assumption about the allocation of revenue from Winston Furniture, and that they may have been overly aggressive in their estimation of their ability to grow the business. **Teetsel Test. Trial Tr. Vol. 2, Pages 183:18–185:9.** Had Teetsel reached a different conclusion about the WWC model, he would have had no reason to protect Moriarty, Tortorici, and King, and would have sought termination of their employment. **Teetsel Test. Trial Tr. Vol. 2, Page 185:10–20.**

Although Breaux was aware of the potential MBO and had been copied on an email to which the WWC model was attached, Breaux was not aware that Moriarty, Tortorici, and King had prepared the WWC model prior to receiving Carmicle's letter, and initially wanted more information. **Breaux Test. Trial Tr. Vol. 3, Page 114:1–18.** Breaux later realized that the model to which Carmicle referred was the WWC model attached to the email on which he had previously been copied. **Breaux Test. Trial Tr. Vol. 3, Page 87:21–88:13.**

Packard was not aware of either the potential MBO or the WWC model prior to receiving Carmicle's letter. **Packard Test. Trial Tr. Vol. 3, Pages 133:14–135:10.** After learning that

other members of the Board had already known about the MBO and discussing the WWC model with Teetsel, however, Packard had no concerns about the MBO or the WWC model.[34] **Packard Test. Trial Tr. Vol. 3, Pages 133:14–136:5.**

On February 10, 2014, Pearlman orally reported his findings to BJI's Board of Directors. **Teetsel Test. Trial Tr. Vol. 2, Pages 191:11–192:8; Breaux Test. Trial Tr. Vol 3, Pages 92:11–93:21; Packard Test. Trial Tr. Vol. 3, Pages 141:25–143:2.** With respect to the differences between the CIM and the WWC model, Pearlman concluded that the allegations of misconduct in Carmicle's January 20, 2014 letter were baseless. **Pearlman Test. Trial Tr. Vol. 8, Page 66:1–10.** Pearlman further reported that Carmicle had characterized and submitted at least $100,000.00 in expenses for travel, sporting events, and other entertainment as advertising expenses, with the result that these expenses were paid by the Company without first being reviewed and approved by Moriarty. **Pearlman Test. Trial Tr. Vol. 8, Pages 66:21–67:5.** According to Pearlman, the weight of the evidence suggested that Moriarty would not have approved such expenses at a time when the Company was laying off employees. **Pearlman Test. Trial Tr. Vol. 8, Page 67:6–11.** Finally, Pearlman reported (1) that Carmicle "had been breaking into" the email accounts of other employees, including Carmicle's superiors, (2) that Carmicle's reliance on the generic password (Password1) as justification for his actions would not "hold water" and was "totally unrealistic," and (3) that Carmicle's actions violated the Company's Computer and Internet Policy and amounted to "very, very serious misconduct." **Pearlman Test. Trial Tr. Vol. 8, Pages 67:12–68:5.**

---

[34] Teetsel's evaluation of the WWC model and conclusion that there was no cause for concern was later validated by the Company's auditing firm in the spring of 2014. **Packard Test. Trial Tr. Vol. 3, Pages 146:20–147:13.**

**M. Termination of Carmicle's Employment**

Immediately following their conversation with Pearlman, Teetsel, Breaux, and Packard discussed Pearlman's findings and determined that Carmicle's employment should be terminated for cause. **Teetsel Test. Trial Tr. Vol. 2, Page 192:9–22; Breaux Test. Trial Tr. Vol. 3, Pages 93:16–94:19; Packard Test. Trial Tr. Vol. 3, Page 142:19–143:6.**

On February 11, 2014, the Board held a meeting in New York City. **Brown Jordan's Trial Exhibit 164.** Present at that meeting were Moriarty, Teetsel, Breaux, Packard, Tortorici, King, and David Farrar. **Brown Jordan's Trial Exhibit 164.** During that meeting, Teetsel brought up Carmicle's January 20, 2014 letter containing allegations against Moriarty, Tortorici, and King, and indicated that the Board had retained Pearlman, an independent third party, to investigate Carmicle's claims. **Brown Jordan's Trial Exhibit 164.** Teetsel indicated that Pearlman had reported to the Board that he fully and sufficiently investigated all allegations contained in the letter and concluded that the allegations lacked any merit. **Moriarty Test. Trial Tr. Vol. 3, Pages 220:25–221:12; Brown Jordan's Trial Exhibit 164.** The Board accepted Pearlman's findings and proceeded to discuss Carmicle's performance in managing BJS and BJC, his improper use of Company funds for personal benefit, his unauthorized spending and advertising commitments, and his improper access to and monitoring of employee email accounts.[35] **Brown Jordan's Trial Exhibit 164.** After a lengthy discussion, the Board instructed management that Carmicle's employment should be terminated for cause. **Brown Jordan's Trial Exhibit 164; Breaux Test. Trial Tr. Vol. 3, Pages 123:21–124:17; Packard Test. Trial Tr. Vol. 3, Page 143:20–25.**

---

[35] Tortorici was also prepared to present the results of his investigation into Carmicle's advertising expenses at that meeting. **Tortorici Test. Trial Tr. Vol. 6, Page 63:1–13.** Tortorici later prepared a chart of unauthorized entertainment expenses coded to advertising from 2009 through 2013. **Tortorici Test. Trial Tr. Vol. 6, Pages 63:17–75:9; Brown Jordan's Trial Exhibit 54.**

The primary reason for terminating Carmicle's employment was his accessing others' emails. **Teetsel Test. Trial Tr. Vol. 2, Pages 192:23–193:2; Breaux Test. Trial Tr. Vol. 3, Pages 94:20–95:5; Packard Test. Trial Tr. Vol. 3, Page 143:7–16.** The Board also determined that Carmicle's employment should be terminated due to his circumvention of the Company's review and approval process for entertainment expenses and his improper use of Company funds for personal benefit. **Teetsel Test. Trial Tr. Vol. 2, Pages 192:23–193:6; Breaux Test. Trial Tr. Vol. 3, Page 95:7–13; Packard Test. Trial Tr. Vol. 3, Page 143:7–16.** These both constituted termination for cause in the Board's opinion. **Teetsel Test. Trial Tr. Vol. 3, Page 21:3–7.**

On February 17, 2014, Carmicle's employment was terminated in Simpsonville, Kentucky. **Moriarty Test. Trial Tr. Vol. 3, Pages 221:22–222:2.** Present for the termination were Carmicle, Moriarty, King, Tortorici, and Patty Cooper, the vice president of human resources. **Moriarty Test. Trial Tr. Vol. 3, Page 222:3–10.** During the termination meeting, Moriarty followed a script prepared by counsel, deviating only twice—once by leaving out a line informing Carmicle that the conversation was being recorded, because it was not, and again by leaving out a line informing Carmicle that security officers would remove him from the premises, because Carmicle did not refuse to leave. **Moriarty Test. Trial Tr. Vol. 3, Pages 222:22–223:23; Brown Jordan's Trial Exhibit 308.**

The same day, Moriarty provided Carmicle with written notice, in compliance with the terms of Carmicle's Employment Agreement, that his employment had been terminated for cause pursuant to sections c(i) and (ii) and section (d) of Annex I to the Employment Agreement. **Brown Jordan's Trial Exhibits 1, 123.**

**N.** **Carmicle's Personal Laptop and iPad and the Company-Owned Laptop and iPad**

The day Carmicle's employment was terminated, a dispute arose over Carmicle's personal laptop. **Carmicle Test. Trial Tr. Vol. 1, Page 199:6–13.** Carmicle demanded his laptop when leaving, but the Company refused to relinquish it until Carmicle provided proof that he had purchased the laptop with his own funds. **Carmicle Test. Trial Tr. Vol. 1, Page 199:14–16.** Carmicle left both his personal laptop and the Company-owned laptop provided for Carmicle's use on the premises that day. That same day, Carmicle's counsel and counsel for BJI exchanged written communications regarding the Company's retention of Carmicle's personal laptop, the prospect of litigation, and the need to preserve electronic data. **Brown Jordan's Trial Exhibit 251.**

When he returned home, Carmicle used the "Find My iPhone" application to remotely lock the Company-owned laptop with a password and a PIN. **Carmicle Test. Tr. Vol. 1, Pages 208:5–209:2; Brown Jordan's Trial Exhibit 21.** Carmicle claims that he intended to lock his personal laptop and inadvertently locked the Company-owned laptop. **Carmicle Test. Tr. Vol. 1, Page 208:5–8.** While Carmicle's testimony on this matter was inconsistent, the Court finds that Carmicle was told that he had locked the Company-owned laptop the following day, while his personal laptop was still in the Company's possession. **Carmicle Test. Trial Tr. Vol. 2, Pages 112:19–113:13, 115:13–116:10, 145:1–6.** Despite that fact, Carmicle did not attempt to lock his personal laptop after being told that he had not already done so.

At some point between February 18, 2014, and the initiation of the Company's lawsuit against him on March 11, 2014, Carmicle was asked by the Company to provide the password and/or PIN used to lock the Company-owned laptop. **Carmicle Test. Trial Tr. Vol. 2, Pages 123:10–124:25.** As of the time of trial, however, Carmicle had failed to provide the Company

with the information necessary to unlock the Company-owned laptop. **Carmicle Test. Trial Tr. Vol. 1, Pages 208:5–212:14; Brown Jordan's Trial Exhibit 316; Carmicle Test. Trial Tr. Vol. 2, Page 146:1–8; Tim Bryan ("Bryan") Test. Trial Tr. Vol. 1, Page 157:7–158:8.** While Carmicle claims that he could not recall the PIN when asked for it, the Court questions why Carmicle did not use a PIN he could remember, or write down the PIN he had used, if in fact he believed he was locking his personal laptop. *See* **Carmicle Test. Trial Tr. Vol. 1, Page 211:10– 23; Carmicle Test. Trial Tr. Vol. 2, Pages 145:7–146:4. 1.** The Court concludes that at the time he locked the laptop on February 17, 2014, Carmicle knew he was locking the Company-owned laptop rather than his personal laptop.[36]

A few months prior to Carmicle's termination, he received and began using a Company-owned iPad. **Carmicle Test. Trial Tr. Vol. 1, Pages 213:21–214:1.** On the morning of February 17, 2014, Carmicle remotely wiped the Company-owned iPad and restored it to factory settings. **Carmicle Test. Trial Tr. Vol. 1, Pages 214:7–215:4.**

Carmicle claims that his personal iPad—which he used to access other Company employees' email accounts and to take screenshots of individual emails—was lost in late March or early April of 2014 by his eight-year-old son, possibly left behind on a plane, while on a family vacation. **Carmicle Test. Trial Tr. Vol. 1, Pages 216:8–218:12, 219:18–23.** This was less than two months after the termination of Carmicle's employment and less than one month after the Company and Carmicle had initiated legal proceedings.

A forensic examination of Carmicle's personal laptop revealed that 2.4 million files— nearly all of the files on that laptop—had last been accessed within the 48 hours prior to the date on which Carmicle surrendered the laptop for forensic examination in June of 2015. **Carmicle**

---

[36] The Court also notes that as a computer user, Carmicle was "very, very good," "very, very proficient." **Coddington Test. Dep. Tr., Page 47:13–16.**

**Test. Trial Tr. Vol. 2, Pages 21:22–22:16.** Carmicle claims that this was not the result of any affirmative act on his part, but offered "a number of scenarios" that could account for that fact. **Carmicle Test. Trial Tr. Vol. 2, Pages 22:11–23:21.** For example, Carmicle suggested he may have run one or two anti-virus scans, likely backed up the laptop, and may have reinstalled the operating software to resolve a problem with booting. **Carmicle Test. Trial Tr. Vol. 2, Pages 22:23–26:9.**

### O.   Loss Incurred as Result of Carmicle's Accessing Emails and Locking Laptop

Shortly after terminating Carmicle's employment, the Company retained forensic technology specialists at Crowe Horwath LLP ("Crowe Horwath") to determine, among other things, how Carmicle accessed others' emails. **Bryan Test. Trial Tr. Vol. 1, Pages 152:14–23, 154:20–155:3.** Following an investigation, Crowe Horwath concluded that Carmicle likely accessed others' emails using the generic password (Password1) provided to Company employees in connection with the Company's transition to Microsoft Office 365. **Bryan Test. Trial Tr. Vol. 1, Pages 166:15–174:22; Brown Jordan's Trial Exhibit 204.** Although Carmicle told the Company that he had accessed others' emails using that generic password before the Company retained Crowe Horwath, the Company was unwilling to accept Carmicle's word under the circumstances. **King Test. Trial Tr. Vol. 10, Page 81:8–17.** Crowe Horwath billed and the Company paid a total of $25,690.64 for its forensic technology services. **Bryan Test. Trial Tr. Vol. 1, Pages 174:23–176:6; King Test. Trial Tr. Vol. 10, Page 38:7–12; Brown Jordan's Trial Exhibit 206.** Of this amount, about $800.00 to $1,000.00 was incurred in connection with conducting forensic examinations of the Company-owned iPhone, iPad, and laptop provided for Carmicle's use while employed by the Company,[37] and about $800.00 was

---

[37] During this examination, Crowe Horwath was unable to access the Company-owned laptop because the password and PIN necessary to unlock the laptop were not provided. **Bryan Test. Trial Tr. Vol. 1, Page 157:7–158:8.**

incurred in connection with conducting a forensic examination of Carmicle's personal laptop to determine whether it had been accessed while in the Company's possession. **Bryan Test. Trial Tr. Vol. 1, Pages 155:8–158:8, 175:11–176:6.**

The Company also retained Kroll Associates, Inc. ("Kroll") to scan the facility for any audio or video surveillance devices not installed by the Company. **King Test. Trial Tr. Vol. 10, Pages 38:13–39:2; Brown Jordan's Trial Exhibit 245.** In light of Carmicle's accessing the emails of others, the Company was concerned that Carmicle may have installed such surveillance devices to engage in further "snooping." **King Test. Trial Tr. Vol. 10, Pages 38:13–39:2.** Kroll billed and the Company paid a total of $14,331.47 for these services. **Brown Jordan's Trial Exhibit 245.**

### III.    SANCTIONS

The Court will set forth its critical findings of fact as to each claim before turning to its conclusions of law. First, however, the Court sets forth the sanctions to be imposed against Carmicle and the legal reasons for its conclusion that such sanctions are appropriate. The sanctions to be imposed against Carmicle include certain adverse inferences drawn from the absence of evidence lost, deleted, or destroyed by Carmicle. Those adverse inferences, in turn, inform some of the Court's findings of fact.[38]

Prior to December 1, 2015, Federal Rule of Civil Procedure 37(e) provided only that, "[a]bsent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. In the absence of a more comprehensive framework, each

---

[38] Although the Court concludes that drawing certain adverse inferences is an appropriate sanction for Carmicle's egregious conduct, such inferences ultimately have no effect on the outcome of this case. The Court would reach the same conclusions of law whether or not it imposed this particular sanction.

federal circuit established its own standards for imposing sanctions against parties who failed to preserve electronically stored information. *See id.*

In the Eleventh Circuit, "[s]anctions for spoliation of the evidence 'are intended to prevent unfair prejudice to litigants and to ensure the integrity of the discovery process.'" *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1323 (S.D. Fla. 2010) (quoting *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005)). Spoliation includes the "intentional destruction of evidence or the significant and meaningful alteration of a document or instrument," as well as "the intentional concealment of evidence." *Id.* at 1322. The party seeking spoliation sanctions bears the burden of proving: (1) "that the missing evidence existed at one time;" (2) "that the alleged spoliator had a duty to preserve the evidence;"  and (3) "that the evidence was crucial to the movant being able to prove its prima facie case or defense." *Id.* (quoting *Walter v. Carnival Corp.*, No. 09-20962-CIV, 2010 WL 2927962, at *2 (S.D. Fla. July 23, 2010)). "Even if all three elements are met, '[a] party's failure to preserve evidence rises to the level of sanctionable spoliation only where the absence of that evidence is predicated on bad faith, such as where a party purposely loses or destroys relevant evidence.'" *Id.* (quoting *Walter*, 2010 WL 2927962, at *2).

"If direct evidence of bad faith is unavailable, the moving party may establish bad faith through circumstantial evidence." *Id.* (citing *Walter*, 2010 WL 2927962, at *2). To establish bad faith through circumstantial evidence, the moving party must establish:

> (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

*Id.* at 1323 (quoting *Walter*, 2010 WL 2927962, at *2). "The party seeking the sanctions must establish all four of these factors where there is no direct evidence of bad faith." *Id.* (citing *Calixto v. Watson Bowman Acme Corp.*, No. 07-60077-CIV, 2009 WL 3823390, at *16 (S.D. Fla. Nov. 16, 2009)).

More broadly, "[a] federal district court possesses the inherent authority to regulate the progress of actions before it. Within this authority is the power to sanction litigants for bad-faith litigation conduct." *Sprint Solutions, Inc. v. Fils-Amie*, 83 F. Supp. 3d 1290, 1295 (S.D. Fla. 2015) (citing *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764–65 (1980)); *see also Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)). "A court may appropriately sanction a party or attorney who shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order. However, because a court's inherent powers are so potent, they must be exercised with restraint and discretion." *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1545–46 (11th Cir. 1993) (internal quotation marks and citation omitted).

"The key to unlocking a court's inherent power is a finding of bad faith." *Eagle Hosp. Physicians*, 561 F.3d at 1306 (quoting *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998)). "Bad faith exists when the court finds that a fraud has been practiced upon it, or that the very temple of justice has been defiled, or where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers the enforcement of a court order." *Allapattah Servs., Inc. v. Exxon Corp.*, 372 F. Supp. 2d 1344, 1373 (S.D. Fla. 2005) (internal quotation marks and citation omitted).

At the conclusion of the evidentiary hearing held immediately prior to trial, the Court deferred ruling on the Brown Jordan Parties' motion for spoliation sanctions because it could not

determine whether the missing evidence was crucial to proving a prima facie case or defense until all the evidence had been presented at trial. *See* **Trial Tr. Vol. 2, Page 206:14–22.** The Court likewise deferred imposing sanctions under its inherent power until the conclusion of trial. *See* **Trial Tr. Vol. 2, Page 206:14–22.**

Effective December 1, 2015, shortly after trial concluded, Rule 37(e) was amended to authorize curative measures for failure to preserve electronically stored information, specify the measures available, and establish the findings necessary to employ such measures. *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. "It therefore forecloses reliance on inherent authority or state law to determine when certain measures should be used." *Id.* As amended, Rule 37(e) provides as follows:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> > (A) presume that the lost information was unfavorable to the party;
> >
> > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> >
> > (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). This version of Rule 37(e) applies not only to civil cases commenced after December 1, 2015, but also to all proceedings pending on that date unless its application would be unjust or impractical. *See CAT3, LLC v. Black Lineage, Inc.*, No. 14 Civ. 5511 (AT) (JCF), 2016 WL 154116, at *5 (S.D.N.Y. Jan. 12, 2016) (citing 2015 US Order 0017 and 28 U.S.C. § 2074(a)).

The Court concludes that applying the new version of Rule 37(e) would be neither unjust nor impractical. *See id.* (citing *Ultra-Temp Corp. v. Advanced Vacuum Systems, Inc.*, 194 F.R.D. 378, 381 (D. Mass. 2000)) (concluding that no inequity would result from applying new version of Rule 37(e) because the amendment does not establish a new rule of conduct for or greater substantive obligation on the party preserving electronically stored information, and is in some respects more lenient as to the sanctions that can be imposed for violation of preservation obligations). Whether the Court applies the standards in effect prior to or after December 1, 2015, Carmicle was obligated to preserve information once litigation was reasonably anticipated. *See id.* (quoting Report of Advisory Committee on Civil Rules, App. B-15 (Sept. 2014)) ("Rule 37(e) does not purport to create a duty to preserve. The new rule takes the duty as it is established by case law, which uniformly holds that a duty to preserve information arises when litigation is reasonably anticipated."); *see also Managed Care*, 736 F. Supp. 2d at 1324 ("A party has an obligation to retain relevant documents, including emails, where litigation is reasonably anticipated.").

The Court concludes that litigation was reasonably anticipated, and Carmicle had a duty to preserve evidence, as of February 17, 2014. On that date, Carmicle's employment was terminated, and written communications regarding potential litigation and the duty to preserve evidence were exchanged between counsel for Carmicle and counsel for BJI. As the Court noted on the record at the conclusion of the evidentiary hearing, Carmicle's testimony that neither he nor his counsel anticipated litigation as of February 17, 2014 is not credible in light of his testimony that he was "in a heightened state of concern" after submitting his January 20, 2014 letter, had a relatively sophisticated business background, and was represented by counsel, who

on February 17, 2014 received a letter from counsel for BJI regarding potential litigation. ***See
Trial Tr. Vol. 2, Page 205:4–10.***

 The Court further concludes that Carmicle was familiar with the preservation of metadata
and forensic copies of electronic data in light of his educational and professional background and
that fact that he has at all relevant times been represented by counsel. ***See* Trial Tr. Vol. 2,
Pages 205:24–206:2.** For the same reasons, the Court concludes that Carmicle knew or should
have known that he was obligated to take precautions to preserve his personal iPad, his personal
laptop computer, and other devices, as well as all relevant data on those devices, as of February
17, 2014.

 Applying Rule 37(e), as amended, the Court now concludes that Carmicle should have
preserved electronically stored information on his personal iPad, his personal laptop computer,
the Company-owned laptop, the Company-owned iPad, Carmicle's personal iPhone, and Mrs.
Carmicle's computer[39] in anticipation of litigation, and that this information was lost because
Carmicle failed to take reasonable steps to preserve it. This information—including the metadata
relevant to Carmicle's accessing and taking screenshots of others' emails with his personal iPad,
and the last access dates for 2.4 million files on Carmicle's personal laptop—cannot be restored
or replaced through additional discovery. Because the Court finds that Carmicle acted with the
intent to deprive the Brown Jordan Parties of the information's use in litigation, the Court will
presume that the lost information was unfavorable to Carmicle. *See* Fed. R. Civ. P 37(e)(2).

 Assuming for the sake of argument that the new version of Rule 37(e) should not be
applied to this case, the Court concludes that drawing inferences adverse to Carmicle would also
be appropriate under the prior standards. Because the missing evidence was not crucial to the

---

[39] Carmicle had already wiped the Company-owned iPhone as of February 17, 2014.

Brown Jordan Parties' ability to prove their claims,[40] the Court would award sanctions under its inherent power to do so, rather than the framework specific to spoliation sanctions. *See Managed Care Solutions, Inc.*, 736 F. Supp. 2d at 1322–23; *Sprint Solutions, Inc.*, 83 F. Supp. 3d at 1295; *Eagle Hosp. Physicians, LLC*, 561 F.3d at 1306. Carmicle's deliberate deletion and destruction of evidence and lack of candor concerning these actions unquestionably constitutes bad-faith litigation conduct, warranting the imposition of sanctions against him.

The Court declines to impose the additional sanctions requested by the Brown Jordan Parties, including dismissal of Carmicle's claims, entry of default against him, and attorneys' fees. The Court's inherent powers are potent and "must be exercised with restraint and discretion." *Malautea*, 987 F.2d at 1545–46. Dismissal and default are the most severe sanctions available to the Court, and are therefore appropriate only when less drastic measures are insufficient. *See Eagle Hosp. Physicians, LLC*, 561 F.3d at 1306. That is not the case here, particularly in light of the Court's ultimate conclusion that Carmicle's employment was properly terminated for cause and that Carmicle is not entitled to any profits interests or severance pay. With respect to attorneys' fees, the Court notes that Magistrate Judge Brannon has awarded attorneys' fees and costs to the Brown Jordan Parties in connection with certain discovery violations by Carmicle and has ordered additional briefing on other issues, which remain outstanding. *See* Brown Jordan's DE 205. While the fees requested in the Brown Jordan Parties' motion for spoliation sanctions are not exactly the same as those awarded by Magistrate Judge Brannon for discovery violations, the Court concludes that an award of additional attorneys' fees for Carmicle's spoliation of evidence is unnecessary. The Court's explicit finding of bad faith and consequent decision to draw adverse inferences against Carmicle are sufficient.

---

[40] The Court reaches this conclusion not because the evidence lost, destroyed, and deleted by Carmicle was insignificant, but because the remaining evidence in support of the Brown Jordan Parties' claims and defenses is overwhelming.

## IV.   <u>CRITICAL FINDINGS OF FACT</u>

1.        Each time Carmicle used the generic password to access and view the contents of another Company employee's email account through the Office 365 online portal, Carmicle necessarily accessed the server or other computer on which that email was stored.

2.        Each computer Carmicle accessed was used in or affected interstate commerce or communication because the emails stored on each computer Carmicle accessed were either sent across state lines, both to and from Company employees, or sent in the course of operating the Company, a group of entities organized and conducting business in various states.

3.        Carmicle obtained information—whether the content of the email itself, the fact that the email had been sent, to whom, by whom, and when, or other information—each time he accessed an email.

4.        Snow's July 16, 2013 email to Carmicle and numerous other Company employees, which contained the generic password and instructed each employee to test his or her own Office 365 email account what that password, did not confer authority on Carmicle to access *other* employees' accounts using the generic password.

5.        The only source of authority for accessing another employee's email account is the Computer and Internet Policy, pursuant to which Carmicle was authorized to access other employees' email accounts for legitimate Company purposes provided he requested such access from a member of corporate senior management. ***See* Brown Jordan's Trial Exhibits 7, 8.**

6.        It is undisputed that Carmicle intended to access and view the contents of other Company employees' emails accounts. The Court further concludes that Carmicle intended to do so without authorization or to exceed authorized access in doing so. In reaching this conclusion, the Court notes that Carmicle was aware of the Computer and Internet Policy but chose not to

review the Policy or speak with anyone about it prior to accessing other employees' email accounts in 2013. Just two years earlier, Carmicle reviewed the Computer and Internet Policy, spoke with Snow, and obtained the ability to view emails through delegation prior to accessing another employee's emails. **Carmicle Test. Trial Tr. Vol. 11, Pages 135:9–138:3.** This stark change in approach suggests that Carmicle intended to circumvent the requirements of the Computer and Internet Policy in 2013. Moreover, while testimony to the contrary was presented at trial, the Court notes Pearlman's testimony that Carmicle admitted feeling like he had done something wrong when he accessed and viewed the contents of Moriarty's email account. ***See Pearlman Test. Trial Tr. Vol. 8, Pages 30:7–31:6.***

7.      Carmicle knowingly caused the transmission of a code when he remotely locked the Company-owned laptop using the Find My iPhone application immediately following the termination of his employment on February 17, 2014. As a result of such conduct, Carmicle intentionally caused damage to the Company-owned laptop.

8.      The Court has already concluded that Carmicle intentionally locked the Company-owned laptop, despite his testimony that he intended to lock his personal laptop and inadvertently locked the Company-owned laptop. In failing to provide the password or PIN required to unlock the Company-owned laptop, which the Court also concludes was intentional on Carmicle's part, Carmicle rendered that laptop inaccessible.

9.      In light of the fact that his employment had been terminated earlier that day, Carmicle acted without authorization in doing so.

10.      The Company-owned laptop was used in or affected interstate commerce or communication because it was provided to and used by Carmicle for the purpose of communicating with Company employees and conducting Company business across state lines.

11.     The amount paid to Crowe Horwath in connection with its investigation into how Carmicle accessed other employees' email accounts is $23,990.64. The Court reaches this amount by averaging the lowest ($23,890.64) and highest ($24,090.64) estimated amounts attributable to that investigation. *See* **Bryan Test. Trial Tr. Vol. 1, Pages 175:11–176:6.**

12.     The amount paid to Crowe Horwath in connection with its forensic examination of the Company-owned laptop is $300.00, or one-third of the total cost incurred in connection with the forensic examination of the Company-owned iPhone, iPad, and laptop. The Court has arrived at $900.00 as the total cost incurred in connection with such examination by averaging the lowest ($800.00) and highest ($1,000.00) estimated amounts attributable to that cost. ***See* Bryan Test. Trial Tr. Vol. 1, Pages 175:11–176:6.**

13.     With respect to the amounts paid by Carmicle for tickets to athletic events and other entertainment expenses, Carmicle did not comply with the Travel Policy—which required that he submit expense reports to and obtain approval in advance from Moriarty—but these amounts were included in the proposed budgets presented to Moriarty, Tortorici, and King for approval each year.

14.     Similarly, with respect to the amounts paid to Mrs. Carmicle, Carmicle did not comply with the Code of Conduct and Ethics Policy—which required the he disclose any conflicts of interest—but these amounts were included in the proposed budgets presented to Moriarty, Tortorici, and King for approval each year.

15.     Carmicle did not instruct any controller to include such amounts in the fixed advertising portion of the budget. While Carmicle did not volunteer during annual budget meetings that these amounts were included in the proposed budgets, there is insufficient evidence

to suggest that Carmicle actively sought to conceal these amounts from Moriarty, Tortorici, and King.

16.     The tickets to athletic events and other entertainment expenses were not entirely for Carmicle's personal use; rather, there is evidence that Carmicle gave tickets to employees through a lottery system and organized group outings to boost employee morale.

17.     The amounts paid to Mrs. Carmicle may have been excessive in proportion to the amount of work she performed, but there is evidence that she did in fact provide services to the Company, and Carmicle immediately complied when instructed by Moriarty to discontinue payments to Mrs. Carmicle in December of 2011.

18.     Carmicle's decision to provide a set of outdoor furniture to Hurstbourne at no cost was not necessarily unreasonable or adverse to the Company's interests. The donation may even have benefitted the Company in the form of increased sales to Hurstbourne members and the opportunity to hold a photo shoot at Hurstbourne.

19.     Carmicle's employment was properly terminated for cause as defined in the Employment Agreement and the Profits Interest Agreements.

20.     During the twelve-month period preceding the termination of Carmicle's employment on February 17, 2014, Carmicle repeatedly engaged in gross negligence or willful misconduct by accessing and viewing the contents of other Company employees' email accounts hundreds of times without authorization in violation of the Computer and Internet Policy. Such conduct constituted cause for termination of Carmicle's employment as defined in the Employment Policy.

21.     During that period of time, Carmicle also included large entertainment expenses in the fixed advertising portion of the budget rather than submitting such expenses to Moriarty for approval in advance, as required by the Travel Policy.

22.     It is undisputed that certain individuals, including Teetsel, Breaux, and Pearlman, represented to Carmicle that his employment would not be terminated in retaliation for his disclosure of the information contained in his January 20, 2014 letter to the Board or his cooperation in the ensuing investigation.

23.     That representation was not false, as the termination of Carmicle's employment was not retaliatory, nor did Carmicle suffer retaliation in any other form.

24.     Rather, as a natural consequence of conducting an independent investigation into goings-on at the Company, Carmicle's repeated acts of gross negligence or willful misconduct were revealed, giving rise to termination for cause of his employment.

25.     The evidence presented at trial suggested that each of the individuals who represented to Carmicle that he would suffer no retaliation in fact meant what they said at the time they said it, and proceeded to conduct a fair and independent investigation.

26.     Carmicle is not entitled to any compensation under the Profits Interest Agreements because his employment was properly terminated for cause.

27.     Carmicle is not entitled to severance pay under the Employment Agreement because his employment was properly terminated for cause.

## V.     CONCLUSIONS OF LAW

### A.  The Company's Claims Against Carmicle

The Court first addresses each of the claims asserted against Carmicle in the Company's First Amended Complaint [Brown Jordan's DE 61].

**1. Violation of the Computer Fraud and Abuse Act (Count I)**

The Company asserts that Carmicle violated the Computer Fraud and Abuse Act ("CFAA") by accessing other Company employees' email accounts and by transmitting a code to lock a Company-owned laptop, rendering the laptop inaccessible. The Court agrees on both points.

**a. Carmicle Violated the CFAA by Accessing Other Company Employees' Email Accounts**

"Whoever . . . intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer," violates the CFAA. 18 U.S.C. § 1030(a)(2)(C). There is no statutory definition for the term "without authorization." However, "'authorization' is commonly understood as '[t]he act of conferring authority; permission.'" *Lockheed Martin Corp. v. Speed*, No. 6:05-CV-1580-ORL-31, 2006 WL 2683058, at *5 (M.D. Fla. Aug. 1, 2006) (quoting *The American Heritage Dictionary*, 89 (1976)). As defined in the CFAA, "the term 'exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). "[T]he term 'protected computer' means a computer . . . which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B).

Because each computer Carmicle accessed was used in or affected interstate commerce or communication, Carmicle accessed and obtained information from a protected computer (as defined in the CFAA) each time he used the generic password to access and view the contents of another Company employee's email account through the Office 365 online portal. *See Cont'l Grp., Inc. v. KW Prop. Mgmt., LLC*, 622 F. Supp. 2d 1357, 1370 (S.D. Fla. 2009); 18 U.S.C. § 1030(e)(2)(B).

Carmicle acted without authorization or exceeded authorized access each time he used the generic password to access and view the contents of another Company employee's email account. Under the clear and unambiguous language of the Computer and Internet Policy—the only potential source of authorization—Carmicle was not authorized to access and view the contents of other Company employees' email accounts using the generic password.

"Where the terms of a contract are clear and unambiguous, the parties' intent must be gleaned from the four corners of the document." *BKD Twenty-One Mgmt. Co., Inc. v. Delsordo*, 127 So. 3d 527, 530 (Fla. Dist. Ct. App. 2012) (quoting *Crawford v. Barker*, 64 So. 3d 1246, 1255 (Fla. 2011)). "[A]mbiguity does not exist merely because a contract can possibly be interpreted in more than one manner. Indeed, fanciful, inconsistent, and absurd interpretations of plain language are always possible. It is the duty of the trial court to prevent such interpretations." *Id.* (quoting *Am. Med. Int'l, Inc. v. Scheller*, 462 So. 2d 1, 7 (Fla. Dist. Ct. App. 1984)). "Accordingly, contractual language is ambiguous only if it is susceptible to more than one *reasonable* interpretation." *Id.* (citing *Penzer v. Transportation Ins. Co.*, 29 So. 3d 1000, 1005 (Fla. 2010)).

While the Court notes that the Computer and Internet Policy uses the terms "employees," "managers," "senior management," and "corporate senior management" without definition, the Court finds no ambiguity with respect to whether Carmicle's use of the generic password was authorized. ***See* Brown Jordan's Trial Exhibits 7, 8.** Under the only reasonable interpretation of the Computer and Internet Policy, Carmicle acted without authorization or exceeded authorized access each time he used the generic password to access and view the contents of another Company employee's email account. Despite Carmicle's assertions to the contrary, it would be unreasonable to interpret the Computer and Internet Policy as authorizing him to

exploit a generic password—which by happenstance permitted Carmicle to access others' email accounts without requesting such access through appropriate and otherwise necessary channels—solely on suspicion of dishonesty concerning the content of communications between others, without any reason to suspect wrongful or illegal conduct prior to doing so.[41]

Finally, Carmicle *intentionally* accessed one or more computers without authorization or exceeded authorized access and thereby obtained information from one or more protected computers. The evidence, as set forth in the Court's critical findings of fact, suggests that Carmicle acted in deliberate contravention of the Computer and Internet Policy.[42]

Accordingly, Carmicle violated the CFAA by accessing other Company employees' email accounts. *See* 18 U.S.C. § 1030(a)(2)(C).

### b. Carmicle Violated the CFAA by Transmitting a Code to Lock a Company-Owned Laptop

"Whoever . . . knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer," violates the CFAA. 18 U.S.C. § 1030(a)(5)(A). "[T]he term 'damage' means any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

Carmicle knowingly caused the transmission of a code when he remotely locked the Company-owned laptop using the Find My iPhone application immediately following the

---

[41] Learning about the WWC Model or any other purportedly suspicious activity *after* using the generic password to access multiple email accounts a number of times over an indeterminate period does not retroactively render Carmicle's actions authorized under the Computer and Internet Policy.

[42] "[T]he requisite intent to prove a violation of 18 U.S.C. § 1030(a)(2)(C) is . . . the intent to obtain unauthorized access of a protected computer." *United States v. Willis*, 476 F.3d 1121, 1125 (10th Cir. 2007) (citing *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1125 (W.D. Wash. 2000)). "The [plaintiff] need not also prove that the defendant had the intent to defraud in obtaining the information or that the information was used to any particular ends." *Id.*

termination of his employment on February 17, 2014. By rendering the laptop inaccessible, Carmicle intentionally caused damage to the Company-owned laptop within the meaning of the CFAA by impairing the availability of any data, program, system, or information on that laptop. *See* 18 U.S.C. § 1030(e)(8). Finally, because it was used in or affected interstate commerce or communication, the Company-owned laptop was a protected computer as defined in the CFAA. *See Cont'l Grp., Inc. v. KW Prop. Mgmt., LLC*, 622 F. Supp. 2d 1357, 1370 (S.D. Fla. 2009); 18 U.S.C. § 1030(e)(2)(B).

Accordingly, Carmicle violated the CFAA by transmitting a code to lock a Company-owned laptop. *See* 18 U.S.C. § 1030(a)(5)(A).

### c.  The Company Is Entitled to Compensatory Damages

The CFAA permits "[a]ny person who suffers damage or loss by reason of a violation of [the CFAA to] maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(c), (g). However, "[a] civil action for violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." *Id.*

Of the five subclauses enumerated in section 1030(g), only subclause (I) applies to the instant case. Accordingly, to maintain a civil action against Carmicle under the CFAA, Carmicle must establish "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." *Id.* § 1030(c)(4)(A)(i)(I).

> [T]he term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.

*Id.* § 1030(e)(11).

The Court has previously concluded that the Company's alleged loss need not have resulted from an interruption of service to be actionable under the CFAA. *See* Brown Jordan's DE 100. Rather, the statutory definition includes two separate types of loss: (1) reasonable costs incurred in connection with such activities as responding to a violation, assessing the damage done, and restoring the affected data, program, system, or information to its condition prior to the violation; and (2) any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service. *See* 18 U.S.C. § 1030(e)(11).

In the instant case, the Company's loss is of the first type. The amount paid to Crowe Horwath in connection with its investigation into how Carmicle accessed other employees' email accounts and its forensic examination of the Company-owned laptop is a reasonable cost incurred in connection with such activities as responding to a CFAA violation, assessing the damage done, and restoring the affected data, program, system, or information to its condition prior to the violation. *See A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009); *Aquent LLC v. Stapleton*, 65 F. Supp. 3d 1339, 1345 (M.D. Fla. 2014). Likewise, the $14,331.47 paid to Kroll in connection with scanning for any audio or video surveillance devices not installed by the Company is a reasonable cost incurred in connection with such activities as responding to a CFAA violation and assessing the damage done. These costs were incurred by the Company during a one-year period and aggregate more than $5,000.00 in value. Accordingly, the Company may maintain a civil action against Carmicle under the CFAA to obtain compensatory damages and injunctive relief or other equitable relief.

Having found that Carmicle violated the CFAA and that the Company is entitled to maintain a civil action against Carmicle under the CFAA, the Court concludes that the Company

is entitled to $38,622.11 in compensatory damages under the CFAA. This amount includes $24,290.64 paid to Crowe Horwath and $14,331.47 paid to Kroll.

### 2. Violation of the Stored Communications Act (Count II)

The Company asserts that Carmicle violated the Stored Communications Act ("SCA") by accessing other Company employees' email accounts. The Court agrees.

#### a. Carmicle Violated the SCA

"[W]hoever . . . (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system," violates the SCA. 18 U.S.C. § 2701(a).

The Court has previously concluded that using a generic password to access another Company employee's email account through Office 365, a cloud-based service, constitutes "access[ing] . . . a facility through which an electronic communication service is provided" within the meaning of the SCA. *See* Brown Jordan's DE 100. The Court has also previously concluded that accessing another Company employee's email account through a cloud-based service constitutes "obtain[ing] . . . access to a wire or electronic communication while it is in electronic storage in such system" within the meaning of the SCA. *See* Brown Jordan's DE 100. For the reasons set forth above, the Court further concludes that Carmicle intentionally acted without authorization or exceeded authorization in doing so.

Accordingly, Carmicle violated the SCA by accessing other Company employees' email accounts. *See* 18 U.S.C. § 2701(a).

### b. The Company Is Entitled to Actual and Punitive Damages

"[A]ny . . . person aggrieved by any violation of [the SCA] in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind may, in a civil action, recover from the person or entity . . . which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2707(a). Among other things, "appropriate relief includes . . . damages." 18 U.S.C. § 2707(b).

> The court may assess as damages in a civil action under this section the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, but in no case shall a person entitled to recover receive less than the sum of $1,000. If the violation is willful or intentional, the court may assess punitive damages.

18 U.S.C. § 2707(c).

Some courts have interpreted this provision to permit an award of $1,000.00 per violation of the SCA. *See In re Hawaiian Airlines, Inc.*, 355 B.R. 225, 230 (D. Haw. 2006); *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 759 F. Supp. 2d 417, 429 (S.D.N.Y. 2010). Relying on these decisions, the Company requests an award of $1,000.00 for each time Carmicle accessed another employee's email account. However, the Eleventh Circuit Court of Appeals recently held that this provision "does not provide for a statutory award of $1,000 per violation, even when a plaintiff proves actual damages or a violator's profits. Rather, it establishes a floor award of $1,000—regardless of the number of violations—when a plaintiff shows actual damages or a violator's profits." *Vista Mktg., LLC v. Burkett*, No. 14-14068, 2016 WL 425165, at *14 (11th Cir. Feb. 4, 2016).

The actual damages suffered by the Company as a result of Carmicle's violation of the SCA include $23,990.64 paid to Crowe Horwath in connection with its investigation into how Carmicle accessed other employees' email accounts and $14,331.47 paid to Kroll in connection

with scanning for any audio or video surveillance devices not installed by the Company. Together, the Company's actual damages total $38,322.11.[43]

Because Carmicle's violation of the SCA was willful or intentional, the Court may award punitive damages.

> The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a defendant and creates substantive limits on the amount of punitive damages a state may impose. In determining whether [an] award crosses this substantive line and is constitutionally excessive, we are required by the Supreme Court to consider three guideposts: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded . . . and the civil penalties authorized or imposed in comparable cases.

*Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1362 (11th Cir. 2004) (internal citations omitted).

The Court concludes that exploiting a generic password to access other Company employees' email accounts numerous times over a period of at least six months without any legitimate reason to believe such conduct was authorized is inexcusable and therefore warrants an award of punitive damages against Carmicle under the SCA. The Court concludes that the Company is entitled to $38,322.11—an amount equal to its actual damages under the SCA—as punitive damages.[44]

### c.  The Company Is Entitled to Costs and Reasonable Attorney Fees

"In the case of a successful action to enforce liability under [the SCA], the court may assess the costs of the action, together with reasonable attorney fees determined by the court." 18 U.S.C. § 2707(c). The Court concludes that the Company is entitled to its reasonable attorney fees and costs incurred in connection with litigating its claim under the SCA. The amount of

---

[43] This amount is included in the $38,622.11 in compensatory damages to which the Company is entitled under the CFAA. While the CFAA and the SCA provide two independent bases for the Company to recover these funds, the Company is not entitled to double recovery.

[44] This amount is in addition to the $38,622.11 in compensatory damages to which the Company is entitled under the CFAA.

such fees and costs will be determined by the Court at a later date upon an appropriate motion filed by the Company.

### 3. Breach of Fiduciary Duty and the Duty of Loyalty (Count III)

The Company asserts that Carmicle breached his fiduciary duty and duty of loyalty by using Company funds to pay for tickets to athletic events and other entertainment expenses for personal use, facilitating the continued payments to his wife at an increased rate for several years, and providing furniture to Hurstbourne at no cost. The Court disagrees.

Before deciding the merits of the Company's state-law claim for breach of fiduciary duty and the duty of loyalty, the Court must determine which state's laws govern this claim. The states from which the Court must choose include Florida, Kentucky, Delaware, and California. Each of these states is either the state of organization or principal place of business—or both—of one or more of the four entities collectively referred to as the Company. Florida is the forum state. The allegations relevant to this claim primarily involve actions taken by Carmicle, a Kentucky resident, while working in Kentucky.

A federal court sitting in diversity applies the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "As a preliminary matter, the court must characterize the legal issue and determine whether it sounds in torts, contracts, property law, etc. Once it has characterized the legal issue, it determines the choice of law rule that the forum state applies to that particular type of issue." *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007) (citing *Acme Circus Operating Co. v. Kuperstock*, 711 F.2d 1538, 1540 (11th Cir. 1983)).

Before beginning a choice of law analysis, however, a court should determine whether a conflict of laws truly exists. *Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1234–35 (11th

Cir. 1995). No conflict of laws exists when the asserted conflict is a false conflict. *Tune v. Philip Morris, Inc.*, 766 So. 2d 350, 352 (Fla. Dist. Ct. App. 2000). A false conflict arises when (1) the laws of the different sovereigns are the same, (2) the laws of the different sovereigns are different but produce the same outcome under the facts of the case, and (3) when the policies of one sovereign would be furthered by the application of its laws while the policy of the other sovereign would not be advanced by the application of its laws. *Id.*

### a. Florida's Choice of Law Rules for Breach of Fiduciary Duty and the Duty of Loyalty

Under Florida's choice of law rules, claims for breach of fiduciary duty and the duty of loyalty are considered the internal affairs of a corporation, and are governed by the laws of the state of incorporation. *See Mukamal v. Bakes*, 378 F. App'x 890, 896 (11th Cir. 2010) (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982)); *see also* Fla. Stat. § 607.1505(3); Restatement (Second) Conflict of Laws § 302 (Am. Law Inst. 1971). Similarly, "the law of the state or other jurisdiction under which a foreign limited liability company exists governs . . . [t]he organization and internal affairs of the foreign limited liability company . . . ." Fla. Stat. § 605.0901(1). "In the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties," however, "the local law of the other state will be applied." Restatement (Second) of Conflict of Laws § 302 (Am. Law Inst. 1971); *see also Mukamal*, 378 F. App'x at 896.

As the Court has already noted, BJI Holdings, LLC is a Delaware LLC with its principal place of business in Florida, BJI is a Florida corporation with its principal place of business in Florida, BJS is a California corporation with its principal place of business in Kentucky, and BJC is a Delaware corporation with its principal place of business in California. Accordingly,

depending on the specific entity or entities to which Carmicle owed a fiduciary duty and duty of loyalty, the governing law may be that of Florida, Kentucky, Delaware, or California.

### b. False Conflict

With respect to the Company's claim for breach of fiduciary duty and the duty of loyalty, the Court concludes that a false conflict exists between the laws of Florida, Kentucky, Delaware, and California. The laws of these sovereigns are virtually identical with the exception of the applicable statute of limitations period.[45] However, because the Court finds that the Company has failed to establish a breach by Carmicle of any fiduciary duty or duty of loyalty and resulting damages, the outcome is the same regardless of the applicable statute of limitations period. That is, Carmicle prevails on this claim regardless of which state's laws govern.

Under Florida law, "[t]he elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002).

> Where . . . there is not an express fiduciary relationship, one may be implied in law based on the specific factual situation surrounding the transaction and the relationship of the parties. A fiduciary relationship exists when one is under a duty to act, or give advice, for the benefit of another upon matters within the scope of that relation. An implied fiduciary relationship will lie when there is a degree of dependency on one side and an undertaking on the other side to protect and/or benefit the dependent party. The relation and duties involved need not be legal; they may be moral, social, domestic or personal. If a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief.

*Reuss v. Orlando Health, Inc.*, No. 615CV805ORL28GJK, 2015 WL 6329854, at *3 (M.D. Fla. Oct. 21, 2015) (internal quotation marks and citations omitted). The elements of a claim for

---

[45] Under Florida's choice of law rules, statutes of limitation are considered substantive, rather than procedural, for choice of law purposes. *See Perez v. Fedex Ground Package Sys., Inc.*, 587 F. App'x 603, 606 (11th Cir. 2014) (citing *Fulton Cty. Adm'r v. Sullivan*, 753 So. 2d 549, 553 (Fla. 1999)); *Castillo v. Cessna Aircraft Co.*, 712 F. Supp. 2d 1306, 1311 (S.D. Fla. 2010) (citing *Merkle v. Robinson*, 737 So. 2d 540, 542–43 (Fla. 1999)).

breach of fiduciary duty and the circumstances under which a fiduciary duty arises do not differ in any material respect under the laws of Kentucky, Delaware, or California. *See, e.g.*, *Miles Farm Supply, LLC v. Helena Chem. Co.*, No. 4:06-CV-23-R, 2008 WL 3010064, at *7, 12 (W.D. Ky. Aug. 1, 2008) (quoting *Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F. Supp. 2d 902, 916 (W.D. Ky. 2007)); *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch.) (citing *ZRii, LLC v. Wellness Acquisition Grp., Inc.*, No. CIV. A. 4374-VCP, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009)); *Aquent LLC v. Stapleton*, 65 F. Supp. 3d 1339, 1347–49 (M.D. Fla. 2014) (applying Delaware law); *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1137 (C.D. Cal. 2003) (quoting *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 80 Cal. Rptr. 2d 329, 355 (Cal. Ct. App. 1998)); *Paskenta Band of Nomlaki Indians v. Crosby*, No. 2:15-CV-00538-GEB, 2015 WL 4879650, at *7 (E.D. Cal. Aug. 14, 2015).

Under the laws of Florida, as under the laws of Kentucky, Delaware, and California, Carmicle owed fiduciary duties to the Company in his role as president of BJS and BJC. Whether that title was merely a "customer facing accommodation" or not, it is undisputed that Carmicle was responsible for running each entity, with significant authority over the expenditures made by BJS and BJC, the preparation of annual budgets for BJS and BJC, the hiring and compensation of employees and independent contractors by BJS and BJC, and other matters. In that role, a high level of trust and confidence was reposed by Moriarty, Tortorici, and King—the officers of BJI—in Carmicle.

However, the Court concludes that Carmicle's actions did not rise to the level of a breach of his fiduciary duties and such actions were not the proximate cause of any damages to the Company. *See, e.g.*, *Mitchell Co. v. Campus*, 672 F. Supp. 2d 1217, 1238–39 (S.D. Ala. 2009) (applying Florida law). Rather, Carmicle included all disputed expenditures in the proposed

budgets submitted each year to Moriarty, Tortorici, and King, any one of whom could easily have discovered their existence. There is insufficient evidence to conclude that Carmicle actively sought to conceal these expenditures or that such expenditures were made solely for Carmicle's personal benefit. The evidence suggests that the Company did in fact benefit to some degree from these expenditures in the form of improved employee morale and team-building and in the form of services rendered by Mrs. Carmicle. Likewise, Carmicle's decision to provide a set of outdoor furniture to Hurstbourne at no cost was not necessarily unreasonable or adverse to the Company's interests. The donation may even have benefitted the Company.

Accordingly, Carmicle is not liable for a breach of fiduciary duty or the duty of loyalty.

### 4. Conversion (Count IV)

The Company asserts that Carmicle converted Company property by using Company funds to pay for tickets to athletic events and other entertainment expenses for personal use, facilitating the continued payments to his wife at an increased rate for several years, and providing furniture to Hurstbourne at no cost. The Court disagrees.

Again, the Court must determine which state's laws govern this claim. The Court must decide between the laws of Florida, the forum state, and Kentucky, the state in which most of the alleged conduct constituting conversion occurred. Before beginning a choice of law analysis, however, the Court must determine whether a true conflict of laws exists.

### a. Florida's Choice of Law Rules for Conversion

Florida uses the "significant relationship test" for conflicts of law premised upon tort claims. *See Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980). Under Florida law, a court should consider the following:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in section 6.

(2) Contacts to be taken into account in applying the principles of section 6 to determine the law applicable to an issue include:

    (a) the place where the injury occurred,

    (b) the place where the conduct causing the injury occurred,

    (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

    (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Id.*; Restatement (Second) Conflict of Laws § 145 (1971).

The presumption of the significant relationship test is that generally the law of the forum where the injury occurred determines the substantive issues unless another state has a more compelling interest. *See Bishop*, 389 So. 2d at 1001.

### b. False Conflict

With respect to the Company's claim for conversion, the Court concludes that a false conflict exists between the laws of Florida and Kentucky. The laws of these sovereigns do not differ in any material respect with the exception of the applicable statute of limitations period. However, because the Court finds that the Company has failed to establish conversion by Carmicle, the outcome is the same regardless of the applicable statute of limitations period. That is, Carmicle prevails on this claim regardless of which state's laws govern.

"Under Florida law, the elements of conversion are '(1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein.'" *Joe Hand Promotions, Inc. v. Creative Entm't, LLC*, 978 F. Supp. 2d 1236, 1241 (M.D. Fla. 2013) (quoting *Joe Hand Promotions, Inc. v. Hart*, No. 11-80971-CIV, 2012 WL 1289731, at *2 (S.D. Fla. Apr. 16, 2012)). Under Kentucky law, the elements of conversion are:

> (1) plaintiff has legal title to the converted property; (2) plaintiff had possession or the right to possession at the time of conversion; (3) defendant exercised dominion over the property, to defendant's use and enjoyment, such that plaintiff's right to use and enjoy the property was denied; (4) defendant intended to interfere with plaintiff's possession; (5) plaintiff made some demand for the property's return which defendant refused; (6) defendant's action caused plaintiff's loss of the property; and (7) plaintiff was damaged thereby.

*Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650, 673 (E.D. Ky. 2009) (citing *Kentucky Ass'n of Ctys. All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 (Ky. 2005)).

Under the laws of either state, the Court concludes that Carmicle's actions did not rise to the level of conversion. In particular, there is insufficient evidence to conclude that Carmicle exercised dominion over the Company's funds and furniture for his own use and enjoyment such that the Company's right to such property was denied. As the Court has previously noted, there is insufficient evidence to conclude that the disputed expenditures were made solely for Carmicle's personal benefit. The evidence instead suggests that the Company did in fact benefit to some degree from these expenditures in the form of improved employee morale and team-building and in the form of services rendered by Mrs. Carmicle. Likewise, the Court cannot conclude that Carmicle's decision to provide a set of outdoor furniture to Hurstbourne at no cost was necessarily an act of dominion to his own use and enjoyment, or adverse to the Company's rights and interests.

Accordingly, Carmicle is not liable for conversion.

## 5. Unjust Enrichment (Count V)

The Company asserts that Carmicle was unjustly enriched by using Company funds to pay for tickets to athletic events and other entertainment expenses for personal use and facilitating the continued payments to his wife at an increased rate for several years. The Court disagrees.

Once again, the Court must first determine whether the laws of Florida or Kentucky govern the Company's unjust enrichment claim. Before beginning a choice of law analysis, the Court must determine whether a true conflict of laws exists.

### a.  Florida's Choice of Law Rules for Unjust Enrichment

"An unjust enrichment claim is one in the nature of quasi-contract. Florida's choice of law as to contracts is that of *lex loci contractus*, which looks to the place the contract was executed." *David v. Am. Suzuki Motor Corp.*, 629 F. Supp. 2d 1309, 1316 (S.D. Fla. 2009) (quoting *In re NationsRent Rental Fee Litig.*, No. 06-60924-CIV, 2009 WL 636188, at *10 (S.D. Fla. Feb. 24, 2009)) (internal quotation marks omitted). "Under this rule, an implied-in-law contract is created where the last act necessary to complete the contract is made." *ThunderWave, Inc. v. Carnival Corp.*, 954 F. Supp. 1562, 1564 (S.D. Fla. 1997) (citing *Trumpet Vine Investments, N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1119 (11th Cir. 1996)).

### b.  False Conflict

With respect to the Company's claim for unjust enrichment, the Court concludes that a false conflict exists between the laws of Florida and Kentucky. The laws of these sovereigns are virtually identical with the exception of the applicable statute of limitations period.  However, because the Court finds that the Company has failed to establish unjust enrichment, the outcome is the same regardless of the applicable statute of limitations period. That is, Carmicle prevails on this claim regardless of which state's laws govern.

The elements of a claim for unjust enrichment under Florida law are as follows: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value

for it. *Merle Wood & Associates, Inc. v. Trinity Yachts, LLC*, 714 F.3d 1234, 1237 (11th Cir. 2013) (quoting *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So. 2d 383, 386 (Fla. Dist. Ct. App. 1997)). Similarly, the elements of a claim for unjust enrichment under Kentucky law are as follows: (1) a benefit conferred on the defendant at the plaintiff's expense; (2) a resulting appreciation of benefit by the defendant; and (3) inequitable retention of benefit without payment for its value. *Collins v. Kentucky Lottery Corp.*, 399 S.W.3d 449, 455 (Ky. Ct. App. 2012) (citing *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009)).

The Court concludes that Carmicle was not unjustly enriched. Rather, as the Court has previously noted, the evidence suggests that the Company did in fact benefit to some degree from the disputed expenditures in the form of improved employee morale and team-building and in the form of services rendered by Mrs. Carmicle.

Accordingly, Carmicle is not liable for unjust enrichment.

## 6. Breach of Contract and Declaratory Judgment (Count VI)

The Company seeks a declaratory judgment pursuant to 28 U.S.C. § 2201[46] that Carmicle's employment was terminated for cause as defined in the Employment Agreement and the Profits Interest Agreements. *See* Brown Jordan's DE 61. The Court concludes that Carmicle's employment was properly terminated for cause.

As an initial matter, the Court notes that the interpretation of the Employment Agreement, including its definition of termination for cause, is governed by Florida law pursuant to a choice of law clause.[47]

---

[46] Pursuant to 28 U.S.C. § 2201, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

[47] That clause reads as follows: "This Agreement shall be governed and construed in accordance with the laws of the State of Florida without regard to conflicts of laws principles thereof and all questions concerning the validity and construction hereof shall be determined in accordance with the laws of said state." **Brown Jordan's Trial Exhibit 1.**

"Under Florida's choice-of-law rules, courts should respect a choice-of-law provision within a contract, unless the chosen law contravenes Florida public policy." *MDS (Canada), Inc. v. Rad Source Techs., Inc.*, 822 F. Supp. 2d 1263, 1295 (S.D. Fla. 2011) (citing *Florida Evergreen Foliage v. E.I. Du Pont De Nemours, Co.*, 135 F. Supp. 2d 1271, 1277 (S.D. Fla. 2001)). However, because the laws of Florida and Kentucky are the same with respect to contract interpretation,[48] a false conflict exists, and no choice of law analysis is necessary. Accordingly, whether or not the termination of Carmicle's employment was for cause as that phrase is defined in the Employment Agreement must be determined in accordance with Florida law.

As defined in the Employment Agreement, "cause" means, among other things,

the Executive's gross negligence or willful misconduct in the performance of his duties as an employee of the Company that is not cured within seven (7) days following written notice by the Company to the Executive of such gross negligence or willful misconduct, or three (3) occurrences of the Executive's gross negligence or willful misconduct in any twelve-month period . . . .

**Brown Jordan's Trial Exhibit 1.** The Court concludes that this language unambiguously establishes two separate grounds for termination for cause: (1) a single occurrence of gross negligence or willful misconduct that is not cured within seven days following written notice thereof, or (2) three occurrences of gross negligence or willful misconduct in any twelve-month period, written notice of which is not required. It would be unreasonable to interpret this language as requiring written notice and an opportunity to cure *both* after a single instance of gross negligence or willful misconduct *and* after three occurrences of gross negligence or willful

---

[48] The Court has already discussed Florida law governing contract interpretation. Under Kentucky law, as under Florida law, the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence, unless there is an ambiguity in the contract. *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002) (citing *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000)). "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Id.* (citing *Transp. Ins. Co. v. Ford*, 886 S.W.2d 901, 905 (Ky. Ct. App. 1994)).

misconduct in any twelve-month period, inasmuch as such an interpretation would render the definition either redundant or absurdly under-inclusive.

During the twelve-month period preceding the termination of Carmicle's employment on February 17, 2014, Carmicle engaged in gross negligence or willful misconduct hundreds and hundreds of times by using the generic password to access and view the contents of other Company employees' email accounts. As the Court has previously concluded, Carmicle was not authorized under the Computer and Internet Policy to access and view others' email accounts in the manner in which he did. Carmicle intended to access and view the contents of other Company employees' emails accounts without authorization or to exceed authorized access in doing so. Carmicle was aware of the Computer and Internet Policy but chose not to review the Policy or speak with anyone about it prior to accessing other employees' email accounts in 2013, in stark contrast to the approach he had taken just two years earlier. Carmicle even admitted feeling like he had done something wrong when he accessed and viewed the contents of Moriarty's email account.

Having committed far more than three acts of gross negligence or willful misconduct in a twelve-month period, Carmicle was not entitled to written notice prior to termination for cause of his employment. On February 17, 2014, Carmicle's employment was properly terminated for cause as defined in the Employment Agreement and by incorporation in the Profits Interest Agreements.

## B.  Carmicle's Remaining Claims Against the Brown Jordan Parties

The Court now turns to each of the remaining claims asserted in Carmicle's Revised Amended Complaint [DE 71].

1. **Wrongful Discharge in Breach of Defendants' Fraudulent Misrepresentation to Protect Carmicle from Retaliation (Count III)**

Carmicle asserts that the Board, through its members and through its legal representative, fraudulently misrepresented to Carmicle that he would suffer no retaliation for disclosing illegal and unethical conduct by Moriarty, Tortorici, and King. *See* DE 71. The Court disagrees.

While a federal court sitting in diversity generally applies the conflict of law rules of the forum state, "[w]hen a defendant moves successfully for a transfer to a more convenient forum under 28 U.S.C. s 1404(a) . . . the transferee court must apply the same state law that the transferor court would have applied." *Acme Circus Operating Co. v. Kuperstock*, 711 F.2d 1538, 1540 (11th Cir. 1983) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964)); *see also James Ventures, L.P. ex rel. Alpert v. Timco Aviation Servs., Inc.*, 315 F. App'x 885, 888 (11th Cir. 2009) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964)); *Roofing & Sheet Metal Servs., Inc. v. La Quinta Motor Inns, Inc.*, 689 F.2d 982, 991 (11th Cir. 1982) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964)). A court in the Western District of Kentucky applies the choice of law rules of Kentucky.[49]

> Kentucky applies different choice-of-law rules depending on whether the claim involves a contract or a tort. In contract cases, Kentucky law requires the Court to determine which state has the most significant relationship to the transaction and the parties. In tort cases, Kentucky does not apply the most significant relationship test. The conflicts question [in tort cases] should not be determined on the basis of a weighing of interests . . . but simply on the basis of whether Kentucky has enough contacts to justify applying Kentucky law.

*MW Universal, Inc. v. G5 Capital Partners, LLC*, No. CIV.A. 08-495-KSF, 2012 WL 588743, at *3 (E.D. Ky. Feb. 21, 2012) (internal quotation marks and citations omitted).

---

[49] Although the Court applied Florida's choice of law rules to determine that Kentucky law applied to a subset of Carmicle's claims on summary judgment, *see* Carmicle's DE 126, the Court would have reached the same determination under Kentucky's choice of law rules.

With respect to Carmicle's claim for fraudulent misrepresentation, Kentucky unquestionably has enough contacts to justify applying Kentucky law. This claim is brought by a citizen of Kentucky regarding the termination of his employment in Kentucky. Accordingly, Kentucky law governs this claim.

### a.   Elements of Fraudulent Misrepresentation Under Kentucky Law

Under Kentucky law, the elements of a fraudulent misrepresentation claim are as follows:

> (1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff.

*Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 536 F. App'x 558, 562 (6th Cir. 2013) (quoting *Flegles, Inc. v. TruServ Corp.*, 289 S.W. 3d 544, 548–49 (Ky. 2009)). The plaintiff's reliance must be reasonable. *Id.* (quoting *Flegles*, 289 S.W. 3d at 549).

It is undisputed that certain individuals, including Teetsel, Breaux, and Pearlman, represented to Carmicle that his employment would not be terminated in retaliation for his disclosure of the information contained in his January 20, 2014 letter to the Board or his cooperation in the ensuing investigation. That representation was not false, as the termination of Carmicle's employment was not retaliatory, nor did Carmicle suffer retaliation in any other form. Rather, as a natural consequence of conducting an independent investigation into goings-on at the Company, Carmicle's repeated acts of gross negligence or willful misconduct were revealed, giving rise to termination for cause of his employment. The evidence presented at trial suggested that each of the individuals who represented to Carmicle that he would suffer no retaliation in fact meant what they said at the time they said it, and proceeded to conduct a fair and independent investigation. Accordingly, Carmicle has failed to establish that the representation

was false or that anyone making such a representation knew it was false or made it recklessly. This failure is fatal to Carmicle's claim.

### 2. Claim for Breach of Contract by Refusing to Compensate Carmicle for His Ownership Interest in BJI (Count IV)

Carmicle asserts that the Brown Jordan Parties have breached the Profits Interest Agreements by refusing to compensate Carmicle for his interest in BJI Holdings, LLC. *See* DE 71. Because Carmicle's employment was properly terminated for cause, the Court disagrees.

Under Kentucky's choice of law rules applicable to claims sounding in contract, the Court must apply the law of the state with the most significant relationship to this claim, despite the fact that the Profits Interest Agreements contain a choice of law clause in favor of Delaware law and the Employment Agreement defining termination for cause contains a choice of law clause in favor of Florida law. *See Wells Fargo Fin. Leasing, Inc. v. Griffin*, 970 F. Supp. 2d 700, 707–10 (W.D. Ky. 2013). However, the Court need not conduct a choice-of-law analysis unless there is a conflict between the different states' laws. *Wells Fargo Fin. Leasing, Inc. v. Griffin*, 970 F. Supp. 2d 700, 706 (W.D. Ky. 2013) (citing *Asher v. Unarco Material Handling, Inc.*, 737 F. Supp. 2d 662, 667 (E.D. Ky. 2010)). If no conflict exists, Kentucky law is applied. *Asher*, 737 F. Supp. 2d at 667–68.

The Court has already concluded that the laws of Florida and Kentucky are the same with respect to contract interpretation. The Court now adds that Delaware law is the same as the laws of Florida and Kentucky with respect to contract interpretation. *See, e.g.*, *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) (explaining that a contract is ambiguous only where it is susceptible to more than one reasonable interpretation and should otherwise be interpreted so as to give effect to the plain meaning of the contract's terms and provisions). Accordingly, the Court applies Kentucky law to interpret the provisions of the Employment Agreement. For the

same reasons the Court concluded that Carmicle's employment was properly terminated for cause as defined in the Employment Agreement under Florida law, the Court concludes that Carmicle's employment was properly terminated for cause as defined in the Employment Agreement under Kentucky law.

As a result, Carmicle immediately forfeited his interest in BJI Holdings, LLC pursuant to the Profits Interest Agreements at the time his employment was terminated for cause. In other words, Carmicle is not entitled to any compensation under the Profits Interest Agreements. Carmicle's claim for breach of the Profits Interest Agreements therefore fails.

### 3. Claim for Breach of Contract – Severance Pay (Count XI)

Carmicle asserts that the Brown Jordan Parties have breached the Employment Agreement by refusing to pay Carmicle the equivalent of six months' salary as severance pay. *See* DE 71. Because Carmicle's employment was properly terminated for cause, the Court disagrees.

As the Court has already concluded, Kentucky law must be applied to the interpretation of the Employment Agreement in the absence of a conflict between the laws of Florida and Kentucky. Under Kentucky law, the termination of Carmicle's employment was for cause as defined in the Employment Agreement. Accordingly, Carmicle is not entitled to severance pay under the Employment Agreement. Carmicle's claim for breach of the Employment Agreement therefore fails.

### 4. Petition for Declaration of Rights (Count VII)

Carmicle asserts that the Brown Jordan Parties intend to enforce a non-competition clause contained in the Employment Agreement. *See* DE 71. That clause was effective during Carmicle's employment and for a period of twelve months after the date of termination of his

employment. *See* **Brown Jordan's Trial Exhibit 1.** Carmicle asserts that the non-competition clause expired or was abandoned by the parties prior to the termination of his employment and is unreasonable and unenforceable as a matter of law. *See* DE 71.

In their Motion for Summary Judgment, the Brown Jordan Parties stated that "[c]ounsel for Carmicle ha[d] represented in writing that [Carmicle would] voluntarily dismiss Count VII, Petition of Declaration of Rights, as moot because the non-competition clause in question ha[d] already expired by its own terms." *See* Carmicle's DE 86 at 3 n.1. While Carmicle did not dispute that statement, and no evidence relevant to this claim was presented at trial, Count VII remains pending.

Because Carmicle's employment was terminated on February 17, 2014, and the non-competition clause remained effective only for a period of twelve months after that date, that clause expired prior to trial. In the absence of "a live controversy with respect to which the court can give meaningful relief," this claim is moot and the Court lacks subject matter jurisdiction to evaluate its merits. *Troiano v. Supervisor of Elections in Palm Beach Cty., Fla.*, 382 F.3d 1276, 1282 (11th Cir. 2004) (quoting *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1334–35 (11th Cir. 2001)). Count VII is therefore dismissed.

## VI.   CONCLUSION

For all of the foregoing reasons, it is **ORDERED and ADJUDGED** as follows:

1. The Brown Jordan Parties' Motion for Sanctions [DE 121] is **GRANTED** insofar as the Court has imposed sanctions in the form of adverse inferences drawn against Carmicle for his spoliation of evidence.

2. With respect to Count I of the Company's First Amended Complaint against Carmicle for violation of the CFAA, the Company is entitled to judgment in its favor in the

amount of **$38,622.11**.

3. With respect to Count II of the Company's First Amended Complaint against Carmicle for violation of the SCA, the Company is entitled to judgment in its favor in the amount of **$38,322.11**, plus reasonable attorney fees and costs incurred in connection with litigating its claim under the SCA. The amount of such attorney fees and costs will be determined by the Court at a later date upon an appropriate motion filed by the Company.

4. With respect to Counts III, IV, and V of the Company's First Amended Complaint against Carmicle for breach of fiduciary duty and the duty of loyalty, conversion, and unjust enrichment, the Company is not entitled to judgment in its favor and shall take nothing.

5. With respect to Count VI of the Company's First Amended Complaint against Carmicle for declaratory judgment, the Company is entitled to judgment in its favor in the form of a declaration that Carmicle's employment was properly terminated for cause as defined in the Employment Agreement and the Profits Interest Agreements.

6. With respect to Count III of Carmicle's Revised Amended Complaint for wrongful discharge in breach of the Brown Jordan Parties' fraudulent misrepresentations to protect Carmicle against retaliation, Carmicle is not entitled to judgment in his favor and shall take nothing.

7. With respect to Count IV of Carmicle's Revised Amended Complaint for breach of contract by refusing to compensate Carmicle for his ownership interest in BJI, Carmicle is not entitled to judgment in his favor and shall take nothing.

8. With respect to Count XI of Carmicle's Revised Amended Complaint for breach of

contract and severance pay, Carmicle is not entitled to judgment in his favor and shall take nothing.

**9.** Count VII of Carmicle's Revised Amended Complaint is dismissed as moot.

**10.** Final judgment will be entered in a separate order.

**11.** The Clerk of the Court is directed to **CLOSE THIS CASE**.

**DONE AND ORDERED** in Chambers, Fort Pierce, Florida, this 1st day of March, 2016.

Robin L. Rosenberg
United States District Judge

Copies furnished to all counsel of record.